**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MILDRED KINARD )
141 58th Street, S.E. )
Washington, DC  20019, )
)
    and )
)
EARLENE WHEELER )
220 58th Street N.E. )
Washington, DC  20019, )
)
    and )
)
VICKY BORDEAUX )
143 58th Street, S.E. )
Washington, DC  20019, )
)
    and )
)
DONALD ROBINSON )
22 57th Place, S.E., Unit B )
Washington, DC  20019, )
)
Individually, and on behalf of )
All others similarly situated, )
)
               Plaintiffs, )
)
    v. )      Civil Action No. __ - _____
)      (Judge _____)
EAST CAPITOL FAMILY RENTAL, L.P. )
1040 Park Avenue, Suite 300 )
Baltimore, MD  21201 )
)
    and )
)
A&R MANAGEMENT, INC. )
1040 Park Avenue, Suite 300 )
Baltimore, MD  21201 )
)
    and )
)
KETTLER MANAGEMENT, INC. )
1751 Pinnacle Drive, Suite 700 )
McLean, VA  22102 )

1

Defendants.    )

_____ )

## **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES (CLASS ACTION LAWSUIT)**

Plaintiffs Mildred Kinard, Earlene Wheeler, Vicky Bordeaux, and Donald Robinson ("the Named Plaintiffs"), for themselves individually and on behalf of a class of additional unnamed plaintiffs similarly situated (collectively, "the Plaintiffs"), by their attorneys, for their Complaint against Defendants East Capitol Family Rental L.P., Kettler Management, Inc., and A&R Management, Inc. ("the Defendants"), seeking declaratory and injunctive relief and damages, hereby allege on the basis of their personal knowledge, information, and belief as follows:

## **NATURE OF THIS ACTION**

1.      This is an action for declaratory and injunctive relief and damages brought by and on behalf of tenants of the Capitol Gateway housing development, a public housing property that provides housing to low-income District of Columbia residents.  Under the United States Housing Act, shelter costs for tenants residing in federally subsidized public housing projects like Capitol Gateway must not exceed 30 percent of tenant income.  42 U.S.C. §1437a(1).  Those shelter costs include the costs of utility service, and where tenants in public housing are directly responsible for utilities, the owner must provide tenants with a utility allowance that approximates a reasonable consumption of utilities for an energy-conservative household of modest circumstances.  24 C.F.R. § 965.501 *et seq.*  These regulations also require notice and the opportunity to comment on changes to tenant utility allowance amounts, to ensure that changes to the allowance do not result in requiring tenants to overpay for their shelter costs.

2.      Twice since December 2013, the Defendants have reduced the utility allowances provided to Capitol Gateway residents without providing proper, advance notice or an opportunity to comment, as required by federal law.  During this same period and for several

years prior, the Defendants failed to increase the utility allowances following utility rate changes of 10 percent or more, as required by federal law.  Moreover, the current utility allowances, specifically with respect to the amount allocated for electricity usage, are so low that they do not approximate the reasonable consumption costs of even an energy-conservative household, as required by federal law.  As a result of the Defendants' unlawful conduct, since October 2012 and before, tenants of the 61 public housing units at Capitol Gateway have been overcharged rent and/or received undersized utility assistance payments.  The tenants now seek to recover for these overcharges and underpayments, and to obtain an order that the Defendants comply with federal law in establishing adequate allowances going forward.

## JURISDICTION AND VENUE

3.      Jurisdiction of this action is vested in this Court pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because the Defendants reside and/or transact business in this jurisdiction and all or a substantial part of the events, acts and/or omissions giving rise to the Plaintiffs' claims occurred in this judicial district.

## PARTIES

**A.      Named Plaintiffs**

5.      Plaintiff Mildred Kinard currently resides at 141 58th Street, S.E., in Washington, D.C. 20019.  Ms. Kinard has rented her home in the Capitol Gateway development since 2008.  Ms. Kinard's three-bedroom townhouse is one of the 61 public housing units at Capitol Gateway, subject to a subsidy for rent and utilities from the D.C. Housing Authority ("DCHA") and the U.S. Department of Housing and Urban Development ("HUD").

6.      Plaintiff Earlene Wheeler currently resides at 220 58th Street, N.E. in Washington, D.C. 20019.  Ms. Wheeler has rented her home in the Capitol Gateway development since 2007.  Ms. Wheeler's three-bedroom townhouse is one of the 61 public housing units at Capitol Gateway, subject to a subsidy for rent and utilities from DCHA and HUD.

7.      Plaintiff Vicky Bordeaux currently resides at 143 58th Street, S.E., in Washington, D.C. 20019.  Ms. Bordeaux has rented her home in the Capitol Gateway development since 2007.  Ms. Bordeaux's three-bedroom townhouse is one of the 61 public housing units at Capitol Gateway, subject to a subsidy for rent and utilities from DCHA and HUD.

8.      Plaintiff Donald Robinson currently resides at 22 57th Place, S.E., Unit B, in Washington, D.C. 20019.  Mr. Robinson has rented his apartment in the Capitol Gateway development since approximately 2007.  Mr. Robinson's two-bedroom apartment, part of a four-unit building, is one of the 61 public housing units at Capitol Gateway, subject to a subsidy for rent and utilities from DCHA and HUD.

**B.      Defendants**

9.      Defendant East Capitol Family Rental Limited Partnership ("ECFRLP") is a limited partnership organized and operating under the laws of the District of Columbia.  East Capitol Family Rental LP is the record owner of the rental units comprising the Capitol Gateway Development, including those rented by the Named Plaintiffs.

10.      Defendant A&R Management, Inc. ("A&R") is a corporation organized and operating under the laws of Maryland.  From the beginning of Plaintiffs' tenancies until 2014, pursuant to a contract with ECFRLP, A&R served as the Managing Agent at Capitol Gateway.  A&R's duties as managing agent included, among other things, signing leases and lease

4

amendments with tenants; performing tenant certifications and recertifications; and establishing rent, utility allowance, and utility reimbursement amounts.

11.     Defendant Kettler Management, Inc. ("Kettler") is a corporation organized and operating under the laws of Virginia.  From mid-2014 until the present, Kettler has been the Managing Agent at Capitol Gateway.  Kettler's duties as managing agent include, among other things, signing leases and lease amendments with tenants; performing tenant certifications and recertifications; and establishing rent, utility allowance, and utility reimbursement amounts.

## STATUTORY AND REGULATORY BACKGROUND

### A.     Public Housing Generally

12.     The United States Housing Act of 1937 established the public housing program to "promote the goal of providing decent and affordable housing for all citizens" by supplying funding to states and local jurisdictions to remedy "the acute shortage of decent and safe dwellings for low-income families."  42 U.S.C. § 1437(a); *see also* 24 C.F.R. parts 965, 966 (implementing regulations).  Conventional public housing is owned and operated by local public housing agencies ("PHAs") and rented to low-income families, who pay approximately thirty percent (30%) of their income toward the monthly rent and utility costs.  *Id*. § 1437a(a).    HUD supplements this rental stream from low-income tenants with operating subsidies under an Annual Contributions Contract (ACC) between HUD and the local PHA, as well as capital grants.  The statutory provision limiting rent and utility costs to a percentage of the tenant's income – a rule that became part of the Housing Act beginning in 1969 – is commonly known as the "Brooke Amendment."

13.     In the 1990s, faced with a stock of severely distressed public housing properties, Congress enacted the Urban Revitalization Demonstration Program, which eventually came to be known as HOPE VI.  The purpose of HOPE VI was to provide federal funding for the

demolition, renovation, and revitalization of public housing properties and neighborhoods and to promote economically mixed housing.  Central to the HOPE VI program was the creation of Mixed-Finance Public Housing, a tool that allows HUD and PHAs to combine public, private, and nonprofit funding sources to develop and operate housing.

14.     In mixed-finance projects, the PHA may support some or all of the units with capital or operating subsidy, typically through funds from the PHA's Annual Contributions Contract (ACC).   Under the mixed-finance statute and regulations, any such PHA-funded unit is subject to all of the rules, regulations, and protections applicable to conventional public housing. 42 U.S.C. § 1437z-7; 24 C.F.R. part 905.  Importantly, "each mixed-finance project must be structured to . . . [e]nsure the continued operation of the public housing units in accordance with all Public Housing Requirements . . . ." *Id.* § 905.604(c)(1).  Where a mixed-finance public housing property is privately owned and managed, the owner assumes responsibility for complying with all public housing regulations.

**B.      Payment of Utilities in Public Housing**

15.     The Brooke Amendment to the United States Housing Act generally limits the rent that a public housing tenant may pay to 30 percent of adjusted income.  42 U.S.C. § 1437a(a)(1).  Subtracted from this amount is a utility allowance, in essence a credit for tenants who pay for utilities.  The utility allowance must be calculated to approximate "the monthly cost of a reasonable consumption of [any tenant-paid] utilities and other services for the unit by an energy-conservative household of modest circumstances consistent with the requirements of a safe, sanitary, and healthful living environment."  24 C.F.R. § 5.603.

16.     Once the utility allowance is subtracted, any remaining amount – referred to as the tenant rent – is actually paid to the landlord as rent each month.  24 C.F.R. § 960.253.  If the utility allowance is greater than the total tenant payment, then the family pays no rent and

receives the remaining amount of the utility allowance as a monthly utility reimbursement check.

*Id.*

17.     HUD published final regulations in 1984 governing utility allowances in the

public housing program, nearly identical in substance to the regulations today.  U.S. Dep't of

Hous. & Urban Dev., *PHA-Owned or Leased Projects; Maintenance and Operation; Tenant*

*Allowances for Utilities* 49 Fed. Reg. 31,399 (Aug. 27, 1984).  Those regulations provide various

requirements for the calculation of utility allowances, documentation of these calculations,

revisions to the allowances over time, and rights for tenant notice and comment.  *See generally*

24 C.F.R. §§ 965.501-507.

18.     The owner must ensure that all residents receive notice of any revision to utility

allowances at the property at least 60 days before the proposed effective date of the revision.  24

C.F.R. § 965.502(c).  The notice must:

a)  describe with reasonable particularity the basis for determination of the
    revised allowances, including a statement of the specific items of equipment
    and function whose utility consumption requirements were included, *id.*;

b)  notify residents of the place where the owner's records documenting the basis
    for the revisions are available for inspection, *id.*;

c)  provide all residents an opportunity of at least 30 days before the proposed
    effective date to submit written comments on the proposed revisions, *id.*; and

d)  notify residents of the availability and procedures for requesting individual
    relief based on factors such as the special needs of elderly or ill residents or
    those with disabilities, or special factors affecting usage not within the control
    of the resident.  24 C.F.R. § 965.508.

19.     HUD has issued extensive guidance on how owners may calculate utility

allowances, based on either actual consumption data or engineering methodologies that calculate

reasonable consumptions based on a variety of factors.  *See* U.S. Dep't of Hous. & Urban Dev.,

*Utility Allowance Guidebook* (Sept. 1998).  While owners are granted discretion in the choice of

a particular methodology, the chosen methodology <u>must</u> consider nine specific factors, including "the size of the dwelling units and the number of occupants per dwelling unit," and "the physical condition, including insulation and weatherization, of the housing project." *Id*. § 965.505(d).[1]

20.     The owner must review its utility allowances at least annually and make revisions reasonably required to continue to adhere to the above standards. *Id*. § 965.507(a).  More specifically, the owner must revise its utility allowances if there has been a change in rates of 10 percent or more since the last revision. *Id*. § 965.507(b).  Such rate changes are the only type of utility allowance change that is exempt from the detailed notice requirements above. *See id*.

21.     The owner's determinations of allowances and revisions are considered final and valid "unless found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id*. § 965.502(e).

### C.     The Low-Income Housing Tax Credit Program

22.     The Low-Income Housing Tax Credit ("LIHTC") Program provides federal tax credits to owners of housing projects with rent-restricted units that meet certain guidelines. *See generally* 26 U.S.C. § 42.  The distribution of federal tax credits and the administration of the program is managed in each jurisdiction by a state or local housing credit agency.  In the District of Columbia, that agency is the D.C. Housing Finance Agency (DCHFA).

---

[1] (d) In establishing allowances, the PHA shall take into account relevant factors affecting consumption requirements, including: (1) The equipment and functions intended to be covered by the allowance for which the utility will be used. For instance, natural gas may be used for cooking, heating domestic water, or space heating, or any combination of the three; (2) The climatic location of the housing projects; (3) The size of the dwelling units and the number of occupants per dwelling unit; (4) Type of construction and design of the housing project; (5) The energy efficiency of PHA-supplied appliances and equipment; (6) The utility consumption requirements of appliances and equipment whose reasonable consumption is intended to be covered by the total resident payment; (7) The physical condition, including insulation and weatherization, of the housing project; (8) Temperature levels intended to be maintained in the unit during the day and at night, and in cold and warm weather; and (9) Temperature of domestic hot water.

23.     A property qualifies for low-income housing tax credits if 20 percent of its units

are rent-restricted and occupied by residents at 50 percent of area median income or below, or 40

percent of its units are rent-restricted and occupied by residents at 60 percent of area median

income or below.  26 U.S.C. § 42(g)(1).  "Rent-restricted" units are those in which the gross rent

equals 30 percent or less of an applicable income level selected by the state agency that

administers the program.  *Id.* § 42(g)(2)(A).  To qualify, gross rent also must include "any utility

allowance determined by the Secretary after taking into account such determinations under

section 8 of the United States Housing Act of 1937."  *Id.* § 42(g)(2)(B).

24.     Regulations issued by the Internal Revenue Service in fact require a utility

allowance to be included in the gross rent calculation and give LIHTC owners multiple options

for establishing the applicable utility allowance:

a)  Use the local public housing agency's utility allowance, 26 C.F.R. § 1.42-
    10(b)(4)(i);

b)  Use an official estimate from a local utility company for a unit of similar size
    and construction for the geographic area, *id*. § 1.42-10(b)(4)(ii)(B);

c)  Use an official estimate from the state/local tax credit agency for a unit of
    similar size and construction for the geographic area, *id*. § 1.42-
    10(b)(4)(ii)(C);

d)  Use an estimate produced by the "HUD Utility Schedule Model" that can be
    found on the LIHTC page at http://www.huduser.org/datasets/lihtc.html, *id*. §
    1.42-10(b)(4)(ii)(D);

e)  Use an energy consumption analysis performed by a properly licensed
    engineer or another qualified professional approved by the state/local tax
    credit agency based on data from the previous 12 months, *id*. § 1.42-
    10(b)(4)(ii)(C).

25.     Like the public housing regulations, the LIHTC regulations also require prior

notice to tenants and the state/local housing credit agency prior to any change in the applicable

utility allowances for a LIHTC property, including the underlying documentation for the new

estimate. *Id.* § 1.42-10(c)(1). The agency may request additional information from the property owner. *Id.* Changes may go into effect 90 days later. *Id.*

26.     Also like the public housing regulations, the LIHTC regulations require owners to conduct an annual review of utility allowances and to consider "any changes to the building" and "changes in utility rates." *Id.* § 1.42-10(c)(2).

## FACTUAL BACKGROUND

### A.     The Capitol Gateway Development

27.     The Capitol Gateway project grew out of a $30.8 million HOPE VI grant awarded in 2000 to DCHA to redevelop three dilapidated public housing properties in Washington, D.C. The redevelopment consisted of three phases: a 151-unit mid-rise senior building; 142 homeownership units; and 86 family rental units, of which 61 are designated "public housing units," operated as public housing with DCHA public housing ACC funds.

28.     The 86 rental units are known as Capitol Gateway Family Rental, owned by ECFRLP. Those rental units consist of three-bedroom townhomes and one- or two-bedroom apartments in four-unit buildings. In 2005, DCHA – which owned the property on which the 86 units sit – entered into a long-term ground lease for the land with ECFRLP, which then constructed the housing units. ECFRLP funded the development with a combination of government loans and the syndication to investors of low-income housing tax credits pursuant to Section 42 of the Internal Revenue Code.

29.     In May 2005, ECFRLP entered a "Regulatory and Operating Agreement" ("R&O Agreement") with DCHA concerning the property. Pursuant to the R&O Agreement, 61 of the units at property "shall be set aside as 'public housing' as defined in Section 3(b) of the United States Housing Act of 1937 . . . and shall be eligible to receive the benefit of operating assistance

provided to the Authority by HUD."  The agreement refers to these rental units as the "PHA-Assisted Units," and obligates DCHA to provide ongoing operating subsidy for the purpose of maintaining them as public housing units.

30.     The R&O Agreement defines a "PHA-Assisted Unit" as one "maintained as a 'public housing' unit in accordance with Public Housing Requirements," which include the 1937 Act, its implementing regulations, and other HUD and local law sources.

31.     Contemporaneous with the R&O Agreement, in May 2005, ECFRLP entered into an agreement with A&R, Inc., for the day-to-day management of the Capitol Gateway property. This agreement, designated the "Management Plan," sets forth A&R's duties with respect to operation of the 86 units, including the 61 PHA-Assisted Units.  Among other things, the Management Plan charges A&R with complying with all public housing and LIHTC requirements with respect to leasing, recertification, and tenant rent.

32.     Also in May 2005, ECFRLP entered into an "Indenture of Restrictive Covenants for Low-Income Housing Tax Credits," covering the 86 units at Capitol Gateway Family Rental, with the District of Columbia Department of Housing and Community Development.  The covenants bind ECFRLP for the 15 years it is entitled to receive tax credits under the LIHTC program.  Among other things, the covenants require ECFRLP to operate the 86 units as "Low-Income Units," defined as those meeting the rent restrictions set forth in Section 42 of the Internal Revenue Code relating to the LIHTC program.

33.     Sometime in 2014, Kettler replaced A&R as the managing agent for Capitol Gateway.  Upon information and belief, Kettler's duties are substantially the same as those of A&R as described in the Management Plan, including the obligation to comply with all public housing and LIHTC requirements with respect to leasing, rent, and recertification.

B.      **Tenants' Leases at Capitol Gateway**

34.     The Named Plaintiffs have each signed several different form leases with

Defendant A&R governing their tenancies at the property.  Upon information and belief, A&R

used these same form leases for all of its tenants at the property.  The Defendants appear to have

used three different form leases during their years as the owner and manager at the property, a

2008 version, a 2012 version, and a 2015 version.

35.     All three versions of the form lease acknowledge the applicability of governing

HUD regulations.  In the 2008 version, the landlord promises to comply with all HUD

regulations:

> LANDLORD'S OBLIGATIONS.  Landlord agrees to comply with the requirements of
> all applicable building codes and housing that materially affect health and safety, and
> HUD and DCHA regulations.  2008 Lease (Mildred Kinard) ¶9(b)(2).

 Similarly, the 2012 and 2015 versions acknowledge the applicability of HUD regulations:

> This lease and your occupancy of the premises are governed by the Regulations of the
> District of Columbia Tax Credit Allocation Committee (TCAC), the U.S. Department of
> Housing and Urban Development (HUD), and the District of Columbia Housing
> Authority.  2012 Lease (Mildred Kinard) ¶2; 2015 Lease (Mildred Kinard) ¶ 2.

36.     In all three versions of the form lease, the landlord promises to provide a utility

allowance as a reduction in the tenant's rent for all subsidized units.  2008 Lease (Mildred

Kinard) ¶6(c); 2012 Lease (Mildred Kinard) ¶4; 2015 Lease (Mildred Kinard) ¶ 4.

37.     In addition, in all three versions of the lease, the landlord promises to comply with

HUD regulations in making any change to the tenant's income-based rent.  2008 Lease (Mildred

Kinard) Addendum A; 2012 Lease (Mildred Kinard) ¶4; 2015 Lease (Mildred Kinard) ¶4.

38.     The R&O Agreement between DCHA and ECFRLP that governs the Capitol

Gateway public housing units requires the owner to get approval from DCHA of the form lease

and of any changes made to it.  R&O Agmt. ¶3.7.  The 2008 version of the lease was approved

by DCHA and is referenced in the R&O Agreement.  Defendants neither presented to DCHA nor gained its approval of the 2012 and 2015 versions of the lease.

39.     Applicable public housing regulations also require the landlord to provide notice to the tenants and a 30-day period before making any changes to the form lease.  24 C.F.R.   § 966.3.   The Defendants neither presented any notice of proposed changes to residents, nor provided an opportunity for the submission of any comments, before implementing changes in the 2012 and 2015 versions of the lease.

40.     The requirements for DCHA approval of any changes to the 2008 form lease, as well as notice to the tenants and a comment period, also are reflected in the 2008 lease itself. 2008 Lease (Mildred Kinard) ¶ 19.

**C.      Provision of and Changes in Tenants' Utility Allowances**

41.     The owner requires Capitol Gateway tenants in the townhomes to pay the bills for all utilities, which includes electric, water, and sewer charges.  Tenants in the apartment units are responsible for the payment of electricity only.

42.     When tenants began leasing units at Capitol Gateway, A&R/ECFRLP established their utility allowances in accordance with the allowances then in effect for similar units in the DCHA Housing Choice Voucher Program ("HCVP"), a separate subsidy program administered entirely by DCHA.  At that time, the monthly allowances for a townhome unit, with the same three-bedroom configuration as the townhome units at Capitol Gateway using the same utilities for which the Capitol Gateway tenants were responsible, were $397 for an interior unit and $429 for an exterior unit.

43.     During that same period, DCHA altered its HCVP utility allowances several times.  In January 2012, the HCVP utility allowances increased to $412 for an interior three-

bedroom townhome and $440 for an exterior three-bedroom townhome.  In April 2013 they

dropped slightly to $404 for an interior three-bedroom townhome and $432 for an exterior three-

bedroom town home. In April 2014, the HCVP utility allowances increased again to $416 for an

interior three-bedroom townhome and $445 for an exterior three-bedroom townhome.

44.     During this same time period, between 2008 and 2014, DCHA implemented

similar changes in the utility allowances applicable to one- and two-bedroom walk-up apartment

units like those at Capitol Gateway.

45.     Sometime in 2014, after DCHA simplified its method for calculating utility

allowances, it implemented a single allowance of $401 for three-bedroom townhome units that,

like those at Capitol Gateway, have electric heat and pay water bills.  For one- and two-bedroom

walk-up apartment units that, like those at Capitol Gateway, have electric heat and pay for

electric but not water bills, the simplified utility allowance is $196 for one-bedroom units and

$246 for a two-bedroom unit.  DCHA implemented the above changes in its HCVP utility

allowance schedules to reflect both increases and decreases in prevailing market rates for the

utilities covered by the schedules.

46.     Upon information and belief, the utility allowances at Capitol Gateway remained

constant until 2013.  While the HCVP utility allowances increased in 2012 and dropped slightly

in 2013, ECFRPL/A&R did not make any changes to the utility allowances provided to tenants at

the property.

47.     On or around October 29, 2013, Capitol Gateway sent some or all of the tenants a

notice indicating that their utility allowances were being reduced as of December 1, 2013, with

the change to take effect at the tenant's next interim or annual recertification.  The new

allowance for a three-bedroom townhome unit, exterior or interior, was set at $282, a reduction

of $115 or $147 depending on the location of the unit. Of the $282 figure, $135 is allocated for electricity usage and $133 for water. Upon information and belief, the one- and two-bedroom apartment units at Capitol Gateway received nearly-identical notices of a decrease in their applicable utility allowances of a similar magnitude.

48.     The notice to tenants regarding the new utility allowance figures did not describe the basis for the reduction. It did not include any information about reviewing the landlord's documents related to the change or offer any opportunity to submit comments regarding the change. Nor did it inform residents that they could request individual relief from the reduction based on their age, disability, or other special circumstances causing increased utility consumption.

49.     The new utility allowance figures no longer conform to the HCVP utility allowance schedules previously used at Capitol Gateway. Upon information and belief, the new utility allowance figures are based on an engineering methodology contracted by the Defendants.

50.     Upon information and belief, neither ECFRLP nor A&R submitted anything regarding the 2013 change in utility allowances to DCHFA, the agency administering the tax credits for Capitol Gateway. Nor, upon information and belief, did they receive prior approval for the change, or the notice to tenants thereof, from DCHA.

51.     In early 2015, tenants at Capitol Gateway experienced another reduction in their utility allowances. For three-bedroom townhome units, the new utility allowance is $246, a reduction of $36 from the amount previously in effect. Upon information and belief, the one- and two-bedroom apartment units at Capitol Gateway received nearly-identical notices of a decrease in their applicable utility allowances of a similar magnitude.

52.     Upon information and belief, neither Kettler nor ECFRLP ever provided any advance written notice to the majority of tenants regarding the 2015 reduction in their utility allowances.  Some tenants received notice several months after the reductions had been implemented.  Other tenants never received any notice of the reductions.  Some tenants received notice immediately before the change went into effect.

53.     For those tenants to whom it was provided, the notice with regard to the 2015 reduction did not describe to tenants the basis for the reduction; offer information about reviewing the landlord's documents related to the change; offer any opportunity to submit comments regarding the change; or inform residents that they could request individual relief from the reduction based on their age, disability, or other special circumstances.

54.     Upon information and belief, neither ECFRLP nor Kettler submitted anything regarding the 2015 change in utility allowances to DCHFA, nor did they receive prior approval for the change, or the notice to tenants thereof, from DCHA.

**D.     Comparison of Electric Allowances to Actual Consumption**

55.     Of the $282 allowance that took effect for the three-bedroom townhomes on December 1, 2013, $149 is allocated to electricity usage, including heat, and the remainder, $133, to water and sewer.

56.     The 2008 HCVP utility allowances that Capitol Gateway had relied on up to that point had provided significantly higher amounts for electricity - $322 for interior three-bedroom townhomes and $353 for exterior three-bedroom townhomes.

57.     Plaintiffs, through counsel, have undertaken a pre-suit factual investigation into the actual amounts charged to a sample of tenants at the property for electricity, in order to compare these amounts to the reduced utility allowances provided to those same tenants

following the 2013 reduction.  Each of the sampled tenants live in three-bedroom townhomes

with households of varying sizes and would be members of the proposed class.  Plaintiffs have

collected data about the electric bills for six tenants for a period of three years, October 2011

through September 2014.

58.     Electric bills for the sampled tenants averaged $199 for October 2013 through

September 2014, the period when the lower utility allowances went into effect, or 34 percent

more than the new utility allowance provided.

59.     Upon information and belief, the reduced utility allowances for electric charges

adopted by Capitol Gateway beginning in December 2013 and in early 2015 are inadequate for

the average tenant in an energy-conservative household of modest circumstances to pay for a

reasonable amount of electric consumption.

### D.     The Named Plaintiffs' tenancies and utility allowances

Mildred Kinard

60.     Plaintiff Mildred Kinard moved into a three-bedroom interior unit townhome at

Capitol Gateway in 2007.

61.     Prior to October 2013, Ms. Kinard's utility allowance was set at $397.  Between

2007 and 2013, Ms. Kinard's rent fluctuated between zero and $403, with a utility

reimbursement fluctuating accordingly between zero and $206.

62.     On or around October 29, 2013, Ms. Kinard received a letter from Capitol

Gateway, indicating that her utility allowance would reduce to $282 at her next annual

recertification.

63.     Effective May 1, 2014, A&R performed an annual recertification for Ms. Kinard. At that recertification, it applied the new utility allowance of $282, resulting in a rent amount of $110.

64.     On November 6, 2014, Ms. Kinard entered into a settlement agreement in a landlord-tenant dispute with Capitol Gateway.  As part of that settlement agreement, and subsequent enforcement proceedings, Capitol Gateway restored her utility allowance to $397 through April 30, 2015, and paid her retroactively to cover the $115 difference for each month between May 2014 and April 2015.

65.     Effective May 1, 2015, Kettler performed another annual recertification for Ms. Kinard.  At that recertification, it applied a reduced utility allowance of $246, resulting in a rent of zero and a monthly utility reimbursement of $36.

66.     Ms. Kinard received no advance written notice of any kind regarding the 2015 reduction in the utility allowance to $246.

Earlene Wheeler

67.     Plaintiff Earlene Wheeler moved into a three-bedroom townhome at Capitol Gateway in 2007.

68.     Prior to October 2013, Ms. Wheeler's utility allowance was set at $429.  Between 2007 and 2013, Ms. Wheeler's rent fluctuated between zero and $250, with a utility reimbursement fluctuating between zero and $362.

69.     Upon information and belief, effective February 1, 2014, A&R performed an annual recertification for Ms. Wheeler.  At that recertification, it applied a new, lower utility allowance of $282 per month, resulting in Ms. Wheeler's utility reimbursement check decreasing from $175 to $2 per month, with her rent obligation remaining at zero.

18

70.     Effective on or around March 1, 2015, Kettler applied to Ms. Wheeler a reduced utility allowance of $246, reducing her monthly utility reimbursement from $2 to zero, and adding a new rent obligation of $34 per month.

71.     Ms. Wheeler did not receive notice of the 2015 reduction in the utility allowance until May 2015, two months after the change had been implemented.

Vicky Bordeaux

72.     Plaintiff Vicky Bordeaux moved into a three-bedroom interior unit townhome at Capitol Gateway in 2007.

73.     Prior to October 2013, Ms. Bordeaux's utility allowance was set at $397. Between 2007 and 2013, Ms. Bordeaux's rent fluctuated between zero and $612, with a utility reimbursement fluctuating accordingly between zero and $397.

74.     Upon information and belief, effective June 1, 2014, A&R performed an annual recertification for Ms. Bordeaux.  At that recertification, it applied the new utility allowance of $282, resulting in a rent amount of zero and a utility reimbursement of $282.

75.     Effective on or around March 1, 2015, Kettler applied to Ms. Bordeaux a reduced utility allowance of $246, resulting in a rent of zero and a monthly utility reimbursement of $246.

76.     Ms. Bordeaux received no advance written notice of any kind regarding the 2015 reduction in the utility allowance to $246.

Donald Robinson

77.     Plaintiff Donald Robinson moved into a two-bedroom apartment unit in a four-unit building at Capitol Gateway in 2007.

78.     Upon information and belief, prior to October 2013, Mr. Robinson's utility allowance was set at $233.  Between 2007 and 2013, Mr. Robinson's rent fluctuated between zero and $224, with a utility reimbursement fluctuating between zero and $35.

79.     Upon information and belief, at some point during 2015, Kettler applied a new, lower utility allowance to Mr. Robinson's unit, resulting in his monthly rent obligation increasing from $6 to $149.

## CLASS ACTION ALLEGATIONS

80.     The Named Plaintiffs bring this action for themselves individually and on behalf of all others similarly situated.

81.     The Named Plaintiffs seek to represent a class consisting of all tenants who are, have been, or will in the future be residents at Capitol Gateway Family Rental and whose units receive public housing subsidies and are rent-restricted under the Low-Income Housing Tax Credit program.

82.     The Named Plaintiffs seek certification pursuant to Rule 23(b)(2), Fed. R. Civ. P., to represent a class of persons requesting declaratory and injunctive relief to terminate the pattern of unlawful conduct in which the Defendants are engaged in by reducing utility allowances without proper notice, failing to increase the same utility allowances following substantial rate increases, and failing to provide properly-calculated utility allowances, all in violation of the United States Housing Act of 1937, the Low-Income Housing Tax Credit program, and the applicable leases between the Named Plaintiffs and the Defendants.  The Named Plaintiffs also seek certification pursuant to Rule 23(b)(3), Fed. R. Civ. P., to represent a class of persons requesting the recovery of damages to the extent they have been the subject of the Defendants' unlawful conduct.

83.     Although the precise size of the class for which certification is sought is currently

unknown, the total number of putative class members, upon information and belief, is at least 61

tenants and likely numbers more.  Accordingly, the proposed class is so numerous that the

joinder of all individual class members is impracticable.

84.     All of the tenants composing the proposed class – those whose units receive

public housing subsidies and are rent-restricted under the Low-Income Housing Tax Credit

Program – are equally subject to the actual or potential adverse consequences of the ongoing,

common course of conduct engaged in by the Defendants.  As a result, this action presents

questions of fact and/or law that are common to the class as a whole.  Those common questions

include, but are not necessarily limited to: (i) whether the Defendants failed to provide proper

notice of reductions in utility allowances for public housing/LIHTC tenants at the property; (ii)

whether the Defendants failed to increase utility allowances for public housing/LIHTC tenants at

the property, despite substantial increases in prevailing utility rates; (iii) whether the Defendants

failed properly to calculate the utility allowances for public housing/LIHTC tenants at the

property; and (iv) whether the Defendants' acts and/or omissions violate applicable provisions of

the United States Housing Act of 1937, the Low-Income Housing Tax Credit statute and

regulations, and form leases between the parties.

85.     The Named Plaintiffs' causes of action and claims for relief against the

Defendants are typical of the causes of action and claims for relief of the proposed class as a

whole.  The conduct on the part of the Defendants to which the Named Plaintiffs and the

members of the proposed class have been subjected and the relief that the Named Plaintiffs and

affected members of the proposed class seek as a result are essentially the same.  The Named

Plaintiffs know of no disputes or conflicts of interest among themselves or between any of them

and any member of the proposed class, and the Named Plaintiffs will fairly and adequately represent and protect the interests of all members of the proposed class as a whole.

86.     The Named Plaintiffs are represented by competent legal counsel with substantial experience in complex civil litigation matters, including class actions, cases involving federally-subsidized housing, and landlord/tenant disputes.

87.     The Defendants have acted, or failed and/or refused to act, on grounds that apply generally to all members of the proposed class, such that final declaratory and injunctive relief is appropriate with respect to the proposed class as a whole.

88.     Questions of law and fact common to the proposed class as a whole predominate over any questions affecting only individual members of the proposed class, and a class action is therefore superior to other available methods of fairly and efficiently adjudicating this controversy because, among other things, class action treatment will allow a large number of similarly-situated persons to pursue their claims simultaneously and efficiently, without the unnecessary duplication of time, effort, expense and presentation of evidence that numerous substantially similar individual actions would involve.  In addition, the class action mechanism provides the only method by which indigent or low-income persons with comparatively small individual claims can, as a practical matter, seek redress for the wrongful acts to which they have been subjected by the Defendants as alleged herein.  The benefits of class action treatment of this case substantially outweigh the difficulties, if any, arising from management of this case as a class action.

## FIRST CAUSE OF ACTION
### (42 U.S.C. § 1983: Violation of the United States Housing Act of 1937)

89.     The Named Plaintiffs reallege and incorporate by reference, as though fully restated herein, the allegations set forth in paragraphs 1 through 88 above.

22

90.     Defendants have been delegated the previously exclusively state function of operating public housing for the benefit of low-income District residents, in accordance with public housing rules and regulations.  Defendants' actions are subject to pervasive regulation by HUD and DCHA and monitoring to ensure compliance with such rules and regulations.

91.     The Defendants, acting under color of state law, have reduced the utility allowances at Capitol Gateway in two separate instances, once beginning in or around December 2013 and a second time in or around early 2015.

92.     On both occasions, the Defendants provided either no notice to the tenants at all, or notices that failed to describe the basis for the revised figures, to notify tenants of where the landlord's supporting records could be inspected, to provide all tenants an opportunity to submit written comments, or to notify tenants of the availability and procedures for requesting individual relief based on special factors.  As a result, the notices failed to comply with the Brooke Amendment to the United States Housing Act of 1937, 42 U.S.C. § 1437a(a)(1), and its implementing regulations at 24 C.F.R. §§ 965.502 and 965.508.

93.     On at least two occasions between 2012 and the present, DCHA increased its HCVP utility allowance schedules for units comparable to those at Capitol Gateway, reflecting substantial increases in prevailing market rates for the utilities covered by the allowance schedules.  During this same period, Defendants, acting under color of state law, failed to increase the utility allowances tenants at Capitol Gateway received, as required by the Brooke Amendment to the United States Housing Act of 1937, 42 U.S.C. § 1437a(a)(1), and its implementing regulations at 24 C.F.R. § 965.507.

94.     Upon information and belief, the reduced utility allowances for electric charges adopted by Capitol Gateway beginning in December 2013 and in early 2015 are inadequate for

the average tenant in an energy-conservative household of modest circumstances to pay for a reasonable amount of electric consumption, as required by the Brooke Amendment to the United States Housing Act of 1937, 42 U.S.C. § 1437a(a)(1), and its implementing regulations at 24 C.F.R. § 965.507. By failing to provide adequate allowances that meet this standard, the methodology used to calculate these allowances is arbitrary, capricious, an abuse of discretion, or otherwise not in conformance with the law.

95.     Plaintiffs are entitled under 42 U.S.C. § 1983 to enjoin Defendants' unlawful conduct and seek actual damages for Defendants' deprivation of their rights under the United States Housing Act of 1937, 42 U.S.C. §1437 *et. seq*. under color of state law.

96.     As a result of Defendants' unlawful conduct, tenants in units receiving public housing subsidies were charged higher rents by Defendants, or received lower utility reimbursement checks from Defendants, than they were entitled to pay or receive under federal law.

## SECOND CAUSE OF ACTION
### (Violation of the United States Housing Act of 1937, 42 U.S.C. § 1437a)

97.     The Named Plaintiffs reallege and incorporate by reference, as though fully restated herein, the allegations set forth in paragraphs 1 through 88 above.

98.     The Defendants have reduced the utility allowances at Capitol Gateway in two separate instances, once beginning in or around December 2013 and a second time in or around early 2015.

99.     On both occasions, the Defendants provided either no notice to the tenants at all, or notices that failed to describe the basis for the revised figures, to notify tenants of where the landlord's supporting records could be inspected, to provide all tenants an opportunity to submit written comments, or to notify tenants of the availability and procedures for requesting

individual relief based on special factors.  As a result, the notices failed to comply with the

Brooke Amendment to the United States Housing Act of 1937, 42 U.S.C. § 1437a(a)(1), and its

implementing regulations at 24 C.F.R. §§ 965.502 and 965.508.

100.    On at least two occasions between 2012 and the present, DCHA increased its

HCVP utility allowance schedules for units comparable to those at Capitol Gateway, reflecting

substantial increases in prevailing market rates for the utilities covered by the allowance

schedules.  During this same period, Defendants, acting under color of state law, failed to

increase the utility allowances tenants at Capitol Gateway received, as required by the Brooke

Amendment to the United States Housing Act of 1937, 42 U.S.C. § 1437a(a)(1), and its

implementing regulations at 24 C.F.R. § 965.507.

101.    Upon information and belief, the reduced utility allowances for electric charges

adopted by Capitol Gateway beginning in December 2013 and in early 2015 are inadequate for

the average tenant in an energy-conservative household of modest circumstances to pay for a

reasonable amount of electric consumption, as required by the Brooke Amendment to the United

States Housing Act of 1937, 42 U.S.C. § 1437a(a)(1), and its implementing regulations at 24

C.F.R. § 965.507.  By failing to provide adequate allowances that meet this standard, the

methodology used to calculate these allowances is arbitrary, capricious, an abuse of discretion, or

otherwise not in conformance with the law.

102.    Plaintiffs have a private right of action under the United States Housing Act of

1937, 42 U.S.C. §1437 *et. seq*. to enjoin Defendants' unlawful conduct and seek actual damages.

103.    As a result of Defendants' unlawful conduct, tenants in units receiving public

housing subsidies were charged higher rents by Defendants, or received lower utility

reimbursement checks from Defendants, than they were entitled to pay or receive under federal law.

**THIRD CAUSE OF ACTION**
**(Violation of the Low-Income Housing Tax Credit (LIHTC) Program, 26 U.S.C. § 42)**

104.     The Named Plaintiffs reallege and incorporate by reference, as though fully restated herein, the allegations set forth in paragraphs 1 through 88 above.

105.     The Defendants have reduced the utility allowances at Capitol Gateway in two separate instances, once beginning in or around December 2013 and a second time in or around early 2015.

106.     On both occasions, the Defendants provided either no notice to the tenants at all, or notices that failed to include the underlying documentation for the new estimate or to provide at least 90 days' notice prior to the effective date of the change.  On both occasions, Defendants also failed to provide any notice of the change to the D.C. Housing Finance Agency, the state/local housing credit agency implementing the LIHTC program in the District of Columbia. As a result, these notices violated the Low-Income Housing Tax Credit Program statute, 26 U.S.C. § 42, and its implementing regulations at 26 C.F.R. § 1.42-10.

107.     Upon information and belief, Defendants, acting under color of state law, failed to conduct any kind of annual review of utility allowances at the property to account for changes in utility rates, in violation of the Low-Income Housing Tax Credit Program statute, 26 U.S.C. § 42, and its implementing regulations at 26 C.F.R. § 1.42-10.

108.     Plaintiffs have a private right of action under the Low-Income Housing Tax Credit Program statute, 26 U.S.C. § 42, to enjoin Defendants' unlawful conduct and seek actual damages.

109.     As a result of Defendants' unlawful conduct, tenants in units subject to the rent restrictions of 26 U.S.C. § 42 and its implementing regulations were charged higher rents by Defendants, or received lower utility reimbursement checks from Defendants, than they were entitled to pay or receive under federal law.

**FOURTH CAUSE OF ACTION**
**(Violation of the Plaintiffs' Leases with Defendants)**

110.     The Named Plaintiffs reallege and incorporate by reference, as though fully restated herein, the allegations set forth in paragraphs 1 through 88 above.

111.     The Named Plaintiffs and Defendants are parties to form lease agreements entered in approximately 2008, 2012, and, in some cases, 2015.  Because the Defendants failed to comply with the R&O Agreement, applicable HUD regulations, or the 2008 lease itself in making changes in the 2012 and 2015 versions of the form lease, the Named Plaintiff allege that the 2008 version of the form lease remains in effect.

112.     In each of these lease agreements, Defendants obligate themselves to comply with HUD regulations applicable to Plaintiffs' tenancies.  The regulations that apply are those under the United States Housing Act of 1937, including 24 C.F.R. §§ 965.501-507.

113.     In each of these lease agreements, Defendants obligate themselves to calculate Plaintiffs' rent in accordance with prevailing HUD regulations, including providing Plaintiffs with utility allowances.  These utility allowances, which are part of the rent calculations for all tenants in units receiving public housing subsidies, must be calculated and applied as required by the United States Housing Act of 1937 and its implementing regulations at 24 C.F.R. §§ 965.501-507.

114.     By reducing utility allowances without proper notice, failing to increase the same utility allowances following substantial rate increases, and failing to provide properly-calculated

27

utility allowances, all in violation of the United States Housing Act of 1937 and its implementing

regulations, Defendants also have violated their obligations under their leases with the Plaintiffs.

115.    As a result of Defendants' unlawful conduct, tenants in units receiving public

housing subsidies were charged higher rents by Defendants, or received lower utility

reimbursement checks from Defendants, than they were entitled to pay or receive under the lease

and federal law.

### FIFTH CAUSE OF ACTION
### (Third-Party Beneficiary Claim for Violation of Indenture of Restrictive Covenants for Low Income Housing Tax Credits)

116.    The Named Plaintiffs reallege and incorporate by reference, as though fully

restated herein, the allegations set forth in paragraphs 1 through 88 above.

117.    Defendant ECFRLP is a party to an agreement with the D.C. Department of

Housing and Community Development, the Indenture of Restrictive Covenants for Low Income

Housing Tax Credits.  Pursuant to that agreement, Defendant ECFRLP must operate the 86 units

covered by the agreement, including all the units occupied by members of the proposed class, in

compliance with the rent restrictions of the Low-Income Housing Tax Credit Program statute, 26

U.S.C. § 42, and its implementing regulations at 26 C.F.R. § 1.42-10.

118.    By reducing utility allowances and changing the methodology for calculating

utility allowances without proper notice, failing to increase the same utility allowances following

substantial rate increases, and failing to provide properly-calculated utility allowances, all in

violation of 26 U.S.C. § 42 and its implementing regulations, Defendant ECFRLP also has

violated its obligations under the Indenture of Restrictive Covenants.

119.    The Indenture of Restrictive Covenants explicitly gives tenants of the units

covered by the agreement the right to enforce against ECFRLP the rent-related obligations set

forth therein.  Specifically, the Indenture provides that "in addition to all other remedies provided

by law or in equity, the tenants either individually or collectively, shall be entitled to enforce,

upon Owner, specific performance requirements of" the Article governing rent restrictions.

Indenture of Restrictive Covenants, Art. VIII, at 7.

120.   As a result of Defendant ECFRLP's unlawful conduct, tenants in units subject to

the rent restrictions of 26 U.S.C. § 42 and its implementing regulations were charged higher rents

by Defendant, or received lower utility reimbursement checks from Defendant, than they were

entitled to pay or receive under the Indenture of Restrictive Covenants and federal law.

## PRAYER FOR RELIEF

Based upon all of the foregoing, the Plaintiffs respectfully pray that this Court:

a.   Issue an Order certifying this action to proceed as a class action pursuant to Fed.

R. Civ. P. 23(a), 23(b)(2) and 23(b)(3);

b.   Approve the undersigned to serve as class counsel pursuant to Fed. R. Civ.

P. 23(a)(4) and 23(g);

c.   Issue a judgment declaring that the Defendants' practices, acts and/or omissions

concerning the reduction of tenants' utility allowances without proper notice, failure to increase

the same utility allowances following substantial rate increases, and failure to provide properly-

calculated utility allowances violates the Plaintiffs' rights under 42 U.S.C. § 1437 *et seq.* and its

implementing regulations;

d.   Issue a judgment declaring that the Defendants' practices, acts and/or omissions

concerning the reduction of tenants' utility allowances without proper notice, failure to increase

the same utility allowances following substantial rate increases, and failure to provide properly-

calculated utility allowances violates the Plaintiffs' rights under 26 U.S.C. § 42 and its

implementing regulations;

e.      Issue a judgment declaring that the Defendants' practices, acts and/or omissions concerning the reduction of tenants' utility allowances without proper notice, failure to increase the same utility allowances following substantial rate increases, and failure to provide properly-calculated utility allowances violates the Plaintiffs' rights under their leases with the Defendants;

f.      Issue a judgment declaring that the Defendants' practices, acts and/or omissions the reduction of tenants' utility allowances without proper notice, failure to increase the same utility allowances following substantial rate increases, and failure to provide properly-calculated utility allowances violates the Plaintiffs' rights as third-party beneficiaries of the Indenture of Restrictive Covenants entered into by Defendant ECFRLP and the D.C. Department of Housing and Community Development;

g.      Issue preliminary and/or permanent injunctive relief requiring the Defendants to restore the 2008 utility allowances until and unless those allowances are altered in compliance with the law;

h.      Issue preliminary and/or permanent injunctive relief requiring the Defendants to make appropriate adjustments to Plaintiffs' utility allowances in accordance with the U.S. Housing Act and its implementing regulations and the Low Income Housing Tax Credit statue and its implementing regulations;

i.      Award damages and pre-judgment interest to each member of the plaintiff class for amounts by which the member's rent exceeded the amount required by law, and/or by which the member's utility reimbursement was less than the amount required by law, as a result of the unlawful actions described herein.

j.      Award the Plaintiffs their litigation costs and reasonable attorneys' fees incurred in this action; and

k.      Grant the Plaintiffs all such other and further relief as this Court may deem

necessary and/or appropriate in the interests of justice.

**DATED:**      November 2, 2015

                                  **Respectfully submitted,**

                                  Chinh Q. Le (D.C. Bar No. 1007037)
                                  Legal Director
                                  (cle@legalaiddc.org)
                                  Julie H. Becker (D.C. Bar No. 471080)*
                                  (jbecker@legalaiddc.org)
                                  Beth Mellen Harrison (D.C. Bar No. 497363)*
                                  (bharrison@legalaiddc.org)
                                  Supervising Attorneys, Housing Law Unit
                                  Anna Purinton (D.C. Bar No. 999246)*
                                  Senior Staff Attorney, Housing Law Unit
                                  LEGAL AID SOCIETY OF THE DISTRICT
                                    OF COLUMBIA
                                  1331 H Street, N.W.
                                  Suite 350
                                  Washington, D.C.  20005
                                  (202) 628-1161


                                  By:_____/s/  *Julie H. Becker*_____

                                  Attorneys for Plaintiffs


*  Appearing pursuant to LCvR 83.2(g).  Counsel each certify that they are providing
representation in this matter without compensation.