**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MILDRED KINARD , et. al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No.: 1:15-cv-01935 (RCL) |
| ) | |
| EAST CAPITOL FAMILY RENTAL, L.P., et al. ) | |
| ) | |
| Defendants. ) | |
| ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Defendants' motion to dismiss this action rests on certain fundamental misconceptions regarding the character of the housing at issue in this case and the nature of the Plaintiffs' claims. Defendants provide public housing, a distinct housing program traditionally operated only by state agencies. By stepping into this role, Defendants have undertaken to act "under color of state law" with respect to calculating rent and supplying utility allowances. Where, as here, a public housing provider fails to comply with the utility allowance rules, tenants may recover under 42 U.S.C. § 1983. *See Wright v. Roanoke Hous. & Redev. Auth.*, 479 U.S. 418 (1987). Defendants' attempts to distinguish *Wright* are without merit.

Moreover, even if the Plaintiffs had no § 1983 cause of action, they would be entitled to enforce both the public housing and Low-Income Housing Tax Credit statutes directly against the Defendants. Both statutes confer precisely the type of right – to a rent that includes a properly-assessed utility allowance – that is suitable for private enforcement. The property's Indenture of Restrictive Covenants also incorporates that right, notwithstanding Defendants' misguided attempt to separate utility allowances from the concept of rent restrictions.

1

The issues in this case – which arise directly under federal law and through contract provisions incorporating that federal law – are federal questions suitable for resolution by this court.  Finally, A&R Management and Kettler Management are proper defendants in this case because, contrary to their claim, East Capitol is not in fact a "disclosed principal" in A&R and Kettler's dealings with the tenants.

For these reasons, Defendants' Motion to Dismiss should be denied.

## STATUTORY AND REGULATORY FRAMEWORK

This case concerns private parties who, by contract with the D.C. Housing Authority (DCHA), have assumed DCHA's role in operating public housing at the Capitol Gateway development.  That the Plaintiffs live in public housing units, rather than another type of subsidized housing, is critical to the analysis here.  The program known as "public housing," provided for under 42 U.S.C. § 1437 *et seq.*, differs from other forms of low-income housing in one fundamental respect: public housing is owned and operated by government entities known as public housing agencies (PHAs) and not, until very recently, by private parties.  *See* 42 U.S.C. § 1437a(b)(6) (defining "public housing agency" as a state or municipal entity).  In recent years, Congress has authorized PHAs to partner with private entities for the purpose of leveraging funds to modernize aged and run-down public housing projects.  Such partnerships, however, do not alter the fundamental character of those properties as government housing.

A.  Public housing and other types of low-income housing assistance

Public housing in the United States dates to 1937, when Congress enacted the United States Housing Act, 42 U.S.C. § 1437 *et seq.*  The policy objective underlying the Act was, and is, "to assist States and political subdivisions of states to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families."  *Id.* § 1437 (2016).  To carry

out this goal, the Act established local governmental entities known as public housing agencies (PHAs), which in turn were responsible for constructing and operating housing for low-income renters. The PHA responsible for operating public housing in the District is the District of Columbia Housing Authority (DCHA). *See* D.C. Code § 6-202 (2016).

Under the Housing Act and its implementing regulations, a PHA's role is to own, maintain, and manage rental housing for low-income individuals and families. Toward this end, each PHA enters into an Annual Contributions Contract (ACC) with the Department of Housing and Urban Development (HUD), pursuant to which HUD provides the agency with funds for operation and maintenance of its public housing stock. *See generally* 42 U.S.C. §§ 1437c, 1437d. Using primarily those funds, the PHA rents apartments and houses to families who meet low-income guidelines. As the landlord for those units, the PHA is responsible for every aspect of the rental relationship: selecting tenants, signing leases, calculating rent in accordance with families' income (including providing properly-calculated utility allowances), performing routine maintenance and major repairs, and evicting tenants who fail to comply with the lease. *See generally* 24 C.F.R. §§ 960.200 to 960.208 (Admission); 960.253 to 960.261 (Rent and Reexamination); 966.4 (Lease requirements).

By vesting governmental entities with ownership and maintenance responsibilities, the public housing program differs fundamentally from other types of low-income housing, including all of the types discussed in Defendants' Motion to Dismiss and the cases cited therein. *See* Defs' Mot. to Dismiss (hereinafter "Defs' Mot."), at 12-13. Aside from public housing, there are three other main forms of federally-funded affordable housing: the Section 8 Housing Choice Voucher Program; the Project-Based Section 8 Program and its various subcategories; and the Low-Income

Housing Tax Credit Program.  Unlike public housing, each of these federal housing types depends entirely on private ownership and management.  The programs are structured as follows:

- Site-based rental assistance.  After establishing public housing in 1937, Congress shifted its attention to the private market, authorizing HUD to subsidize private entities in a variety of ways for the purpose of providing low-income housing.  The now-defunct Section 236 and Section 221(d)(3) programs, for example, permitted private owners to receive mortgage subsidies in exchange for providing low-cost housing, while the Section 202 program offered low-interest loans to nonprofit entities providing affordable housing for senior citizens.  *See* 12 U.S.C. § 1715z-1 (Section 236); *id.* § 1715*l* (Section 221(d)(3); *id.* § 1701q (Section 202).  Similarly, in the project-based Section 8 program, HUD contracts directly with private owners to provide rental assistance for some or all of the units in the property.  *See* 42 U.S.C. § 1437f.  All of these types of site-based housing assistance, while subject to federal rules and regulations, are owned and operated by private entities.

- The Section 8 Housing Choice Voucher Program.  In the voucher program, created in 1974 and codified at 42 U.S.C. § 1437f(o), PHAs provide vouchers to individual families, who then secure housing on the private market using the voucher.  The PHA enters a contract with each individual landlord, guaranteeing rental payments on the family's behalf in exchange for the private owner's agreement to maintain the unit and fulfill certain other responsibilities.  *See generally* 24 C.F.R. § 982.1.  In the voucher program, the private owner is responsible for choosing tenants, creating leases, and administering all aspects of the landlord-tenant relationship.

- The Low-Income Housing Tax Credit (LIHTC) program.  Congress established the LIHTC program in 1986 in order to incentivize the development of affordable housing by

providing tax credits to private developers and investors. The federal government allocates tax credits to states, which in turn award them to private development projects in exchange for a covenant to provide housing affordable to low- and moderate-income tenants. *See generally* 26 U.S.C. § 42. The LIHTC statute and IRS regulations establish processes for setting rent levels, but neither the federal nor state governments have any involvement in the day-to-day operation of LIHTC projects.

Public housing differs from all of these low-income housing programs because it alone operates solely under the auspices of the state, rather than via publicly-funded private entities. With one exception, discussed below, private landlords play no role at all in public housing. Instead, the program is structured so that PHAs are wholly responsible for every aspect of their housing projects. And, in part because the housing is state-provided and subject to due process requirements, tenants in public housing enjoy a number of rights that tenants in Section 8 and other types of private subsidized housing do not have.[1]

B.  Mixed-finance public housing

There is one form of public housing involving private ownership: so-called "mixed finance" development, a relatively new form of public housing created to expand the options available to PHAs for modernizing their oldest and most troubled housing projects. Congress authorized mixed-finance development as part of the HOPE VI program, which was first enacted in 1993 with the goal of addressing the nation's large number of severely distressed public housing units. Toward this end, the HOPE VI program funded renovation and revitalization of public

---

[1]    Public housing tenants, for example, are entitled to a PHA-provided grievance process to address complaints about the terms and conditions of their housing; they may transfer among PHA-owned projects with minimal administrative burden; they may form resident councils with PHA funding and assistance; and, of course, they are entitled to notice and an opportunity to object regarding any change to the lease or the utility allowances. *See* 24 C.F.R. §§ 966.4(c); 966.50 *et seq.*; 964.1 *et seq.*; 965.501 *et seq.*; 966.3; 14 D.C.M.R. Chap. 60-65.

housing projects across the country, typically integrating the units into larger mixed-income housing developments.  A central component of these revitalization efforts has been the decision to authorize PHAs to combine HUD funding with outside sources, including private developers and nonprofit organizations, and to leverage those funds to create public housing within mixed-income communities.  This process has become known as "mixed-finance public housing development."[2]

The statutory authority for mixed-financed public housing is codified at 42 U.S.C. § 1437z-7 (2016), which authorizes PHAs to provide both capital and operating assistance to mixed-finance projects.  Any rental units developed or subsidized with such funds must remain part of the public housing program, subject to all public housing requirements: "The units assisted with capital or operating assistance in a mixed-finance project shall be developed, operated, and maintained in accordance with the requirements of this [low-income housing] chapter relating to public housing during the period required by under this chapter, unless otherwise specified in this section."  42 U.S.C. § 1437z-7(c).  The implementing regulations, set forth at 24 C.F.R. Part 905, have several similar provisions, defining "public housing" to include PHA-financed units in mixed-finance developments and subjecting those units to all public housing rules.  *See, e.g.*, 24 C.F.R. § 905.108 (defining "owner entity" as "an entity that owns public housing units," whether a PHA or an entity in which the PHA owns no interest); *id.* (defining "public housing" as including "dwelling units

---

[2]      The Department of Housing and Urban Development has produced a number of informational and policy materials regarding HOPE VI and mixed-finance public housing. *See, e.g.*, U.S. Dep't of Hous. and Urban Dev., "Mixed-Finance Public Housing Development" (March 2001) (available at http://portal.hud.gov/hudportal/documents/huddoc?id=doc_10114.pdf); "About HOPE VI" (available at http://portal.hud.gov/hudportal/HUD?src=/program_offices/public_indian_housing/programs/ph/hope6/about); U.S. Dep't of Hous. and Urban Dev., "Mixed-Finance Public Housing" (available at http://portal.hud.gov/hudportal/HUD?src=/program_offices/public_indian_housing/programs/ph/hope6/mfph); *see also* Cong. Res. Serv. Rpt. No. 41654, *An Introduction to Public Housing*, at 36-37 (available at https://www.fas.org/sgp/crs/misc/R41654.pdf).  All referenced pages were last visited Jan. 28, 2016.

in a mixed finance project" that receive public housing capital or operating assistance); *id.* § 905.505 (requiring that any public housing developed or modernized with capital funds "shall be operated under the terms and conditions applicable to public housing" for 20 or 40 years, depending on the type of project); *id.* § 905.600 (describing "mixed-finance" as "the development or modernization of public housing where the public housing units are owned in whole or in part by an entity other than a PHA").   The statute also makes clear that mixed-finance units shall be considered part of the PHA's public housing stock for all purposes, regardless of whether they are owned or operated by the PHA or a private entity: "For purposes of this chapter, any reference to public housing owned or operated by a public housing agency shall include dwelling units in a mixed finance project that are assisted by the agency with capital or operating assistance."   42 U.S.C. § 1437z-7(c); *see also* 24 C.F.R. § 905.200(b)(2) (defining "development" of mixed financed housing as activities designed "to add units to a PHA's public housing inventory"). Toward this end, any PHA participating in a mixed-finance project must execute an amendment to its Annual Contributions Contract with HUD, bringing those units within the scope of the ACC's coverage and making them subject to all public housing requirements.   *See* 24 C.F.R. §§ 905.304, 905.604(j).

Thus, although mixed-financed public housing units may be located in private developments, they remain subject to public housing rules in all respects.   Even more importantly, the PHA, and not the private owner, remains accountable to HUD under its ACC for administering those units as public housing.   *See id.* §§ 905.100(b); 905.108 (defining Capital Fund ACC Amendment); 905.304.

As HUD's regulations make clear, the overarching purpose of authorizing mixed financing is to enable PHAs – not private parties – to continue providing public housing to low-income

residents. The Public Housing Capital Fund Program, the funding source for mixed-finance projects, "provides financial assistance to [PHAs] . . . to make improvements to existing public housing" and "to develop public housing, including mixed-finance developments that contain public housing units." 24 C.F.R. § 905.100(a). "Each mixed-finance project must be structured to . . . [e]nsure the continued operation of the public housing units in accordance with all Public Housing Requirements . . . ." *Id.* § 905.604(c)(1). Even where the public housing units are owned and operated by a private entity (known as an "Owner Entity"), the PHA remains responsible for ensuring that the private entity complies with HUD rules. *See id.* § 905.600 ("PHAs must comply, or cause the Owner Entity and its contractors to comply, as applicable, with all of the applicable requirements in this subpart.").

C. <u>Rent and utilities in public housing</u>

The Brooke Amendment to the United States Housing Act generally limits the rent that a public housing tenant may pay to 30 percent of adjusted income. *See* 42 U.S.C. § 1437a(a)(1).[3] Implementing regulations refer to this amount as the "total tenant payment." 24 C.F.R. § 5.618. Subtracted from this amount is a utility allowance, in essence a credit for tenants who pay for utilities. Once the utility allowance is subtracted, any remaining amount – referred to as the tenant rent – is actually paid to the landlord as rent each month. *See id*. § 960.253. If the utility allowance is greater than the total tenant payment, then the family pays no rent and receives the remaining

---

[3]    The actual text reads:
    [A] family shall pay as rent for a dwelling unit assisted under this chapter (other than a family assisted under section 1437f (o) or (y) of this title or paying rent under section 1437f (c)(3)(B) [1] of this title) the highest of the following amounts, rounded to the nearest dollar: (A) 30 per centum of the family's monthly adjusted income; (B) 10 per centum of the family's monthly income; or (C) if the family is receiving payments for welfare assistance from a public agency and a part of such payments, adjusted in accordance with the family's actual housing costs, is specifically designated by such agency to meet the family's housing costs, the portion of such payments which is so designated.

amount of the utility allowance as a monthly utility reimbursement check.  *See id*.  The utility allowance must be calculated to approximate "the monthly cost of a reasonable consumption of [any tenant-paid] utilities and other services for the unit by an energy-conservative household of modest circumstances consistent with the requirements of a safe, sanitary, and healthful living environment."  *Id*. § 5.603.

The PHA must give notice of any revision to utility allowances at the property to all residents at least 60 days before the proposed effective date.  *Id*. § 965.502(c).  The notice must:

- describe with reasonable particularity the basis for determination of the revised allowances, including a statement of the specific items of equipment and function whose utility consumption requirements were included;

- notify residents of the place where the owner's records documenting the basis for the revisions are available for inspection;

- provide all residents an opportunity of at least 30 days before the proposed effective date to submit written comments on the proposed revisions; and

- notify residents of the availability and procedures for requesting individual relief based on factors such as the special needs of elderly or ill residents or those with disabilities, or special factors affecting usage not within the control of the resident.

*Id*. §§ 965.502(c), 965.508.  The owner's determinations of allowances and revisions are considered final "unless found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  *Id*. § 965.502(e).

Federal regulations also provide broad guidelines for the methodology for calculating utility allowances.  The chosen methodology must "approximate a reasonable consumption of utilities by an energy-conservative household of modest circumstances consistent with the requirements of a safe, sanitary, and healthful living environment."  *Id*. § 965.505(a).  HUD has issued extensive guidance on how owners may calculate utility allowances, based on either actual consumption data or engineering methodologies that calculate reasonable consumption based on a

variety of factors.  *See generally* U.S. Dep't Hous. & Urban Dev., *Utility Allowance Guidebook* (Sept. 1998) (*available at* http://portal.hud.gov/hudportal/documents/huddoc?id=doc_10600.pdf (last visited Jan. 28, 2016)).  Within this general framework, the regulations list nine factors that the PHA *shall* consider in calculating utility allowances, such as "the size of the dwelling units and the number of occupants per dwelling unit," and "the physical condition, including insulation and weatherization, of the housing project."  24 C.F.R. § 965.505(d).

PHAs are required to review their utility allowances at least annually and to make revisions reasonably required to continue to follow the above standards.  *See id*. § 965.507(a).  The PHA must revise its utility allowances if there has been a change in rates of 10 percent or more since the last revision. *Id*. § 965.507(b).  Such rate changes are not subject to the detailed notice requirements above, may occur between annual reviews, and may be made retroactive.  *Id*.

D. Rent and utilities in Low-Income Housing Tax Credit Program housing

The LIHTC Program provides federal tax credits to owners of projects with rent-restricted units that meet certain guidelines.  Specifically, a property qualifies if 20 percent of its units are rent-restricted and occupied by residents at 50 percent of area median income or below, or 40 percent of its units are rent-restricted and occupied by residents at 60 percent of area median income or below.  *See* 26 U.S.C. § 42(g)(1).  Rent-restricted units are those in which the gross rent equals 30 percent or less of the applicable income level.  *See id*. § 42(g)(2)(A).  To qualify, gross rent also must include "any utility allowance determined by the Secretary after taking into account such determinations under section 8 of the United States Housing Act of 1937."  *Id*. § 42(g)(2)(B).

IRS regulations, which require a utility allowance to be included in the gross rent calculation, give LIHTC owners multiple options for establishing the applicable utility allowance, including using the local PHA utility allowance, 26 C.F.R. § 1.42-10(b)(4)(i); official estimates

from a local utility company, the state/local tax credit agency, or the HUD Utility Schedule Model, *id.* § 1.42-10(b)(4)(ii)(B), (C), (D); or an energy consumption analysis performed by a properly licensed engineer or another qualified professional approved by the state/local tax credit agency based on data from the previous 12 months, *id.* § 1.42-10(b)(4)(ii)(C).  The LIHTC regulations also require prior notice to tenants and the state/local tax credit agency prior to any change in the applicable utility allowances, including the underlying documentation for the new estimate.  *Id.* § 1.42-10(c)(1).  Changes may go into effect 90 days later.  *Id.*  The regulations also require owners to conduct an annual review of utility allowances and to consider "any changes to the building" and "changes in utility rates."  *Id.* § 1.42-10(c)(2).

## ARGUMENT

**I.   Plaintiffs are entitled to proceed under § 1983 because Defendants have acted "under color of state law" in reducing public housing tenants' utility allowances.**

As participants in the public housing program, Defendants are state actors subject to suit under 42 U.S.C. § 1983.[4]  As an initial matter, it is undisputed that a public housing authority is a "state actor" for purposes of liability under § 1983.  *See, e.g.*, *Samuels v. District of Columbia*, 770 F.2d 184, 194 n.6 (D.C. Cir. 1985); *Raso v. Lago*, 135 F.3d 11, 15 (1st Cir. 1998); *Thomas v. Dallas Hous. Auth.*, 2015 U.S. Dist. LEXIS 61218 at *14 (N.D. Tex. Apr. 20, 2015) (citing *James v. Dallas Hous. Auth.*, 526 Fed. Appx. 388, 394 (5th Cir. 2013) (unpublished disposition)); *Brooker v. Altoona Hous. Auth.*, 2013 U.S. Dist. LEXIS 82228 n. 19 (W.D. Pa. June 12, 2013) (citing *Solomon v. Philadelphia Hous. Auth.*, 143 Fed. Appx. 447, 456 n.14 (3d Cir. Pa. 2005) (unpublished disposition)); *see also Wright v. Roanoke Redev. & Hous. Auth.*, 479 U.S. 418, 423-

---

[4]      The question of whether a private party acts "under color of state law" for purposes of § 1983 is functionally identical to the analysis required for "state action" under the Fourteenth Amendment.  *See West v. Atkins*, 487 U.S. 42, 49 (1988); *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 935 (1982).  This Opposition therefore uses the terms interchangeably.

29 (1987) (assuming without discussion that a PHA is subject to suit under § 1983).   The sole question here, therefore, is whether an owner or manager, partnered with the PHA to provide public housing in a mixed-finance project, similarly acts under color of state law in its compliance – or lack thereof – with public housing requirements.

As discussed more fully below, Plaintiffs have alleged more than enough regarding state action for the court to permit their § 1983 claim to go forward.   The Supreme Court has held that to establish state action, there must be "such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 295 (2001) (quoting *Jackson* v. *Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974)).   The relationship between the Defendants and DCHA more than satisfies this test, and, for that reason alone, the Defendants are state actors for purposes of § 1983.   In creating and operating the Capitol Gateway development, Defendants have voluntarily joined with the D.C. Housing Authority in fulfilling DCHA's statutory and contractual duty to provide public housing units.   Regardless of whether public housing is an "exclusive public function" – which it is, but which the court need not decide here – the facts alleged thus far make clear that Defendants are sufficiently entwined with DCHA in the ownership and operation of Capitol Gateway to make them the functional equivalent of DCHA itself.   And even if they were less entangled with DCHA, Defendants would nonetheless be subject to suit under § 1983 because providing public housing, unlike other types of federally subsidized housing, is a public function that DCHA has now delegated to these private parties.[5]

---

[5]      Defendants' assertion that the tenants have alleged only "exclusive public function" as a basis for finding state action is incorrect.   *See* Defs' Mot. at 14 n.4.   Plaintiffs' Complaint alleges both that DCHA has delegated an exclusive public function to the Defendants and that Defendants' actions "are subject to pervasive regulation by HUD and DCHA and monitoring to comply with [public housing] rules and regulations."   Compl. ¶ 90.

A. DCHA is inextricably "entwined" in the administration of Capitol Gateway's public housing units.

The "nexus" test set forth in *Brentwood Academy* is a fact-specific analysis, in which "no one fact can function as a necessary condition across the board for finding state action." *Brentwood Acad.*, 531 U.S. at 295. Instead, the court may employ any of several inquiries: whether the private defendant is a "'willful participant in joint activity with the State or its agents,' *Lugar* v. *Edmondson Oil Co.*, 457 U.S. 922, 941 (1982)"; whether it "has been delegated a public function by the State, *cf., e.g.*, *West* v. *Atkins,* 487 U.S. 42, 56 (1988); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 627-628 (1991)," and whether "it is 'entwined with governmental policies' or when government is 'entwined in [its] management or control,' *Evans v. Newton,* 382 U.S. 296, 299 (1966))." *Brentwood Acad.*, 531 U.S. at 296.

Applying these standards "is a matter of normative judgment, and the criteria lack rigid simplicity." *Id.* at 295; *see Bates v. Northwestern Human Servs., Inc.*, 583 F. Supp. 2d 138, 144 (D.D.C. 2008); *Daskalea v. Washington Humane Soc'y*, 480 F. Supp. 2d 16, 25 (D.D.C. March 13, 2007) (state action "is a fact-intensive inquiry, and there exists, as a result, '[n]o succinct summary [] of what constitutes state action for purposes of applying constitutional safeguards'") (quoting *Kolinske v. Lubbers*, 712 F.2d 471, 477 (D.C. Cir. 1983)). *Brentwood Academy* makes clear, however, that the "public function" test is not – contrary to the Defendants' claim here – the sole basis on which to find state action. *See* 531 U.S. at 302-303. Instead, the court may look to the degree to which the private party is "entwined" with governmental policies and the extent of government involvement in the private party's day-to-day operations and management. *See id.* at 296 (quoting *Evans*, 382 U.S. at 301).

In this case, the fact-intensive inquiry described and applied in *Brentwood Academy* compels the conclusion, particularly at the motion to dismiss stage, that the Defendants are state actors. The significant facts include the following:

*Purpose and structure.* First, with regard to Defendant East Capitol Family Rental LP (hereinafter "East Capitol"), the very reason for that entity's existence is to carry out DCHA's obligation to provide public housing in the District of Columbia. East Capitol was organized solely for the purpose of developing Capitol Gateway, and its contract with DCHA makes clear that the intent of the Capitol Gateway development is, in part, to provide public housing using funds issued to DCHA for that purpose by HUD. *See* Regulatory and Operating Agreement for the PHA-Assisted Units of Capitol Gateway Family Rental, Washington, D.C. (executed May 3, 2005) (hereinafter "R&O Agreement") (attached as Exhibit A), at 5-6.[6] The preamble to the agreement provides that "61 of the units at the Development . . . shall be set aside as 'public housing' as defined in Section 3(b) of the United States Housing Act of 1937 . . . and shall be eligible to receive the benefit of operating assistance provided to the Authority by HUD." The agreement refers to these houses as the "PHA-Assisted Units." R&O Agreement, at 6. The agreement defines such a unit as one "maintained as a 'public housing' unit in accordance with Public Housing Requirements," which include the 1937 Act, its implementing regulations, and other HUD and local law sources. *Id.* at 12, 13. The agreement provides in several other places that East Capitol, defined as the "Owner," must operate the PHA-Assisted units as public housing and in accordance with public housing requirements. *See id.* at 16 (Art. 3.1, "Performance"); 20 (Art. 3.7, "Leases"); 22 (Art. 3.10, "Grievance Procedure").

---

[6]     As Defendants note in their motion, the court may consider documents referenced in the Complaint in ruling on a 12(b)(6) motion. *See* Defs' Mot. at 26 n.7; *Malek v. Flagstar Bank*, 70 F. Supp. 3d 23, 27 (D.D.C. 2014). The Complaint references the R&O Agreement at ¶¶ 29-31.

The agreement also makes clear that East Capitol's principal duty with regard to Capitol Gateway is to help DCHA satisfy its contractual obligations to HUD – specifically, its duty to provide public housing in the District of Columbia.  With regard to "Performance," the R&O Agreement provides as follows:

> Owner . . . shall perform such acts to be performed by Owner under the terms of this Agreement to enable the Authority to fulfill its obligations to HUD pertaining to the Development.   Notwithstanding Owner's agreement herein to perform substantial obligations and responsibilities with regard to the PHA-Assisted Units, *the Authority remains accountable to HUD for performance of such functions under and pursuant to the ACC and will monitor the performance of Owner to assure the Authority's compliance therewith.*

*Id.* at 16 (Art. 3.1) (emphasis added); *see id.* at 20 (Art. 3.6) (permitting DCHA to delegate to East Capitol and its managing agents "any administrative functions" that public housing rules require DCHA to perform, "subject at all times to the oversight and approval of [DCHA]").   This description of the parties' relationship is wholly consistent with the mixed-finance statute and regulations, which – as discussed above – are designed to enable PHAs to bring in private partners to help the agencies continue to offer public housing to low-income residents.  *See supra* at 5-8.

*DCHA's involvement in day-to-day operations.*   DCHA's agreements with both East Capitol and Defendant A&R Management – and, upon information and belief, with Kettler, *see* Compl. ¶ 33 – describe an extraordinary degree of participation by DCHA in the regular activities of Capitol Gateway.   To fill the PHA-Assisted units, DCHA refers tenants from its own list of current and former public housing residents, all of whom take priority over individuals not on any DCHA-administered list.   *See* R&O Agreement, at 19 (Art. 3.5(c)); Capitol Gateway Single-Family Rental Management Plan (hereinafter "Management Plan"), at 9-10 (Section IV) (attached as Exhibit B).  DCHA must approve the form lease for those units.  *See* R&O Agreement, Art. 3.7; Management Plan, at 9 (Section III.K).

15

Separate from these initial leasing activities, DCHA also oversees the ongoing landlord-tenant relationship between Defendants and the residents of Capitol Gateway.  A&R must submit for DCHA review all generally applicable communications with the public housing tenants regarding leases, rent levels, and project rules.  *See* R&O Agreement, at 18 (Art. 3.4(e)).  The Management Plan reiterates this requirement in bold and capital letters.  *See* Management Plan, at 9 (Section III.L.)  With respect to lawsuits for eviction, A&R must notify DCHA of its selection of legal counsel and have its legal counsel submit to a "briefing on public housing issues prior to the initiation of all court actions."  Management Plan, at 5 (Section I.S).  Legal counsel further must "notify DCHA of the initiation of all court actions, except nonpayment of rent" and must consult with DCHA if the case concerns the application of public housing requirements.  *Id.*

*Reporting and monitoring obligations.*  In addition to its involvement in daily operations, DCHA also restricts the Defendants' latitude in making major decisions, and it subjects them to stringent monitoring requirements.  The R&O agreement, for example, requires DCHA to approve the Management Plan and any amendments to the plan.  *See* R&O Agreement, at 18 (Art. 3.4(e)).  It requires East Capitol to terminate its managing agent if the agent violates public housing requirements, and authorizes DCHA to veto any replacement managing agent.  *See id.* at 17-18 (Art. 3.4).  In addition, the agreement requires East Capitol to set aside specific financial reserves for the public housing units at the development and restricts how East Capitol may invest those funds.  *See id.* at 27-28 (Art. 5.1.).  And, to ensure that East Capitol and its managing agents are fulfilling their obligations to DCHA – and thus DCHA's obligations to HUD – the agreement requires East Capitol to provide quarterly and annual financial statements to DCHA.  *See id.* at 32-33 (Art. 7.2 through 7.6); *id.* at 34 (Art. 7.7) ("It shall remain the responsibility of [DCHA] to

maintain sufficient records and to take necessary action to assure HUD that all the [DCHA] obligations to HUD under public housing requirements are fulfilled.").

The managing agents, Defendants A&R and Kettler, have similar duties.   Under the Management Plan, the managing agent must submit to DCHA a monthly list of rent and other income, and its annual budget is subject to DCHA approval.  *See* Management Plan, at 4 (Sec. I.K, I.O).  The managing agent also must provide regular accounting and audit reports to East Capitol for DCHA's use, and to DCHA upon request.  *See* Management Plan, at 14, 16 (Section IX, Section XIII.A).

Finally, just as Capitol Gateway must consult closely with DCHA on its day-to-day operations and management, DCHA must ensure that its own public housing rules and governing documents capture the 61 public housing units at Capitol Gateway.  The R&O Agreement requires DCHA to ensure that the "material elements" of the Agreement and other governing documents – such as the Management Plan and the waiting list policies – "are reflected in duly adopted written policies of the Authority."   R&O Agreement, at 22 (Art. 3.12).   The agency must include provisions regarding Capitol Gateway operations in its PHA Plan, a HUD-required document in which each PHA sets forth rules and policies for its public housing units.[7]

Taken together, all of these facts – Capitol Gateway's role in fulfilling DCHA's obligations, DCHA's involvement in the development's daily operations, and DCHA's authority over finances and other major decisions – direct the conclusion that the owner and managers, Defendants here, are acting "under color of state law."   Courts in the D.C. Circuit have found private parties liable as state actors, based on equal or sometimes less evidence, in a variety of

---

[7]     In lieu of a PHA Plan, DCHA has chosen to adopt its public housing rules in regulatory form.  *See generally* 14 D.C.M.R. Chap. 60-65, 74, 98.  The specific regulations addressing Capitol Gateway and other mixed-finance public housing developments are set forth at 14 D.C.M.R. §§ 6113.1 to 6113.7.

similar contexts: the party's role in determining Medicaid eligibility, *see N.B. v. District of Columbia*, 794 F.3d 31, 42-45 (D.C. Cir. 2015); making decisions about psychiatric treatment for children in the city's foster care system, *see Jordan v. District of Columbia*, 949 F. Supp. 2d 83, 89-90 (D.D.C. 2013); operating the city's Correctional Treatment Facility (a portion of the local prison system), *see Moonblatt v. District of Columbia*, 572 F. Supp. 2d 15, 22-24 (D.D.C., 2008); spraying herbicides pursuant to a contract with the U.S. government relating to drug eradication, *see Arias v. Dyncorp*, 517 F. Supp. 2d 221, 227-28 (D.D.C. 2007); prosecuting animal cruelty, *see Daskalea*, 480 F. Supp. 2d at 26-27; and providing residential facilities for children in the city's juvenile justice system, *see Smith v. District of Columbia*, 2002 U.S. Dist. LEXIS 27819, at *19-*20 (D.D.C. 2002).

While Defendants urge this court to apply an "exclusive public function" test for state action, these cases in fact reflect no consistent requirement that the private party be performing an exclusive public function in order to be subject to suit as a state actor.  Although some turn on that conclusion, others address the question of whether the party has engaged in a joint venture with the government, is an agent of the government in relevant respects, or is performing a function that is public, but not necessarily exclusively so.  *See N.B.,* 794 F.3d at 43 (finding that the private party acted as the District's agent for purposes of eligibility determinations); *Jordan*, 949 F. Supp. 2d at 90 (concluding that "controlling the medical care of children in the custody of the District" is a public function, with no mention of exclusivity); *Arias*, 517 F. Supp. 2d at 228 ("Plaintiffs have alleged sufficient facts to state a claim that defendants are operating as a 'willful participant in joint activity with the State or its agents,' are 'controlled by an agency of the state,' or are 'entwined with governmental policies.'") (citing *Brentwood Acad.*, 531 U.S. at 296).

Moreover, the degree of government involvement in the Defendants' activities here is even greater than in some of the other cases finding state action for purposes of § 1983. In *Moonblatt*, for example, the court noted the paucity of evidence regarding "the extent of regulation (or lack thereof) involved in the relationship" between the District and the private prison facility. *See* 572 F. Supp. 2d at 23. Nonetheless, it found state action because prisons – despite a recent "trend toward privatization" – are "traditionally associated with the exclusive prerogative of the state." *Id.* at 24. And in *Jordan*, the court found state action solely on the ground that the District had contracted out the job of providing psychiatric services and making medical decisions for children in the city's care; there was no allegation that the District was involved in any way in the hospital's actions or decisions, or that such medical decisions were an exclusive public function. *See* 949 F. Supp. 2d at 90.

The degree of government involvement here is also far greater than in the cases cited in Defendants' Motion to Dismiss, all of which concern other types of low-income housing. *Miller v. Hartwood Apartments*, for example, cited in Defendant's Motion at 12, involved a Section 8 New Construction project, a type of housing designed to be operated wholly by private ownership with HUD funds. *See* 689 F. 2d 1239, 1240 (5th Cir. 1982); 42 U.S.C. § 1437f. In such housing, as the court noted in *Harwood*, the owner has total responsibility for selecting residents, maintaining the units, and enforcing the lease against noncompliant tenants. *See* 689 F.2d at 1243-44. That situation is quite different from the arrangement at Capitol Gateway, in which DCHA provides the list of tenants from which the owner may choose, reviews the owner's communications with tenants, and must consult on eviction cases based on lease violations. *See supra* at 15-16. Indeed, the *Harwood* court itself noted that "if the questions of tenancy and

eviction were required to be submitted for government approval, [the state action inquiry] could be a different question."  689 F.2d at 1244.

Other cases involving non-public housing are similarly unhelpful to Defendant's state action argument.  *Hodges v. Metts*, for example, concerned evictions in a property with a HUD-subsidized mortgage, pursuant to a program that HUD had expressly excluded from coverage of even its general eviction regulations.  *See* 676 F.2d 1133, 1136-37 (6th Cir. 1982) (cited in Defs' Mot. at 12).  In declining to find state action, the court specifically noted that "[t]he government is not involved in overseeing the day-to-day affairs of the apartment complex," and was instead "only the guarantor of the mortgage."  *Id.* at 1136.  And in *Young v. Halle House*, the court contrasted the project at issue, which received Section 8 and other government funds, from "a classic public housing project, operated directly by a state or municipal government."  152 F. Supp. 2d 355, 362 (S.D.N.Y. 2001) (cited in Defs' Mot. at 11, 12).  Although the degree of government involvement in that case was somewhat greater than in the typical rental property, the court ultimately found a lack of state action because the challenged policy, relating to guests, was not "either compelled or influenced by the regulatory scheme under which it operated."  *Id.* at 364. Here, of course, Defendants' policy relating to utility allowances is not only influenced but controlled by the public housing statute and regulations.  And the extent of DCHA's involvement in the property's activities places this case in an entirely different category than the situations described above, in which the government provides funding and regulation but not oversight of ordinary management functions.

Finally, *Blum v. Yaretsky*, on which Defendants rely principally for the proposition that private parties providing health and welfare services are not state actors, is not apposite.  *See* 457 U.S. 991 (1982).  It is true, as Defendants submit, that neither substantial funding nor

comprehensive regulation is sufficient to transform a private party into a state actor.  *See id.* at 1011; Defs' Mot. at 11.  But the tenants here have never contended that state action in this case rests on the funding or regulation of Capitol Gateway.  Rather, Defendants are state actors because of the extraordinary degree to which DCHA is engaged in the day-to-day job of running Capitol Gateway.  Plaintiffs are unaware of any other type of subsidized housing in which a private party owns and manages the property, but must receive approval from the government agency on even basic management functions such as communications with the tenants.  This extensive level of government "entwinement" with the Capitol Gateway property distinguishes this case from others involving low-income housing, and it is sufficient to state a claim here under § 1983.

      B.  <u>Public housing is a public function.</u>

Because the degree of government entwinement alone qualifies as state action in this case, the court need not decide whether public housing is an "exclusive public function," the central question addressed in Defendants' Motion to Dismiss.  *See* Defs' Mot. at 10-15.  But to the extent that inquiry matters here, the court should conclude that operating public housing is in fact an exclusively public function, and that the Defendants qualify as state actors on that basis as well.

As discussed above, public housing is the only type of federally subsidized housing that is owned and operated by the government rather than by private parties.  *See supra* at 3-5.  By federal design, the states – through their public housing agencies – are responsible for owning and operating housing projects for low-income residents.  Through its Annual Contributions Contracts, HUD funds PHAs to carry out this goal, imposing specific deliverables with regard to the amount and quality of housing a PHA must provide.  Prior to the 1990s and the advent of mixed-finance public housing, there was no provision for public housing that was owned and operated by private entities.  Public housing was solely a government responsibility.

Accordingly, while Defendants may be correct that "low-income housing is not a traditional exclusive state function," that is simply beside the point. Regardless of whether *low-income housing* generally is a public function, there is no dispute that, at least prior to the mixed-finance scheme, *public housing* has always been the job of the state. For this reason, Defendants' reliance on cases involving other types of subsidized housing is misplaced. *See* Defs' Mot. at 12-13 & n.3. Nor are Defendants correct that "the Housing Act provides government funding to provide a service that has traditionally been a private-market service." Defs' Mot. at 14. The U.S. Housing Act authorizes and funds a number of different types of housing, many of which rely on the private market, but public housing is not and has never been one of them. Nor is there any reason to suppose that Congress, by authorizing mixed financing, intended to alter the fundamental character of public housing as a government institution. To the contrary, the mixed-finance statute classifies units in a mixed-finance project, even those privately owned or managed, as "public housing owned and operated by a public housing agency." 42 U.S.C. § 1437z-7(c).

There is no dispute that if the D.C. Housing Authority rather than the Defendants had engaged in the conduct alleged here, DCHA would be subject to liability for actions taken "under color of state law." *See Wright*, 479 U.S. at 429. To hold that the Defendants here are not similarly liable, the court would have to conclude that, by authorizing PHAs to build mixed-finance projects, Congress also intended to strip tenants in those projects of their right to recover under § 1983. That notion cannot be squared with the mixed-finance statute and regulations, which are replete with instructions that mixed-finance projects be functionally indistinguishable, in operation and contractual obligations, from traditional public housing units administered by PHAs. The mixed-finance scheme was enacted to permit PHAs to expand their financial options for developing and modernizing public housing, not to transfer away their obligations to public housing tenants.

Delegating DCHA's duties with regard to rent and utility allowances to a purportedly private party does not extinguish the tenants' rights to challenge those allowances under § 1983.

## II. Plaintiffs' rights under the Brooke Amendment to pay limited rent, including an allowance for utilities, are enforceable against the Defendants via § 1983.

As Defendants themselves acknowledge, in *Wright*, 479 U.S. at 429, the Supreme Court held that the Brooke Amendment to the United States Housing Act "creates an individual right for tenants to enforce, through the remedy offered by Section 1983, the limit on rent, including utility allowances, to 30% of their income." Defs' Mot. at 16. *Wright* is the starting and ending point for the analysis of this question. Its holding, followed by other federal courts since and affirmed in more recent decisions from the Supreme Court, compels the conclusion that Plaintiffs' statutory rights here are enforceable under § 1983. Defendants' various attempts to distinguish *Wright* – citing lower court decisions involving other portions of the Housing Act, pointing to *Wright*'s dissent, and parsing Plaintiffs' claims in search of a factual distinction – all are unavailing and should be rejected.

In *Wright*, public housing tenants alleged that the local housing authority "had overcharged them for their utilities by failing to comply with the applicable HUD regulations in establishing the amount of utility service to which [the tenants] were entitled." *Id.* at 421. More specifically, the tenants alleged the housing authority "had set the utility allowances unreasonably low and failed to revise them." *Wright v. City of Roanoke Redevelopment & Hous. Auth.*, 605 F. Supp. 532, 534 (W.D. Va. 1984). In other words, like the Plaintiffs in this case, the *Wright* tenants claimed that the utility allowances were "so low that they do not approximate the reasonable consumption costs of even an energy-conservative household," and that the public housing authority had "failed to increase the utility allowances following utility rate changes of 10 percent or more," in violation of the Brooke Amendment and its implementing regulations at 24 C.F.R. §§

965.505, 965.507. Compl. ¶ 2; *see also id*. ¶ 89-96.[8]  The lower courts rejected the tenants' claims,

holding that Congress had foreclosed private enforcement, instead intending "for HUD, rather than

the tenants themselves, to enforce the statutory requirements."  *Wright*, 605 F. Supp. at 537-38;

*see also Wright v. City of Roanoke Redevelopment & Hous. Auth.*, 771 F.2d 833, 837 (4th Cir.

1985).

The Supreme Court reversed, holding that Congress indeed had intended to create an

individual enforceable right in low-income tenants to cap their payments for rent and utilities at

30 percent of income.  The Court relied on the same basic test for § 1983 enforcement articulated

in its more recent line of cases: (1) Congress must have intended the statutory provision to benefit

the party seeking to enforce it; (2) the provision must not be so vague and amorphous as to make

judicial enforcement difficult or impractical; and (3) the statute must impose a binding,

unambiguous obligation, phrased in mandatory (not precatory) terms.  *Compare Wright*, 479 U.S.

at 423-31, *with Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997), *Gonzaga University v. Doe*,

536 U.S. 273, 280, 282, 284, 285, 289 (2002).  Under this standard, the Brooke Amendment passed

muster.  The statute "unambiguously confer[s] 'a mandatory [benefit] focusing on the individual

family and its income,' . . . in terms that 'could not be clearer'" and "explicitly confer[s] specific

monetary entitlements."  *Gonzaga*, 536 U.S. at 280 (quoting *Wright*, 479 U.S. at 430); *see also*

*Wright*, 479 U.S. at 430 ("The intent to benefit tenants is undeniable.").  The Brooke Amendment's

---

[8]     Defendants describe *Wright* as involving a public housing authority imposing a surcharge for
excess utility consumption, suggesting a factual distinction from the Plaintiffs' allegations here.  While
their description is correct, it misses the point.  In *Wright*, the mechanism for applying the utility allowance
happened to be different, because the public housing authority paid the utilities rather than the tenants
themselves.  *See* 24 C.F.R. § 965.506(a) (allowing surcharges for PHA-furnished utilities where a tenant's
consumption is in excess of the utility allowance).  But the statutory right at issue (the Brooke Amendment)
and the regulatory requirements at issue are precisely the same as the substantive law at issue in this case.
*See id*. § 965.502 (establishment and notice of utility allowance for tenant- and PHA-paid utilities); §
965.505 (same for methodology for calculating reasonable consumption); § 965.507 (same for review and
revision of utility allowance).

limits on charges for rent and utilities are "sufficiently specific and definite to qualify as enforceable rights . . . that are not . . . beyond the competence of the judiciary to enforce." *Wright*, 479 U.S. at 432.  Finally, nothing in the legislative history indicated that enforcement powers vested in HUD constituted a comprehensive enforcement scheme foreclosing private § 1983 enforcement, and Congressional and agency actions since indicated the opposite understanding. *See id.* at 424-25.

*Wright* continues to be affirmed by the Supreme Court in its more recent decisions on the scope of § 1983 claims, with the Court distinguishing the Brooke Amendment from other federal statutory schemes in which private enforcement under § 1983 has been rejected.  *See, e.g.*, *Gonzaga*, 536 U.S. at 280; *Blessing*, 520 U.S. at 340.  A number of federal court decisions have relied on *Wright* to uphold similar § 1983 claims by public housing tenants.  *See, e.g.*, *Dorsey v. Hous. Auth. of Baltimore City*, 984 F.2d 622 (4th Cir. 1993); *Hill v. Ogburn*, 812 F.2d 679 (11th Cir. 1987); *Castleman v. U.S. Dep't Hous. & Urban Dev.*, 1988 U.S. Dist. LEXIS 10242 (W.D. Mo. 1988); *see also McDowell v. Phila. Hous. Auth.*, 423 F.3d 233 (3d Cir. 2005) (recognizing § 1983 claim to enforce the Brooke Amendment related to utility allowance calculations in the context of enforcing a consent decree settling the case).  Other decisions have applied *Wright* to other aspects of rent calculations under the Brooke Amendment. *See Chastain v. Northwest Ga. Hous. Auth.*, 2011 U.S. Dist. LEXIS 135712 (N.D. Ga. Apr. 28, 2011) (application of minimum rent regulations); *O'Neill v. Hernandez*, 2009 U.S. Dist. LEXIS 27448 (S.D.N.Y. Mar. 31, 2009) (improper rent calculations).  In *Johnson v. Housing Authority of Jefferson Parish*, 442 F.3d 356 (5th Cir. 2006), the Fifth Circuit relied on *Wright* and the subsequent decisions in *Gonzaga* and *Blessing* to hold that similar statutory rent restrictions and utility allowance regulations in the Housing Choice Voucher Program are enforceable under § 1983.

Unable to avoid this precedent, the Defendants attempt to distinguish it.[9]  That effort surely must fail with respect to two of the specific violations alleged by the Plaintiffs here – that Defendants' methodology for calculating its utility allowance does not approximate reasonable consumption and that Defendants failed to revise the utility allowance following rate changes – which are on all fours with *Wright*.  This leaves the Defendants with the argument that the notice violations alleged by Plaintiffs here somehow are distinguishable.  Defendants seem to suggest that, unlike the substantive right to have rent and utilities capped at 30 percent of income, the right to notice and comment is merely "procedural" and thus unenforceable.

The Fourth Circuit considered and rejected this very argument in *Dorsey*, for reasons that hold the same force here.[10]  There is nothing in the *Wright* decision itself or in the larger body of decisions governing § 1983 enforcement that compel any distinction between requirements that could be characterized as procedural versus substantive.  All of the regulations at issue implement the tenants' rights under the Brooke Amendment to cap their payments for rent and utilities at 30 percent of their income, and the notice and comment provisions in particular are designed to ensure that the proposed utility allowance in fact reflects "the monthly cost of a reasonable consumption of utilities," 24 C.F.R. § 5.603, by offering the tenants an opportunity to demonstrate that newly-

---

[9]      Defendants point to several federal court cases declining to find other portions of the Housing Act enforceable under § 1983.  But those cases raise very different claims than those presented in *Wright* and in the instant case.  For example, in *Johnson v. City of Detroit*, 446 F.3d 614, 625-627 (6th Cir. 2006), the Sixth Circuit held that a public housing tenant claiming her child had suffered from lead poisoning could not recover under provisions in the Housing Act containing general policy declarations and authorizing HUD to establish the public housing program.  *See also Caswell v. City of Detroit Hous. Comm'n*, 418 F.3d 615, 619-20 (6th Cir. 2005) (rejecting § 1983 enforcement of a regulation requiring continued rent payments in certain circumstances, because plaintiff could not identify any statutory right tied to this regulation).  Those claims are a far cry from the instant case, in which a statutory provision confers a right to a cap on rent and utility payments, HUD has promulgated regulations directly implementing that statutory right, and the Supreme Court already has held those very rights are enforceable via § 1983.

[10]      Like the Plaintiffs here, the public housing tenants in *Dorsey* alleged multiple violations of the Brooke Amendment and its implementing regulations, including not only failure to provide proper notice and opportunity to comment to utility allowance changes, but also challenges to the methodology for calculating the utility allowance itself.  984 F.2d at 626-27.

proposed figures are incorrect.  The *Wright* Court pointed to the regulations as a whole – including the notice and comment provisions – in describing the scope of enforceable rights.  *See Dorsey*, 984 F.2d at 628, *citing Wright*, 479 U.S. at 431 ("The Regulations . . . have the force of law, . . . they specifically set out the guidelines that the PHAs were to follow in establishing utility allowances, and they require notice to tenants and an opportunity to comment on proposed allowances.").[11]  To hold otherwise could render enforcement meaningless:  "HUD could, simply by revising regulations and thereby carving out a subset of procedural and therefore unenforceable rights, foreclose a remedy the Court and Congress had left open."  *Id.* at 630.

Defendants have not cited a single federal court decision that draws any meaningful distinction between substantive and procedural rights for purposes of § 1983 enforcement.  Indeed, federal courts – including this court and the D.C. Circuit – have held that various provisions in the Housing Act are enforceable under § 1983, despite arguably being procedural in nature.  In *Samuels*, 770 F.2d 184, public housing tenants alleged that the D.C. Housing Authority had failed to implement and maintain an administrative grievance procedure for complaints about conditions in their homes.  They sought to enforce, via § 1983, a provision in the Housing Act requiring HUD to issue regulations for "each public housing agency receiving assistance [under the Act] to establish and maintain an administrative grievance procedure" to resolve "any proposed adverse public housing agency action."  42 U.S.C. § 1437d(k).  The D.C. Circuit held that the tenants could enforce this statutory right to an administrative grievance procedure under § 1983, finding that Congress created a mandatory obligation, and thus an enforceable right, without any intent to

---

[11]     For the same reason, Defendants' argument that Plaintiffs here seek to enforce regulations, rather than a statutory mandate, is simply misplaced.  The Brooke Amendment's cap on a public housing tenant's payments for rent and utilities is the statutory mandate that Plaintiffs seek to enforce.  The comprehensive regulations adopted by HUD define the contours and details of that right, but they do not create the right itself.

foreclose private enforcement. *See Samuels*, 770 F.2d at 195-98; *see also Lowery v. D.C. Housing Authority*, 2006 U.S. Dist. LEXIS 13319, *28-35 (D.D.C.) (holding that a participant in the Housing Choice Voucher Program who had been denied an administrative hearing could enforce 42 U.S.C. § 1437d(k) via § 1983); *Gammons v. Mass. Dep't of Hous. & Cmty. Dev.*, 523 F. Supp. 2d 76 (D. Mass. 2007) (same). In these cases and others, under the Housing Act and numerous other federal statutes, the federal courts have not hesitated to find that "procedural" rights are enforceable under § 1983. This Court should do the same.

III. **In the alternative, Plaintiffs have a private right of action to enforce their rights under the Housing Act and the Low-Income Housing Tax Credit statute to pay limited rent, including an allowance for utilities, directly against Defendants.**

Even if the Plaintiffs had no § 1983 cause of action, they would be entitled to enforce both the Housing Act and Low-Income Housing Tax Credit statutes directly against the Defendants. Both the Housing Act and the Low-Income Housing Tax Credit program confer an individual right to restricted rent that Congress intended benefiting tenants to enforce, thereby creating an implied private right of action. Several federal courts have found an implied right of action under the Brooke Amendment, flowing directly from the same factors identified in the *Wright* decision as supporting enforcement under § 1983. The statute setting forth the Low-Income Housing Tax Credit Program similarly confers an individual right to restricted rent levels, including a utility allowance, with no indication that Congress intended to foreclose private enforcement.

A. Plaintiffs have a private right of action to enforce the Brooke Amendment's limitations on tenant rent and utility payments.

The familiar four-part test for determining whether a federal statute provides an implied private right of action examines: (1) whether the plaintiff is in the class of individuals for whose especial benefit the statute was enacted; (2) whether there is any indication of Congressional intent, implicit or explicit, to create or deny such a remedy; (3) whether private enforcement is consistent

with the underlying purposes of the legislative scheme; and (4) whether the cause of action is one traditionally relegated to state law, making a private cause of action under federal law inappropriate.  *See Cort v. Ash*, 422 U.S. 66, 78 (1975); *El Paso Natural Gas Co. v. United States*, 750 F.3d 863, 889 (D.C. Cir. 2014).  While emphasizing that this test and the test for § 1983 enforcement remain distinct, the Supreme Court has noted that both require the same showing that the statute in question confers individual rights and that Congress intended private enforcement of those rights.  *See, e.g.*, *Gonzaga*, 536 U.S. at 283-84.

The Brooke Amendment easily satisfies these four factors.  As the *Wright* Court recognized, the statute unambiguously confers a specific, mandatory, monetary benefit focused on individual families, with an undeniable intent to benefit those individuals.  479 U.S. at 430; *see also Gonzaga*, 536 U.S. at 280.  While not finding specific evidence in the legislative history of Congressional intent to create private enforcement under the Brooke Amendment – as Defendants note, Defs' Mot. at 19 – the *Wright* Court nonetheless rejected arguments that Congress intended to foreclose private enforcement and noted that subsequent Congressional and agency actions indicated "that private actions were anticipated."  479 U.S. at 425.  This same analysis supports a finding that private enforcement is consistent with the underlying purposes of the Amendment.  Similarly, the *Wright* Court noted the fact that a tenant might be able to bring state law contract claims under a lease for the same violations "is hardly a reason to bar. . .a federal remedy for the enforcement of federal rights," indicating that a private cause of action under federal law to enforce the Brooke Amendment is appropriate.  *See id*. 479 U.S. at 429.

While the *Wright* decision has largely rendered the question of a private right of action a moot point, because of the significant overlap with § 1983 as an enforcement vehicle, several federal court decisions have applied the *Cort v. Ash* analysis to find private right of action under

the Brooke Amendment.  In *Howard v. Pierce*, 738 F.2d 722, 724-30 (6th Cir. 1984), before *Wright* was decided, the Sixth Circuit recognized such a right.  Several district court decisions have followed suit.  In *Junior v. Hous. Auth. of New Orleans*, 1985 U.S. Dist. LEXIS 24085, *2-3 (E.D. La. 1985), the court simply adopted the analysis in *Howard v. Pierce*.  In *Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.*, 620 F. Supp. 806, 809-10 (S.D.N.Y. 1985) and *Castleman v. U.S. Dep't Hous. & Urban Dev.*, 1988 U.S. Dist. LEXIS 10242, *9-10 (W.D. Mo. 1988), the courts analyzed each of the *Cort* factors to find an implied private right of action. *McNeill v. v. New York City Hous. Auth.*, 719 F. Supp. 233, 246-48 (S.D.N.Y. 1989), which declined to find a private right of action under the Brooke Amendment and is cited in Defendants' Motion, represents a minority view.  It also involved very different facts, with tenants claiming that a private landlord's breach of the implied warranty of habitability based on housing code violations in their units (which fell under the Housing Choice Voucher Program) in effect amounted to a breach of the Brooke Amendment.  *See id.*

B.  Plaintiffs have a private right of action under the Low-Income Housing Tax Credit statute.

For similar reasons, the Plaintiffs also have a private right of action to enforce their right to restricted rents, including allowance for utilities, under the Low-Income Housing Tax Credit (LIHTC) statute.  The purpose of LIHTC is to encourage the acquisition, revitalization, and production of affordable housing for low-income families.  *See generally* 26 U.S.C. § 42.[12]  As discussed above, the statute accomplishes this goal by providing incentives to housing providers in the form of tax credits, coupled with mandates that tenants received restricted rents under a

---

[12]      LIHTC is the most important resource for affordable housing production and revitalization under current federal law.  Under LIHTC, 40,502 projects and 2.6 million housing units have been placed in service between 1987 and 2013.  *See* https://www.huduser.gov/portal/datasets/lihtc.html (last visited Jan. 28, 2016).

formula that preserves affordability.  *See id*.  The statute mandates that qualifying properties contain a certain percentage of rent-restricted units occupied by low-income individuals.  *See id*. § 42(g)(1).[13]  "Rent-restricted" units must be affordable, with rents capped at 30 percent of the applicable income limitation, and must include provision of any applicable utility allowance.  *See id*. § 42(g)(2).  While the mechanisms are quite different, both the Housing Act and LIHTC are aimed at supplying affordable housing, using 30 percent of income as the affordability target for the cost of rent and tenant-paid utilities.

Like the Brooke Amendment, the LIHTC rent restrictions confer a specific, mandatory, monetary benefit focused on individual families, with an undeniable intent to benefit those individuals.  Units must be set aside for low-income individuals within specified income ranges, and rents must be capped at a level that is affordable to those families based on their income range. The statutory mandate for rent restrictions speaks in direct terms of the individuals benefited.  *See, e.g.*, *id*. § 42(g)(1) ("individuals whose income is 50 percent or less of area median gross income," and "individuals whose income is 60 percent or less of area median gross income"); *see also id*. § 42(g)(2)(B), (D) (referring to "residents," "low-income tenant").  It is through these rent restrictions that LIHTC achieves its very purpose: to provide affordable housing for low-income families.

Allowing tenants to enforce their right to restricted rents via a private right of action is consistent with the overall legislative scheme of the Low-Income Housing Tax Credit Program. As with the Brooke Amendment, there is no express indication in the statute itself or its implementing regulations that Congress intended to foreclose private enforcement, or that

---

[13]     Specifically, at least 20 percent of units must be rent-restricted and occupied by individuals with incomes at or below 50 percent of area median income, or 40 percent of units must be rent-restricted and occupied by individuals with incomes at or below 60 percent of area median income.  26 U.S.C. § 42(g)(1).

enforcement actions that can be taken by the IRS – specifically, with regard to restricted rents and utility allowances – are sufficiently comprehensive to bar the need for private enforcement. *Cf. Wright*, 479 U.S. at 424-25. The right at issue flows directly from a federal statute creating a federal housing program, hardly the kind of claim traditionally relegated to state law. The fact that a tenant might be able to bring a comparable state law claim "is hardly a reason to bar . . . a federal remedy for the enforcement of federal rights." *Wright*, 479 U.S. at 429.

None of the cases cited by Defendants in their Motion examine the specific question presented in this case: whether a private right of action exists to enforce the tenants' right to restricted rents, including allowance for utilities. Instead, those cases focus on other parts of the statute, *see Mendoza v. Frenchman Hill Ltd. P'ship*, 2005 U.S. Dist. LEXIS 47373, *10 (E.D. Wash. Jan. 20, 2005), or on actions filed by housing providers, not tenants, *see Jardin de las Catalinas Ltd. P'ship v. Joyner*, 861 F. Supp. 2d 12, 21-22 (D.P.R. 2012); *Pendleton Pines Assocs. LLC v. Ledic Mgmt.*, 354 F. Supp. 2d 775 (W.D. Tenn. 2005).[14] For example, the provision of the statute at issue in *Mendoza* requires the housing provider to adopt an agreement with the tax credit agency, which in turn must prohibit certain actions including eviction except for good cause. 2005 U.S. Dist. LEXIS 47373, *10 (citing 26 U.S.C. § 42(h)(6)(E)(ii)(I)). Moreover, the statute specifies that this eviction protection should be enforced by the tenant in state court, *id.* (citing 26 U.S.C. § 42(h)(6)(B)(ii)), strong evidence that Congress intended to foreclose a private right of action under federal law. The statutory mandate for restricted rents, including allowance for utilities, is distinct: it creates a specific, individualized benefit, phrased in terms of tenants who now seek to enforce it, with no evidence that Congress intended to foreclose such private

---

[14]     *Nordbye v. BRCP/GM Ellington*, 2008 U.S. Dist. LEXIS 19891, * (D. Or. Mar. 10, 2008), cited by Defendants, involved a state law action for breach of contract and the propriety of federal removal. The holding in no way addresses enforcement of the statute under federal law.

enforcement.  Under those circumstances, this Court should allow tenants to enforce their federal right via a private right of action under federal law.

### IV. The court has federal-question jurisdiction over the claims relating to violation of the lease and the Low-Income Housing Tax Credit covenant.

Federal jurisdiction is proper over all claims in this case.  As Defendants note in their Motion, Plaintiffs' first three counts raise federal questions under 28 U.S.C. § 1331 and 20 U.S.C. § 1348, and so long as any of those claims remain in this case, the court should exercise supplemental jurisdiction over Plaintiff's fourth and fifth counts, which raise related state law contract claims.  Even if those first three counts did not survive, however, there is an independent basis for federal jurisdiction over the contract claims because they require resolution of substantial questions of federal law.

Although most cases "arise under federal law" within the meaning of 28 U.S.C. §1331 because federal law creates the cause of action, a case may also arise under federal law where a plaintiff's right to relief under a state law claim requires resolution of substantial federal questions.  *See Gunn v. Minton*, 133 S. Ct. 1059, 1064 (2013); *see also Bender v. Jordan*, 623 F.3d 1128, 1130 (D.C. Cir. 2010) (noting that while the breach of contract action in that case "appears on its face to be one created by state law, . . . the federal courts have jurisdiction when, as here, it is apparent that the federal questions overwhelmingly predominate.").  Federal courts have jurisdiction over state law claims "if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress."  *Gunn*, 133 S. Ct. at 1065 (citing *Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308, 314) (2005)).  In *Gunn*, the Supreme Court clarified that the "substantial" prong does not refer to the importance of the federal issue to the parties' case, but rather "the importance of the issue to the federal system as a whole."  *Gunn*, 133

S. Ct. at 1066 (finding that a state legal malpractice claim with an underlying patent issue does not meet substantiality requirement for federal jurisdiction).

Among the cases found to meet the test of *Gunn* and *Grable* are those involving state law contract claims relating to federally-subsidized housing programs. *See, e.g.*, *Evergreen Square v. Wis. Hous. & Econ. Dev. Auth.*, 776 F.3d 463, 467 (7th Cir. 2015) (finding federal jurisdiction over state law claim involving interpretation of federal Section 8 law and guidelines); *One & Ken Valley Hous. Grp. v. Me. State Hous. Auth.*, 716 F.3d 218, 224 (1st Cir. 2013) (finding federal jurisdiction where state contract claim turned on questions of housing authority's implementation of federal regulations and compliance with federally-approved contracts for the Section 8 Housing Choice Voucher Program).

In this case, the state law claims meet all four factors for federal jurisdiction. First, federal questions are necessarily raised in the state contract claims: whether Defendants complied with federal statutes and regulations, incorporated into the contracts, governing the notice and substantive requirements of utility allowances in federal public housing. The lease provisions at issue in Count III include a promise by the landlord to provide a utility allowance as a reduction in the tenant's rent, and to comply with HUD regulations in making any changes to such rent. Compl., ¶¶ 36-37. Similarly, the Indenture of Restrictive Covenants at issue in Count IV includes a promise by the owner that the units "shall be rent restricted as Low-Income Units," and defines "Low-Income Units" with specific reference to the Internal Revenue Code. *See* Indenture at 2, 4 (Art. I.D, Art. III); Compl., ¶ 32. The question of whether Defendants have breached these contracts, as the Plaintiffs allege, turns entirely on the court's interpretation of federal statutes and HUD and IRS regulations governing the federal public housing and LIHTC programs.

Second, the federal questions are "actually disputed," as the Defendants' compliance with the federal requirements is the central question of this lawsuit.  Third, the issue is "substantial," as clarified by *Gunn*.  The federal government has a strong and clear interest in the interpretation and enforcement of the federal laws governing public and LIHTC housing.  It also has an interest in the consistent resolution of these issues and clarification of the law for similarly-situated housing providers and tenants.  Unlike in *Gunn* – where the federal issue was embedded as a "case-within-a-case" and essentially limited in its impact to the case at bar, *see* 133 S. Ct. at 1067-68 – the federal questions here are the beginning and end for the breach-of-contract claims.  How the court resolves those questions in this case will affect not only the parties here, but similar cases in other jurisdictions that concern the interpretation of the same statutory provisions and HUD and IRS regulations.

Nor is there any reason to suppose that addressing these questions in federal court will "disrupt the federal-state balance."  To be sure, contract claims are typically adjudicated in state court, pursuant to state-developed doctrines regarding contract formation, interpretation, and execution.  But this case does not implicate any of those issues.  The only questions in this case require an interpretation of federal law, making this case ideal for federal resolution.[15]

---

[15]     Defendants' request that the contract claims be dismissed as duplicative if the federal causes of action proceed is without basis.  The core concern raised in the case cited by Defendants – jury confusion – is not at issue here, where there has been no jury demand.  *See* Defs' Mot. at 24 n. 6, *citing Hamdy v. County of Niagara*, 2007 WL 295323 (W.D.N.Y.), at *2 (dismissing breach of contract claim where it would be "cumulative, a waste of time and too confusing to submit essentially the same claim to the jury based upon two different theories.").  Litigants regularly bring claims under alternate theories, including in utility allowance cases raising claims quite similar to this one.  *See, e.g., Nelson v. Greater Gadsden Hous. Auth.*, 606 F. Supp. 948, 956 (N.D. Ala. 1985) (ruling on both § 1983 and state law utility allowance claims), *aff'd, Nelson v. Greater Gadsden Hous. Auth.*, 802 F.2d 405, 408 (11th Cir. 1986) (finding district court properly exercised pendant jurisdiction over state law claims in utility allowance case where "federal and state claims clearly derive from a common nucleus of operative fact" and "alleged separate means of redressing a common wrong") (decision abrogated in non-relevant part by *Wright*, 479 U.S. 418 (finding § 1983 was available for enforcement of Brooke Amendment)).

**V. Plaintiffs may enforce the Low-Income Housing Tax Credit covenant as third-party beneficiaries of the contract.**

Defendants' argument against enforcement of the Indenture of Restrictive Covenants for Low Income Housing Tax Credits turns on a critical misunderstanding of the terms of that contract and the rules governing the LIHTC program. Defendants characterize Article III of the Indenture, the provision to which the tenants are third-party beneficiaries, as a "set-aside requirement," apparently relating to the number of units in the housing project that are "rent-restricted." Defs' Mot. at 26. But that is not what the provision says, nor what it means.

Article III of the Indenture, in full, reads as follows:

A. Owner represents, warrants and covenants throughout the term of this Indenture that the Applicable Fraction of units (as defined in Section 42(c)(1) of the Code) shall be 100%.

B. Owner represents, warrants and covenants that, throughout the Compliance Period, not less than 100% of the units shall be rent restricted as Low-Income Units and occupied by households whose income is 60% or less of the Area Median Gross Income, as described in the Code.

Indenture, at 4 (Art. III).[16] This provision does not require any kind of "set-aside" of units in the project; rather, it describes requirements relating to 100 percent of the rental units. The provision also requires that those units "shall be rent restricted as Low-Income Units," which the Indenture defines as "each residential unit, within the property, which is occupied or to be occupied by a household whose income is 60% or less of Area Median Gross Income, as defined in the Code, *and which unit meets the rent restrictions set forth under subsection (g)(2) of the Code* and as are more specifically identified in Exhibit B [setting out the property description for each covered

---

[16]     The term "Applicable Fraction" refers to the percentage of housing in the project, as defined either by number of units or total floor space, that is targeted toward low-income residents. *See* 26 U.S.C. § 42(c)(1)(B)-(D). The "Compliance Period" is the period of 15 years beginning with the first year the tax credits take effect. *Id.* § 42(i)(1).

unit]." *Id.* at 2 (Defn. D) (emphasis added).  Contrary to Defendants' portrayal, the tenants here are not attempting to enforce anything relating to the number of rent restricted units or the character of the families occupying them.  Plaintiffs' claim instead concerns the Indenture's requirement that each unit meet "the rent restrictions set forth under subsection (g)(2) of the Code."  Those rent restrictions include "any utility allowance determined by the Secretary after taking into account such determinations under Section 8 of the United States Housing Act of 1937."  26 U.S.C. § 42(g)(2)(B).  The implementing regulations for Section (g)(2) similarly require LIHTC owners to include a utility allowance in the calculation of tenants' rent.  *See* 26 C.F.R. § 1.42-10.

Put more simply, for an LIHTC unit to qualify as "rent restricted," the rent figure must take into account a utility allowance.  This means that the amount calculated as "affordable" to a family at 60 percent of the Area Median Income must be reduced, just as rent is reduced in public housing, by an allowance amount meant to approximate the average family's utility costs.  *See id.* § 1.42-10(b); 26 U.S.C. § 42(g)(2) (defining "rent restricted" as a unit where the gross rent, including utility costs, does not exceed 30 percent of the income level for the families targeted by the project).  The regulations give owners a number of choices about how to establish the utility allowance, but require an annual review of the amount and advance notice to the tenants of any changes.  *See* 26 C.F.R. § 1.42-10(c).

Because the term "rent restricted" incorporates a utility allowance requirement, Defendants' claim that the tenants may not enforce the utility allowance requirements via Article III of the Indenture is without merit.  Where Defendants have failed to provide an adequate utility allowance, as Plaintiffs allege at ¶¶ 55-59 and ¶ 118 of their Complaint, they have failed to restrict the rents in the manner required by the Indenture and the Internal Revenue Code.  And, for the reasons discussed above at 26-27 with respect to the Brooke Amendment, the failure to give tenants

the required notice of changes in the utility allowance is no less a violation of the rent restrictions than the failure to provide a proper utility allowance in the first place.

**VI. A&R Management and Kettler Management are properly included as Defendants in this case.**

Plaintiffs in this case have stated a claim against A&R and Kettler for breach of contract, based on lease provisions that incorporate the rules governing rent and utilities in subsidized properties.  A&R and Kettler's argument that they are not liable under the lease because they acted as agents of a disclosed principal – namely East Capitol Family Rental LP – is a contested factual issue, and it is not properly raised in this Motion to Dismiss.

An agent is not liable on a contract it executes on behalf of a principal if it discloses the identity of the principal and the agency relationship.  *See Paul v. Judicial Watch*, Inc., 543 F. Supp.2d 1, 5 (D.D.C. 2008) (citing *Rittenberg v. Donohoe Constr. Co. Inc.*, 426 A.2d 338, 341 (D.C. 1981)).  Disclosure requires the other party to have notice at the time of the transaction of both the agency relationship and the principal's identity.  *Ridgewells Caterer, Inc. v. Nelson*, 688 F. Supp. 760, 762 (D.D.C. 1988).   An agent that signs a contract without disclosing its principal and the agency relationship, on the other hand, is personally liable for the contract. *Resnick v. Abner B. Cohen Advertising, Inc.*, 104 A.2d 254, 255 (D.C. 1954).  An agent "does not escape liability by purporting to act for a fictitious or nonexistent principal." *Id.*  Nor can it avoid liability by disclosing the identity of the principal after executing a contract.  *McNeill v. Appel*, 197 A.2d 152, 153 (D.C. 1964).  Whether a principal has been properly disclosed is a question of fact that depends on the circumstances of the transaction.  *American Ins. Co. v. Smith*, 472 A.2d 872, 875 (D.C. 1984).

Here, Plaintiffs have pleaded sufficient facts to state a claim against A&R and Kettler for breach of contract.  Although a prior version of the lease used by A&R around 2008 did identify

A&R as the agent of East Capitol, A&R subsequently had the tenants sign new leases that do not disclose East Capitol Family Rental as the principal. The lease that has been used from at least 2012 through 2015, referenced in ¶ 35 of the Complaint, states on the first page:

> "THIS RESIDENTIAL LEASE (this 'Lease') is made this [date] by and among *Capitol Gateway ('Owner')* and A&R Management, Inc., its authorized management representative or agent ('Management Agent') and [tenant] (hereinafter referred to as "RESIDENT"). Owner and Management Agent are collectively referred to hereinafter as 'LANDLORD.'" (emphasis added).

This lease refers to A&R Management as an agent, but does not disclose East Capitol Family Rental as the principal. Instead, it identifies "Capitol Gateway" as the owner, and suggests A&R Management is its agent.[17] Capitol Gateway is not the same entity as East Capitol Family Rental. Upon information and belief, "Capitol Gateway" is not a trade name for East Capitol or a legal entity of any kind. Similarly, there is no factual support for Kettler's contention that it acted as the agent of a disclosed principal. Kettler has assumed A&R's role at the property, with all parties continuing to perform on the obligations under the leases. Although Plaintiffs have not had the benefit of discovery in this case, no documents reviewed to date disclose East Capitol as Kettler's principal.

Moreover, both A&R Management and Kettler have taken actions, including filing lawsuits against tenants solely in the names of the management companies, which suggest that the companies are independent parties to the lease agreements. During the period at issue in this case, both A&R and Kettler have filed eviction actions against tenants at the property in the management company's own name, with no indication that either was acting as an agent for another entity. *See, e.g.*, *Kettler Management v. Lashawn Scott*, Civil Action No. 2015 LTB 10348 (D.C. Superior

---

[17] Because Plaintiffs did not anticipate a disclosed-principal question, the Complaint does not address this particular paragraph of the lease. To the extent that the Court deems it necessary to ruling on this 12(b)(6) motion, Plaintiffs respectfully request leave to amend the Complaint to include allegations regarding the leases' agency language.

Court); *A & R Management, Inc. v. Yvonne Gaston*, Civil Action No. 2013 LTB 26742 (D.C. Superior Court). A&R has also sued tenants in cases brought under its own name combined with the fictional principal "Capitol Gateway." *See, e.g.*, *A & R Management, Inc. – Capitol Gateway v. Yvonne Gaston*, Civil Action No. 2013 LTB 20471 (D.C. Superior Court).

D.C. Superior Court Rule Civil 17(a) requires that lawsuits be "prosecuted in the name of the real party in interest." For those eviction cases to have been properly filed under the court rule and agency principles, A&R and Kettler themselves must be parties to the lease with the tenants, and not merely signatories on behalf of East Capitol. *See* Restatement (Third) of Agency § 6.01 cmt. e ("An agent who enters into a contract on behalf of a disclosed principal may not sue on the contract in the agent's own name, even if so authorized by the principal, unless the agent does so in another capacity, for example, as a party to the contract or an assignee. If an agent is a party to a contract, the agent may sue on it in the agent's name, the principal's name, or both."). A&R and Kettler are taking the position that they are not, in fact, parties to the lease only now that they are on the other side of a lawsuit with the tenants.

Plaintiffs have pleaded facts sufficient to proceed on the claims against A&R and Kettler. Any ruling regarding whether A&R and Kettler can shield themselves from liability as agents of a disclosed principal is at best premature, as it involves factual issues which will be developed through discovery. In addition, there is a factual question regarding A&R Management's relationship with East Capitol. The R&O agreement describes A&R Management as "having an identity of interest of owner," calling into question whether a true agent-principal relationship existed between the parties, or whether they should in fact be considered one and the same. R&O Agreement, at 17 (Art. 3.4(b)). Without the benefit of discovery, Plaintiffs have not had the opportunity to fully investigate or present to the court these issues. This court should decline

40

Defendants' invitation to dismiss A&R and Kettler from this suit, pending further development of these disputed factual issues.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiffs respectfully request that the Defendants' Motion to Dismiss be denied.

Dated: January 29, 2016

**Respectfully submitted,**

Chinh Q. Le (D.C. Bar No. 1007037)
(cle@legalaiddc.org)
Julie H. Becker (D.C. Bar No. 471080)*
(jbecker@legalaiddc.org)
Beth Mellen Harrison (D.C. Bar No. 497363)*
(bharrison@legalaiddc.org)
Anna Purinton (D.C. Bar No. 999246)*
(apurinton@legalaiddc.org)
LEGAL AID SOCIETY OF THE DISTRICT
 OF COLUMBIA
1331 H Street, N.W.
Suite 350
Washington, D.C.  20005
(202) 628-1161

* Pursuant to LCvR 83.2(b)(g)

By:_____ /s/ _*Julie H. Becker*_____

Attorneys for Plaintiffs