# Exhibit A

Regulatory and Operating Agreement for the PHA-Assisted Units of Capitol Gateway Family Rental, Washington, D.C.

After Recordation Return To:
Margaret McFarland, Esq.
District of Columbia Housing Authority
1133 North Capitol Street, NE, Suite 210
Washington, DC 20002

# REGULATORY AND OPERATING AGREEMENT

## FOR THE

## PHA-ASSISTED UNITS OF

## CAPITOL GATEWAY FAMILY RENTAL

## WASHINGTON, DC

DCHAOGC/MVS/R&O Agree CapGate 5-1-05                 1



## TABLE OF CONTENTS

RECITALS ................................................................................................................................................ -5-

1. ....................................................................................................................... DEFINITIONS. -7-

2. ............................................................................................................. PHA-ASSISTED UNITS. -15-
   2.1 ................................................................................................ Number and Description. -15-
   2.2 ...................................................................................................................... Distribution. -15-
   2.3 ..................................................................................................... Target Households -15-
   2.4 .......................................................................................................... Over-Income Tenants. -15-
   2.5 .................................................................................... Changing Designation of Units. -15-

3. .................................................................................. OPERATION OF PHA-ASSISTED UNITS. -16-
   3.1 ....................................................................................................................... Performance. -16-
   3.2 ..................................................................................................................................... Intent. -16-
   3.3 ..................................................................................................................... Budget. -17-
   3.4 .......................................................................................................... Management Agent. -17-
   3.5 ....................................................................................... Resident Selection and Assignment. -18-
   3.6 ..................................................................................................................... Delegation. -20-
   3.7 ............................................................................................................................ Leases. -20-
   3.8 ................................... Authority Determinations Not to Adversely Affect Owner. -20-
   3.9 ........................................................................................................... HUD Waivers. -21-
   3.10 ........................................................................................... Grievance Procedure. -21-
   3.11 ............................................... Tax Credit Requirements and Bonds Requirements. -22-
   3.12 ....................................................... Due Adoption; Public Housing Agency Plan. -22-

4. ............................................................................ AUTHORITY FUNDING ASSISTANCE. -22-
   4.1 ............................................................................................. Program-Based ACC. -22-
   4.2 .............................................................................................. Operating Subsidy. -23-
   4.3 ......................................................................................... Section 42 Compliance. -24-
   4.4 ........................................................................ Documentation for Operating Subsidy. -25-
   4.5 ......................................................................................................... Future Changes. -25-
   4.6 .............................................................................................. Operating Account. -26-
   4.7 ............................................................................. Subsidy Carryover Account. -26-

5. ........................................................................................... PHA-RELATED RESERVES. -27-
   5.1 .............................................................................. Replacement Reserve (PHA-Assisted). -27-
   5.2 .................................................................................... Affordability Reserve. -27-

6. ....................... PRESERVATION AND TRANSFORMATION OF PHA-ASSISTED UNITS. -28-
   6.1 ................................................................................................................... General. -28-
   6.2 .......................................................................................................... No Contribution. -28-
   6.3 .......................................................................................................... Initial Remedies. -28-
   6.4 .................................................................................................... Transformation. -29-



6.5 ....................................................................Preservation and Transformation Plan. -30-
6.6 ..............................................................................Restoration of Units. -31-
6.7 ..............................................................................First Right of Return. -31-
6.8 ...................................................................................Subsequent Laws. -31-
6.9 .........................................................................................Good Faith. -31-

7 ...............FINANCIAL STATEMENTS AND REPORTS; ANNUAL RECONCILIATION. -32-
7.1 ..............................................................................Accounting System. -32-
7.2 .................................................................................Quarterly Reports. -32-
7.3 ...........................................................Annual Statement of Income and Expenses. -32-
7.4 ....................................................................Annual Audited Financial Statements. -32-
7.5 ..................................................................................Supplemental Data. -32-
7.6 ..................................................................................Annual Reconciliation. -33-
7.7 ..................................................................................Maintenance of Records. -33-

8 ....................NON-DISCRIMINATION AND OTHER FEDERAL REQUIREMENTS -34-

9 ....................INSURANCE REQUIREMENTS; RESTORATION OF PROPERTY -34-

10 .............................................................DISPOSITION AND ENCUMBRANCE -35-
10.1 ..................................................................................No Disposition. -35-
10.2 ..................................................................................No Encumbrances. -35-
10.3 ..................................................................................Exclusions. -35-
10.4 ..................................................................................Transfers of Interests. -36-

11 ........................................................................DEFAULT AND REMEDIES -37-
11.1 ..................................................................................Default. -37-
11.2 ..................................................................................Notice and Cure Period. -37-
11.3 ..................................................................................Remedies. -37-
11.4 ..................................................................................Preserving Operations. -38-
11.5 ..................................................................................Rights of Others -38-
11.6 ..................................................................................Exclusive Remedy -38-

12 ..................................................................DISCLAIMER OF HUD RELATIONSHIPS -38-

13 ..................................................................................MISCELLANEOUS. -39-
13.1 ..................................................................................Term of Agreement. -39-
13.2 ..................................................................................Decision Standards. -39-
13.3 ..................................................................................Authority Approvals. -39-
13.4 ..................................................................................Notices. -40-
13.5 ..................................................................................Further Assurances. -41-
13.6 ..................................................................................No Assignment. -41-
13.7 ..................................................................Interpretation and Governing Law. -41-
13.8 ..................................................................................Severability. -41-
13.9 ..................................................................................No Personal Liability. -41-

13.10.......................................................................Modification of Agreement.    -42-
13.11....................................................... Owner's Employees and Liabilities.    -42-
13.12.................................................................Neither Part an Agent.    -42-
13.13........................................................................... Conflict of Interest.    -42-
13.14........................................................................................ Waivers.    -42-
13.15............................................................................. Total Agreement.    -42-
13.16...........................................................Future Change in Applicable Laws.    -43-
13.17.................................................................................Calendar Days.    -43-
13.18................................................................... Temporary Interests.    -43-
13.19.................................................Acknowledgement of Third Party Rights.    -43-

DCHAOGC/MVS/R&O Agree CapGate 5-1-05    4



## REGULATORY AND OPERATING AGREEMENT
## FOR THE
## PHA-ASSISTED UNITS OF
## CAPITOL GATEWAY FAMILY RENTAL

This **Regulatory and Operating Agreement** (as amended, modified and supplemented from time to time in accordance with Section 13.10, the "Agreement") is entered into as of the _May 3_, 2005, by and between the **District of Columbia Housing Authority** (together with its successors and assigns, the "Authority"), an independent authority of the District of Columbia and a "public housing agency" as defined in the United States Housing Act of 1937, and **East Capitol Family Rental Limited Partnership** (together with its successors and assigns, "Owner"), a limited partnership organized and existing under the laws of the District of Columbia.

### RECITALS

A.    The Authority is the owner of certain real property in the District of Columbia on which are or were previously located the public housing complexes known as East Capitol Dwellings and Capitol View Plaza I, which are being vacated and totally or partially demolished. The United States Department of Housing and Urban Development ("HUD") awarded a FY 2000 HOPE VI Revitalization Grant (the "Grant") to the Authority, pursuant to which HUD is providing the Authority with $30 million in HOPE VI grant funds for the comprehensive revitalization of the East Capitol/Capitol View site and the certain surrounding neighborhoods including a HUD Federal Housing Administration foreclosed Capitol View Plaza II (the "Revitalization"). The Grant is governed by the Grant Agreement as hereafter defined. The housing developments to be built on the sites will be known as Capitol Gateway.

B.    The Revitalization will be implemented in phases. The first phase of the Revitalization is a 151 unit senior building which is already under construction. One of the next phases is the family rental phase which is to be constructed on certain real property in the District of Columbia as more fully described in **Exhibit A** hereto (the "Development Site"). The Development Site and the improvements consisting of 86 units of rental housing to be constructed thereon are referred to herein as the "Development". The Development will include the acquisition of all of the leasehold estate by Owner pursuant to a certain ground lease of even date herewith (as amended, modified and supplemented from time to time, the "Ground Lease"), and the construction and management of 86 units of rental housing (including a leasing/management office) on the Development Site.

C.    The Authority has entered into a Contract for Redevelopment of East Capitol Dwellings and Capitol View Plaza with A&R/THC, LLC ("A&R/THC"), as amended even date herewith to undertake the development, construction and operation of all phases of the Revitalization. Pursuant thereto, A&R/THC has caused Owner to be organized for the

DCHAOGC/MVS/R&O Agree CapGate 5-1-05          5



development, construction, and operation of the Development.

D.    Owner and the Authority desire and intend that the Development be developed, operated and managed so as to create a stable, sustainable community and assure receipt by Owner of all available economic and tax benefits to the fullest extent permitted by applicable law. All 86 units in the Development will be operated and maintained as qualified low-income units under Section 42 of the Internal Revenue Code of 1986, as amended ("**Section 42**"), for a period of not less than the compliance period and any extended use period (as such terms are defined in Section 42), and will additionally qualify as residential units for a period not less than the qualified project period or such later date as required under Section 142 of the Internal Revenue Code of 1986, as amended ("**Section 142**"). In addition, 61 of the units at the Development (the "**PHA-Assisted Units**") shall be set aside as "public housing" as defined in Section 3(b) of the United States Housing Act of 1937, as amended (the "**Act**") and shall be eligible to receive the benefit of operating assistance provided to the Authority by HUD pursuant to Section 9 of the Act or as provided in the MTW Agreement (as defined in Article 1).

E.    The Authority has provided and secured a certain permanent leasehold mortgage loan to Owner (the "**Authority Mortgage Loan**") in the amount of approximately $12,468,913 and certain interest accrued thereon pursuant to a loan agreement of even date herewith entered into between the Authority and Owner (as amended, modified and supplemented from time to time, the "**Authority Mortgage Loan Agreement**"). The Authority Mortgage Loan is secured by a first leasehold mortgage on the Development Site.

F.    Additional financing for the Development includes the following:

1.    A construction loan of tax-exempt bond proceeds in the original amount of approximately $11,125,000 ("**Construction Loan**") is being made by the DCHFA. Following completion of construction of the Development Site, the Construction Loan will be retired with the proceeds of the Authority Mortgage Loan. During construction, the Construction Loan will be collateralized with an account containing funds of the Authority which will be used to fund the Authority Mortgage Loan.

2.    Approximately $6,519,000 million in equity has been or will be obtained through syndication of low-income housing tax credits. The syndication will be accomplished through the admission of the Investor (defined hereafter) as partner(s) in Owner pursuant to Owner's Amended and Restated Limited Partnership Agreement of even date herewith (as amended, modified and supplemented from time to time, the "**Partnership Agreement**").

G.    The Development will be subject to the Tax Regulatory Agreement (defined hereinafter) and the Indenture of Restrictive Covenants (defined hereinafter), and as a result will be subject to certain use restrictions which must be coordinated with use restrictions required by Public Housing Requirements (as hereinafter defined).

H.    Because Owner will be obligated to lease the PHA-Assisted Units to families



whose rents are income-restricted and may be less than the operating costs of the PHA-Assisted Units, the Authority has agreed to subsidize the long-term operation and maintenance of the PHA-Assisted Units through the provision of operating assistance provided to the Authority by HUD.

I.    The Authority is party to a certain agreement with HUD dated as of July 25, 2003 (as amended or succeeded, "MTW Agreement"), relating to the Authority's participation in Public Housing/Section 8 Moving to Work Demonstration authorized under Section 204 of the Omnibus Consolidated Rescissions and Appropriations Act of 1996. Pursuant to such MTW Agreement, and during its term, the Authority is not subject to various provisions of the Act, regulations thereunder, the Annual Contributions Contract, and other HUD requirements specified therein.

## AGREEMENT

In consideration of the foregoing recitals and underlying promises, which both parties agree to be good and valuable consideration, the parties agree as follows:

ARTICLE I    DEFINITIONS.

As used herein, the following terms shall have the following meanings:

1.1    "ACC" means the Consolidated Annual Contributions Contract between HUD and the Authority No. __1__, dated 11|23|99, as amended from time to time including, without limitation, as amended by a Mixed Finance Amendment applying solely to the Development executed substantially contemporaneously herewith.

1.2    "Act" means the United States Housing Act of 1937, as amended from time to time, and any successor legislation.

1.3    "Affiliate" means, with respect to Owner (referred to for clarity in this definition as a "Primary Entity") (1) any entity which has the power and authority to direct the Primary Entity's management and operation, or any entity whose management and operation is controlled by the Primary Entity; or (2) any entity in which an entity described in Section 1.3 (1) has a controlling interest; or (3) any entity a majority of whose voting equity is owned by the Primary Entity; or (4) any entity in which or with which the Primary Entity, its successors or assigns, is merged or consolidated, in accordance with applicable statutory provisions for merger or consolidation, so long as the liabilities of the entities participating in such merger or consolidation are assumed by the entity surviving such merger or created by such consolidation.

1.4    "Affordability Reserve" means a reserve account established by the Owner in accordance with Section 5.2 hereof in order to bridge any PHA-Assisted Units Shortfall.

DCHAOGC/MVS/R&O Agree CapGate 5-1-05                    7



1.5        "Allowable Expense Level" or "AEL" means the Authority's Allowable Expense Level as defined in 24 CFR 990.102, established by HUD for purposes of calculating the Authority's operating subsidy eligibility for the PHA-Assisted Units.

1.6        "Approved Mortgage Lender" means any lender of an Approved Mortgage Loan, together with its successors and assigns.

1.7        "Approved Mortgage Loan" means the Authority Mortgage Loan and any mortgage loan from an Approved Mortgage Lender to Owner that is identified in the Mixed Finance Amendment or that has been approved in writing by the Authority and by HUD, in accordance with Public Housing Requirements.

1.8        "Authority" means the District of Columbia Housing Authority, its successors and assigns.

1.9        "Authority Mortgage Loan" means a mortgage loan of approximately $12,468,913, which consists of HOPE VI Grant Funds, Government of the District of Columbia grant funds, and Authority funds, in addition to certain interest accrued thereon, made by the Authority to Owner pursuant to the Authority Mortgage Loan Agreement.

1.10       "Authority Mortgage Loan Agreement" means the Authority Mortgage Loan Agreement(s) of even date herewith between the Authority, as lender, and Owner, as borrower and any other documents evidencing or securing the Authority Mortgage Loan as defined herein, as the same may be amended or supplemented from time to time.

1.11       "Authority Asset Management Fee" has the meaning given in Section 4.2(a) of this Agreement.

1.12       "Authority Percentage" means the number of bedrooms in the PHA-Assisted Units, divided by the total number of bedrooms in the Development. Any change in the Authority Percentage resulting from a change in the composition of the units comprising the PHA-Assisted Units permitted by Article 2 hereof shall become effective for the PHA Fiscal Year following the year in which such change occurs.

1.13       "Bonds" means, singularly or collectively, the Construction Bonds.

1.14       "Bonds Requirements" means any and all requirements relating to the development and operation of the Development which are contained in the Tax Regulatory Agreement, or any other requirement binding the Owner as a condition or consequence of utilizing proceeds of the Bonds.

1.15       "Business Day" means a day, other than Saturday and Sunday, on which (a) banks located in Washington, D.C., are not required or authorized by law or executive order to close for business, and (b) the New York Stock Exchange is not closed.

DCHAOGC/MVS/R&O Agree CapGate 5-1-05                8



1.16        "Capital Fund" or "Capital Funds" means moneys provided to the Authority by HUD pursuant to Section 9(d) of the Act.

1.17        "Construction Bonds" means the $11,125,000 District of Columbia Housing Finance Agency Collateralized Multifamily Housing Revenue Bonds (Capitol Gateway Family Rental Project) Series 2005.

1.18        "Construction Bond Lender" means the DCHFA and/or Trustee, as may be appropriate.

1.19        "Construction Bond Loan" means the loan agreement of even date herewith between the Construction Bond Lender and the Owner, and for purposes of this document, any other documents evidencing, securing, or in any way relating to the Construction Bond Loan.

1.20        "CPI Index" means the Consumer Price Index for Urban Wage Earners and Clerical Workers issued by the Bureau of Labor Statistics of the U.S. Department of Labor, All Items (1982-84=100) for the Washington-Baltimore, DC-MD-VA-WV area.

1.21        "DCHFA" means the District of Columbia Housing Finance Agency.

1.22        "Declaration of Restrictive Covenants" means that certain Declaration of Restrictive Covenants in favor of HUD, recorded in the land records of the District of Columbia, which obligates the Authority, Owner and any successor in title to the Development Site, including a successor in title by foreclosure or deed-in-lieu of foreclosure (or the leasehold equivalent), to maintain and operate the PHA-Assisted Units in compliance with Public Housing Requirements for the period stated therein, as the same may be amended or supplemented from time to time.

1.23        "Development" means the housing development in the District of Columbia known as Capitol Gateway Family Rental (or any successor name) consisting of eighty-six (86) units of rental housing and the Development Site as defined in Recital B.

1.24        "Development Fiscal Year" means the fiscal year of Owner (which is the calendar year).

1.25        "Development Operating Expenses" means all necessary and reasonable operating expenses of the Development for any period which are generally incurred by all units pursuant to an operating budget, including, without limitation:

(a)        all ordinary and necessary expenses of operations of the Development shown as line items on Form HUD-92547-A (Budget Worksheet), including any payments under the Ground Lease and any real estate taxes or payments in lieu of taxes (to the extent required) that are paid on the Development as a whole, without distinction between PHA-Assisted Units and other units, but exclusive of i) debt service requirements of any lender (including the Authority), and ii) utility expenses for the PHA-Assisted Units which are the direct responsibility of the

DCHAOGC/MVS/R&O Agree CapGate 5-1-05                9



tenant or the Authority;

(b)　　management fees and expenses payable pursuant to the Management Agreement;

(c)　　legal expenses associated with the operation of the Development and accounting and audit expenses, including tax return preparation expenses, which would be permitted to be charged as project expenses pursuant to HUD Handbook 4370.2 REV-1, Financial Operations and Accounting Procedures for Insured Multifamily Projects, or any successor thereto (used for reference but not otherwise applicable to the Development);

(d)　　reasonable contributions to Replacement Reserves required hereunder including other reserves to the extent permitted by the Public Housing Requirements, for any purposes which are deemed prudent by Owner and approved by the Authority, or as required by the Construction Bond Lender or Investor under the partnership agent at the time of closing of the Authority Mortgage Loan;

(e)　　assessments of any community association for which the Development is liable;

(f)　　asset management fee paid yearly to the Investor or its designee;

(g)　　a tax credit monitoring fee and/or any other fee required to be paid to the District of Columbia or its agent;

(h)　　sums for tenant programs and services, as Owner may determine to be reasonable; and

(i)　　fees paid to the Authority.

1.26　　**"Development Site"** means the real property on which the Development is located, as more particularly described in **Exhibit A** hereto.

1.27　　**"DHCD"** means the District of Columbia Department of Housing and Community Development.

1.28　　**"EIOP"** means the End of the Initial Operating Period (as used in 24 CFR §941.404(a) and referenced in 24 CFR §990.102 (Unit Months Available)).

1.29　　**"Grant Agreement"** means the HOPE VI Grant Agreement relating to the revitalization of the Development between the Authority and HUD dated January 12, 2001.

1.30　　**"Ground Lease"** means that certain Ground Lease of even date herewith between the Authority, as Lessor, and Owner, as Lessee, recorded in the land records of the District of Columbia, conveying a leasehold interest in the Development Site.

1.31　　**"HUD"** means the United States Department of Housing and Urban Development,

DCHAOGC/MVS/R&O Agree CapGate 5-1-05　　　　　　10



its successors and assigns.

1.32      "HUD Operating Subsidy" means the Operating Fund assistance received by the Authority from HUD with respect to the Development in any period.

1.33      "Indenture of Restrictive Covenants" means a certain Indenture of Restrictive Covenants for low income housing tax credits executed by Owner and DHCD in connection with the low income housing tax credits and recorded in the land records of the District of Columbia against the Development.

1.34      "Investor" means Enterprise Housing Partners XII Limited Partnership and Enterprise Housing Partners III Series II Limited Partnership, any affiliated entity thereof, or its or their designees, successors and assigns which serve as limited partner and/or special limited partner of the Owner.

1.35      "Management Agent" means the management agent named in the Management Agreement (which shall initially be A&R Management, Inc., having an identity of interest of Owner), or any successor management agent of the Development appointed by Owner in accordance with Section 3.4 of this Agreement.

1.36      "Management Agreement" means the management agreement covering the Development to be entered into between Owner and the Management Agent pursuant to Section 3.4 hereof, as the same may be amended from time to time.

1.37      "Management Plan" means the comprehensive and detailed written description of the policies and procedures to be followed in the management of the Development, as described in Section 3.4 hereof.

1.38      "MTW Agreement" is defined in Recital I.

1.39      "Non-PHA-Assisted Units" means all dwelling units of the Development which are not PHA-Assisted Units.

1.40      "Operating Budget" means an operating budget for the Development that provides for the Development Operating Expenses and has been approved or deemed approved by the Authority in accordance with Section 3.3(a) hereof, as such operating budget may be subsequently amended by Owner with the written approval of the Authority.

1.41      "Operating Fund" or "Operating Funds" means the fund established pursuant to Section 9(e) of the Act, and funds distributed pursuant thereto.

1.42      "Operating Subsidy Payment" means the amount actually paid by the Authority to Owner in satisfaction of the Operating Subsidy Requirement.

1.43      "Operating Subsidy Requirement" is defined in Section 4.2 hereof.

DCHAOGC/MVS/R&O Agree CapGate 5-1-05                    11



1.44      "Owner" means East Capitol Family Rental Limited Partnership and its successors and assigns approved by HUD and the Authority in accordance with, and to the extent required by, Section 10.4 hereof.

1.45      "Partnership Agreement" means the Amended and Restated Agreement of Limited Partnership of Owner, as of the effective date of this Agreement, as it may be amended, modified or supplemented from time to time.

1.46      "Permitted Investments" means (a) direct obligations fully guaranteed by the United States of America or any agency thereof, (b) certificates of deposit and repurchase agreements which are fully insured by the Federal Deposit Insurance Corporation or have maturities no greater than two years issued by any bank trust company or national banking association having an A or better grade, or its equivalent by Standard & Poor's Corporation and Moody's Investor Service, Inc., (c) commercial paper rated in the highest grade by Standard & Poor's Corporation and Moody's Investor Service, Inc., in each case having maturity of not more than one-hundred and eighty days, (d) a money market fund limited to U.S. government obligations, U.S. agency obligations, or repurchase agreements backed by such obligations, (e) investment agreements or guaranteed investment contracts rated, or with any financial institution whose senior long-term debt obligations are rated, at the time such agreement or contract is entered into, in one of the three highest rating categories for comparable types of obligations by any nationally recognized rating agency, and (f) such other investments approved in writing by the Authority and Owner, provided that any such other investment must be consistent with HUD notices on permitted investments or approved in writing by HUD.

1.47      "PHA-Assisted Unit" means a dwelling unit in the Development designated as such by Owner and operated and maintained as a "public housing" unit in accordance with Public Housing Requirements, as further described at Article 2 hereof and eligible for operating subsidy under Section 9 of the Act.

1.48      "PHA-Assisted Unit Lease" means a lease described in Section 3.7 hereof.

1.49      "PHA-Assisted Units Expenses" means (a) the sum of Development Operating Expenses multiplied by the Authority Percentage, plus (b) real estate taxes or payments in lieu thereof, if any are required, that are paid only on account of the PHA-Assisted Units, and that have not been included in Development Operating Expenses. However, the portion of any line item within the Development Operating Expenses included in PHA-Assisted Units Expenses shall be altered from the Authority Percentage if either the Authority or Owner reasonably demonstrates that allocation of such item to the PHA-Assisted Units on the basis of the Authority Percentage is inappropriate (e.g., costs which relate solely or preponderantly to the Non-PHA-Assisted Units, or costs for which the public housing share has been paid through other means). PHA-Assisted Units Expenses shall not include ineligible uses of funds as provided in the Public Housing Requirements.

1.50      "PHA-Assisted Units Income" means (a) PHA-Assisted Rental Income, plus (b)



the Operating Subsidy Payment provided to Owner or other funds provided by the Authority for the Development's operation exclusive of interest on or withdrawals from any reserve account.

1.51        "PHA-Assisted Units Rental Income" means all "dwelling rent" and "other income" (as each is defined in 24 CFR § 990.102 and further defined in 24 CFR § 960.253), if applicable, attributable to PHA-Assisted Units.

1.52        "PHA-Assisted Units Shortfall" means the amount by which PHA-Assisted Units Income is less than PHA-Assisted Units Expenses for any period.

1.53        "PHA Fiscal Year" means the Authority's fiscal year utilized by HUD for purposes of calculating the HUD Operating Subsidy which is currently the year ending on September 30.

1.54        "PHA Plan" means the five year or annual plan adopted by the Authority and approved by HUD in accordance with Section 5A of the Act, or any substitute or alternate plan approved by HUD or the annual plan adopted by the Authority pursuant to the MTW Agreement.

1.55        "Prior Resident" means a family which is identified as such on a list which the Authority has certified and delivered to Owner. The Authority's list will identify families which occupied a unit in the public housing complexes which previously existed on or adjacent to the Development Site, which vacated such unit pursuant to the Authority's request in connection with the Revitalization, and which are eligible for rehousing in accordance with Authority policies or rehousing agreements.

1.56        "Public Housing Assessment System" or "PHAS" means the assessment system utilized by HUD pursuant to 24 CFR Part 902, or its successor for the purposes of inspections of PHA-Assisted Units only.

1.57        "Public Housing Requirements" means the Act; applicable HUD regulations thereunder, any other applicable federal laws, regulations, HUD notices including notices of funding availability, and Executive Orders pertaining to public housing; the ACC (as amended by the Mixed-Finance Amendment); the Grant Agreement; any applicable local statute and regulations including D.C. Code § 6-201 et seq., and the Declaration of Restrictive Covenants (including any documents incorporated into any of them by amendment, exhibit or reference) as those requirements may be waived or amended from time to time. In the event of any conflict among the foregoing authorities, the Declaration of Restrictive Covenants, the Act, D.C. Code § 6-201 et seq., ACC, and any other local statutes and regulations (in that order of primacy, in the event of conflict there among, and taking into account any waivers granted pursuant thereto or pursuant to HUD regulations applicable to privately owned mixed-finance communities such as the Development) shall control; provided however, that the MTW Agreement (and local rules and regulations adopted pursuant thereto) shall be deemed a Public Housing Requirement, and shall supersede any other Public Housing Requirement and such other Public Housing Requirement shall be deemed inapplicable to the extent provided in such MTW Agreement.

DCHAOGC/MVS/R&O Agree CapGate 5-1-05            13



1.58        "Replacement Reserve" is defined in Section 5.1.

1.59        "Revitalization" has the meaning stated in the Recitals.

1.60        "Section 42" means Section 42 of the Internal Revenue Code of 1986, as amended, and any implementing regulations.

1.61        "Section 142" means Section 142 of the Internal Revenue Code of 1986, as amended, and any implementing regulations.

1.62        "Subsidy Carryover Account" means the account established in accordance with Section 4.7 hereof.

1.63        "Tax Credit Requirements" means any and all matters required by Section 42, the Indenture of Restrictive Covenants or any other agreement made with DHCD as a condition of receipt of tax credits, whether or not such requirement is explicitly stated in Section 42 or regulations thereunder.

1.64        "Tax Regulatory Agreement" means, singularly or collectively, a certain Tax Regulatory Agreement executed by Owner and DCHFA (and as appropriate the Trustee) in connection with the Bonds and recorded in the land records of the District of Columbia against the Development.

1.65        "Transformation" means structural adjustments undertaken by Owner in accordance with Article 6 of this Agreement in order to eliminate any long-term PHA-Assisted Units Shortfall and preserve the PHA-Assisted Units as a viable housing resource.

1.66        "Transformation Plan" means the plan described in Section 6.5 hereof.

1.67        "Trustee" means Wachovia Bank, National Association, in its capacity as Trustee under the Trust Indenture relating to the Bonds, together with any successor trustee thereunder and their respective successors and assigns.

1.68        "Unit Months Available" means as defined in 24 CFR §990.102 or any successor regulation, and as used herein shall relate solely to PHA-Assisted Units.

1.69        "Waiting List" means the site-based waiting list described in Section 2.3 hereof.


ARTICLE 2   PHA-ASSISTED UNITS.

2.1   Number and Description.   During the term of this Agreement, Owner will continuously set aside 61 units in the Development as PHA-Assisted Units during the term of this Agreement, which units will initially contain a total of 150 bedrooms ("Initial PHA-Assisted Bedroom Count"). During the term of this Agreement, Owner will maintain and operate the PHA-Assisted

DCHAOGC/MVS/R&O Agree CapGate 5-1-05          14

Units in accordance with Public Housing Requirements and this Agreement. Such units shall be eligible to receive Operating Subsidy Payments from the Authority to the extent that funds for the Operating Subsidiary are appropriated by U.S. Congress and otherwise made available to the Authority pursuant to Section 9(e) of the Act. The PHA-Assisted Units shall be initially comprise of the following mixture of unit sizes and descriptions: 14- 1-Bedrooms, 6- 2-Bedrooms, 40- 3-bedrooms, and 1- 4-bedrooms with a total unit number 61. Of the 61 units, 9 units will be units constructed to the Uniform Federal Accessibility Standards consisting of 6- 2-Bedrooms, 2- 3-Bedrooms, and 1- 4-Bedrooms.

2.2     **Distribution**. The PHA-Assisted Units shall not be fixed units, except the units constructed to the Uniform Federal Accessibility Standards, but shall "float" and as agreed to by the parties, shall be scattered throughout the Development. The mixture of unit sizes and description provided in Section 2.1 shall remain constant, subject to a fifteen percent (15%) deviation from the Initial PHA-Assisted Bedroom Count. PHA-Assisted Units and Non-PHA-Assisted Units shall be maintained and operated without distinction, excepting such differences in admissions procedures, lease terms and other conditions as are mandated by law or intended by Owner and Authority to effectuate the law and/or benefit the Development. The Non-PHA-Assisted Units shall not be subject to this Agreement except insofar as certain maintenance and reporting requirements hereof apply to the Development as a whole.

2.3     **Target Households**. Owner and the Authority intend that the PHA-Assisted Units shall be rented to households with incomes upon admission at or below 60% of area median income as long as the Development is subject to the Tax Credit Requirements. At initial lease-up and thereafter as vacancies occur, Owner will lease vacant PHA-Assisted Units to families on a site-based waiting list established in accordance with Section 3.5 ("Waiting List"); provided, however, that the family meets all eligibility and screening requirements set forth herein or contained in the Management Plan.

2.4     **Over-Income Tenants**. Consistent with the Public Housing Requirements, a unit shall not lose its status as a PHA-Assisted Unit solely because the income of the tenant residing therein rises above the applicable public housing income limit; any such unit shall be governed by rules applicable to units occupied by over-income tenants in the public housing program (subject to such modifications in lease and occupancy terms as are permitted hereunder). If the tenant of a PHA-Assisted Unit shall remain "over income" for a period of one year, Owner shall lease the next-available unit as a PHA-Assisted Unit and thereafter, in accordance with the following Section 2.5, remove the designation of the over-income unit as PHA-Assisted.

2.5     **Changing Designation of Units**. Owner may change the specific units assigned as PHA-Assisted Units at any time provided that:

The number of PHA-Assisted Units shall remain as specified in Section 2.1; and

The number of bedrooms in the PHA-Assisted Units shall remain constant subject to a deviation of fifteen percent (15%) of the Initial Number of PHA-Assisted Bedroom Count as specified in Section 2.1; and

DCHAOGC/MVS/R&O Agree CapGate 5-1-05                    15

If such change is to be made with respect to an occupied PHA-Assisted Unit, the tenant of such unit shall have the same rights with respect to occupancy and rent as applied prior to removal of the unit's designation as a PHA-Assisted Unit (this provision is not applicable to an over-income tenant as provided in Section 2.4); and

Owner shall report changes to the designation of PHA-Assisted Units at least annually, in conjunction with other reporting requirements contained herein, or as otherwise agreed in writing by the Authority and Owner.

## ARTICLE 3    **OPERATION OF PHA-ASSISTED UNITS.**

3.1    **Performance.**  Owner shall maintain and operate the PHA-Assisted Units in compliance with Public Housing Requirements and this Agreement and shall perform such acts to be performed by Owner under the terms of this Agreement to enable the Authority to fulfill its obligations to HUD pertaining to the Development.  Notwithstanding Owner's agreement herein to perform substantial obligations and responsibilities with regard to the PHA-Assisted Units, the Authority remains accountable to HUD for performance of such functions under and pursuant to the ACC and will monitor the performance of Owner to assure the Authority's compliance therewith.  Any actions or inactions that the Authority is permitted by this Agreement to require shall be done by Owner within thirty (30) days of written notice thereof.  Owner shall use diligent efforts to ensure that the Development (or, as applicable, the portion of the Development consisting of PHA-Assisted Units) maintains a designation as a "high performer" under the Public Housing Assessment System ("PHAS") codified at 24 C.F.R. §902, or an equivalent score under any successor statute or regulation adopted by HUD or adopted by the Authority pursuant to the MTW Agreement intended to evaluate the management or maintenance of public housing, to the extent the factors in such system relate to the PHA-Assisted Units or Owner's performance.

3.2    **Intent.**  The Authority and Owner acknowledge that HUD's mixed-finance program is intended to permit public housing authorities to assure a supply of high-quality public housing operated within an environment of private sector practices and incentives.  This Article 3 enumerates certain respects in which operating procedures and other requirements as to the PHA-Assisted Units may differ from those in effect with respect to conventional public housing units owned by the Authority.  The Authority and Owner agree that, if experience demonstrates a need for or the desirability of further departures from standard procedures applicable to PHA-owned public housing, they will consult with each other regarding such further modifications and will take such further implementing steps consistent with Public Housing Requirements, including, as appropriate, requests to HUD for revision or waiver of regulations necessary to enhance the long-term viability of the Development, or requests to the Authority to adopt superseding rules or regulations pursuant to the MTW Agreement, or requests to implement statutory revisions made by Congress from time to time affecting either public housing in general or public housing located within privately-owned mixed-income communities in particular.

3.3    **Budget.**  Not later than one hundred eighty (180) days before the first day of any



subsequent PHA Fiscal Year, Owner shall submit such information as the Authority reasonably requires for its Formula Characteristics Submission. Not later than one hundred twenty (120) days before the first day of any subsequent PHA Fiscal Year, Owner shall submit a proposed yearly operating budget, as the parties hereto may, from time to time, amend by written agreement ("Operating Budget") to the Authority. Owner shall provide to the Authority such supporting information available to it regarding its estimate of Development Operating Expenses as the Authority shall reasonably request. The Authority's review of the Operating Budget is intended to permit it to meet HUD reporting requirements and to reasonably ensure that the Operating Budget accomplishes compliance with this Agreement and permits operation of the Development in an efficient and economical manner sufficient to achieve long-term viability of the Development, consistent with available income including operating subsidy provided by HUD, and is not intended to permit substitution of the Authority's judgment for Owner's or the Management Agent's judgment on routine operating decisions. The Authority shall not have the right to require Owner to incur PHA-Assisted Units Expenses either greater or less than PHA-Assisted Units Income. If the Authority does not object to the proposed Operating Budget within sixty (60) days after its receipt, after compliance by Owner with Section 13.3 hereof, the Operating Budget shall be deemed accepted by the Authority; provided, however, that nothing in this section shall obligate the Authority to provide an Operating Subsidy Payment in excess of the Operating Subsidy Requirement established in Section 4.2(b).

### 3.4    Management Agent.

(a)    Owner will retain Management Agent for the Development pursuant to the Management Agreement which will be subject to written approval by the Authority and HUD. The Management Agreement will hold the Management Agent responsible to Owner for management of the Development in accordance with, *inter alia*, the terms of this Agreement and Public Housing Requirements (with respect to PHA-Assisted Units), and in accordance with the Management Plan prepared by Management Agent which shall be consistent with the Management Agreement and this Agreement (as amended or supplemented from time to time, the "Management Plan") incorporated herein by reference but not recorded among the land records of the District of Columbia. The Management Agreement will contain appropriate provisions permitting Owner to terminate such agreement, and permitting the Authority to require Owner to terminate such agreement, after notice and an opportunity to cure, in the event the Management Agent causes a material breach of this Agreement or a material violation of Public Housing Requirements. The Management Agreement will contain appropriate provisions regarding access by HUD and the Authority, upon reasonable notice, to inspect books and records maintained by the Management Agent relating to the Development.

(b)    The Authority approves the Owner's selection of A&R Management, Inc., which has an identity of interest with Owner, as initial Management Agent and has approved the Management Agreement entered into between Owner and the Management Agent and the Management Plan proposed by the Management Agent. The Authority will have the option to assume and retain management of the Development directly or through an affiliate at the end of any compliance periods provided in the Tax Credit Requirements subject to terms and conditions provided in a management agreement negotiated by Owner and the Authority.



(c)     If Owner shall propose a replacement Management Agent, the Authority may disapprove such proposed Management Agent only in writing specifying good cause for such disapproval. Good cause shall be limited to: (i) the proposed Management Agent's insufficient prior experience or demonstrated poor performance in managing affordable multifamily rental housing; or (ii) the proposed Management Agent's being presently subject to debarment or other legal restraint under Public Housing Requirements.

(d)     Failure by the Authority to state objections to a proposed Management Agent, in writing, consistent with the standards established in this Agreement, within sixty (60) days of receipt of Owner's written proposal, shall constitute the Authority's approval. Pending receipt by Owner of the Authority's written objections or disapproval as aforesaid, and a reasonable time thereafter (no less than sixty (60) days) to correct any conditions forming the basis of the Authority's objections or disapproval or to propose an approvable Management Agent, Owner shall be entitled to manage the Development directly or through its chosen Management Agent so long as it shall do so in full compliance with the terms of this Agreement including the Management Plan.

(e)     The Management Plan shall be approved by Owner, the Authority and HUD prior to its implementation and shall not be amended without the prior written approval of Owner, HUD, and the Authority. Provided, however, that the Authority may refuse to approve the Management Plan, or any proposed amendment thereto, solely on the basis of its written objection that identified provisions in the Management Plan, or any proposed amendment thereto, are materially inconsistent with this Agreement, Public Housing Requirements or the Management Agreement. The Management Plan shall contain appropriate provisions for management policies, practices, and performance standards applicable to the Development. The Management Plan shall contain provisions that require the Management Agent to submit to the Authority for prior review and approval all communications (except communications required by applicable laws, regulations, orders, or general newsletters and updates) with the tenants concerning the PHA-Assisted Unit Lease, rent charges, or Development rules if said communication affects more than five percent (5%) of the tenants. The Authority will review and approve such communications within five (5) business days of receipt or such communication is deemed approved by the Authority.

### 3.5    Resident Selection and Assignment.

(a)     The selection of applicants for admission to occupancy of units in the Development shall be the function of Owner, subject to the approval by the Authority of the standards and policies to be applied with respect to the PHA-Assisted Units and shall be set forth in the Management Plan.

(b)     Owner will establish and operate a site-based waiting list ("Waiting List") for admission to the PHA-Assisted Units, subject to Public Housing Requirements. The Authority will undertake and diligently pursue all steps necessary to ensure that the Waiting List is established in accordance with Public Housing Requirements, including obtaining HUD approval



to the extent such approval is required, prior to one hundred twenty (120) days before construction completion. The Management Plan will provide for the taking of applications at one or more sites maintained by Owner and/or the Management Agent, with appropriate accommodations for people with mobility impairments and other disabilities.

(c)    Owner will accept applications from families on the Authority's certified list of Prior Residents which the Authority has provided to Owner. The Owner will place those Prior Residents who complete housing applications and comply with required procedures within the time given (all such procedures and times to be developed in consultation with the Authority) on the Waiting List ahead of applicants who are not Prior Residents, but subject always to a determination of eligibility and qualification in accordance with screening criteria applicable to Prior Residents, such criteria has been approved by the Authority. Prior Residents and Non-Prior Residents will be placed on the Waiting List according to the following: 1) Prior Residents who participate in the community self sufficiency program; 2) Prior Residents; 3) Residents of public and assisted housing developments East of the River Washington, DC (Wards 7 and 8); 4) public housing residents in the District of Columbia; and 5) low income person or families in the District of Columbia. Owner shall have no responsibility to any person or family claiming to be a Prior Resident, but who is not listed on such Authority-provided list, nor shall any Prior Resident who does not timely respond to a solicitation that has been mailed to the address on such Authority-provided list be entitled to later claim any preference for admission. The priority among the Prior Residents shall be determined on the basis of the chronological order of the dates of the commencement of the Prior Resident's most recent uninterrupted tenancy at East Capitol Dwellings or Capital View Plaza I or II. Prior Residents who no longer have public housing resident status, but who are eligible and qualified for the Non-PHA-Assisted Units, shall have first priority for such units.

Subject to the above-referenced provisions in this sub-section, the target mix for the PHA-Assisted Units shall be the following: 1) fifty percent (50%) shall be occupied by households having incomes at or below 30% of area median income; 2) twenty-five percent (25%) shall be occupied by households having incomes at a) above 30% of area median income and b) below or at 36% of area median income; and 3) twenty-five percent (25%) shall be occupied by households having incomes at a) above 36% of area median income and b) below or at 60% of area median income.

(d)    Owner, through the Management Agent, will be responsible for application intake, applicant interview and screening, verification procedures, determination of eligibility for admission and qualification for preference, record maintenance, waiting list maintenance, unit assignment and execution of leases, and all administrative functions in connection with the enforcement and termination of leases, all in accordance with the Management Plan as amended, modified, or supplemented in accordance with Section 3.12 hereof. The Authority shall have the right to approve any material amendments to the Management Plan. The Management Plan shall incorporate reasonable screening of prospective residents for ability to pay required rent and otherwise comply with the lease. The Management Agent shall establish procedures, which shall be set forth in the Management Plan, for informal review of eligibility or suitability determinations for admission to the PHA-Assisted Units, consisting of an opportunity for a



meeting with a person or persons designated by the Management Agent other than the person who made the initial determination.

(e)     The system for administering admissions to the PHA-Assisted Units may be revised as of the 26th anniversary of the date of first occupancy of any PHA-Assisted Unit, if necessary, such that by no later than the end of the thirtieth (30th) year after the date of first occupancy, there shall be no need for the Authority to provide Operating Subsidy Payments to the PHA-Assisted Units and Owner shall be able to demonstrate a reasonable likelihood of repaying all debt on the Development (including all debt owed to the Authority) in accordance with its terms. Nothing herein is intended to authorize any deviation from Public Housing Requirements, including the admission to the PHA-Assisted Units of any family that is not eligible for public housing.

(f)     Upon the request of Owner, the Authority will request and diligently pursue an exception or waiver or pursue under its authority under the MTW Agreement, of any portion of 24 CFR Part 903, Subpart A as it may be amended or replaced (the "Deconcentration Rule") that is not consistent with the terms of this Agreement or which adversely affects the economic or social viability of the Development. Owner shall not be in default hereunder if a failure or delay in performance of its obligations arises from the application of the Deconcentration Rule to the Development.

3.6     **Delegation**. To the extent that Public Housing Requirements may require the Authority to perform any administrative functions with regard to the PHA-Assisted Units, the Authority shall delegate such responsibility to Owner, subject to re-delegation to the Management Agent, subject at all times to the oversight and approval of the Authority as provided for herein. The right for Owner to delegate the administrative functions with regard to the PHA-Assisted Units provided for herein does not relieve Owner of the responsibilities and obligations provided in this Agreement.

3.7     **Leases**. Tenant leases executed with respect to the PHA-Assisted Units ("PHA-Assisted Unit Leases") shall be on forms proposed by Owner and approved by the Authority and shall comply with 24 C.F.R. Part 966, Subpart A, as amended or replaced from time to time and the Public Housing Requirements, subject to any variations approved by HUD or the Authority in accordance with its authority under the MTW Agreement. An initial form of PHA-Assisted Unit Lease has been so reviewed and approved by the Authority.

Owner may charge as rent to the tenant of each PHA-Assisted Unit (and without regard to any subsidy paid by the Authority) the maximum rental amount permitted by Public Housing Requirements, but subject to a flat or ceiling rent equal to the maximum rent permitted under the Bonds Requirements or Tax Credit Requirements, and subject as well to a minimum rent or maximum rent as provided in the Management Plan. To the extent permitted by Public Housing Requirements, PHA-Assisted Unit Leases shall provide for directed transfers, increases in rental payments and other actions required to increase income from the PHA-Assisted Units under the circumstances contemplated in Section 6.4 hereof.

DCHAOGC/MVS/R&O Agree CapGate 5-1-05            20

3.8    <u>Authority Determinations Not to Adversely Affect Owner</u>.

(a)    Nothing in this section shall limit the effect of Authority actions which are mandated by Public Housing Requirements.

(b)    The parties recognize that if the Authority were hereafter voluntarily to adopt policies or procedures with respect to public housing residents generally which also applied to residents of the PHA-Assisted Units, such policies or procedures might have the effect of causing adverse financial consequences to the Development, either directly or through adverse market effects. It is the intention of the parties, and the specific purpose of this section, that the Development continue to be operated essentially with the degree of difference from or adherence to the Authority's policies for its conventional properties, and with the adherence to private housing market standards, which are reflected in the initial operation of the Development and the initial policies agreed to by the parties, unless a new agency wide policy or procedure adopted by the Authority has a documented adverse financial consequence to the Development.  The following paragraphs are intended to implement this shared understanding and agreement.

(c)    Except as required by the Public Housing Requirements, the Authority shall not adopt particular policies, procedures or documents governing the PHA-Assisted Units which are distinct from those governing residents of the Authority's conventional public housing without the written agreement of Owner (including through this Agreement).  If Owner and the Authority agree, in this Agreement, the Management Plan, or Management Agreement, that the Authority shall adopt or ratify particular policies or procedures governing the PHA-Assisted Units which are distinct from those governing residents of the Authority's conventional public housing (with the approval of HUD,  and which may include, without limitation, the tenant selection procedures and preferences, the Waiting List, the form of PHA-Assisted Unit Lease and the grievance procedure), then the Authority shall do so and shall take no action to amend any such distinct policy, procedure or document governing the PHA-Assisted Units, once so adopted, without the written agreement of Owner .

(d)    If any policy or procedure which the Authority proposes to voluntarily adopt is of a type which the Authority or HUD expect to be applied consistently to every public housing unit and public housing applicant or resident under the jurisdiction of the Authority, then the Authority will attempt to take steps to minimize adverse financial impact on the Owner.

3.9    <u>HUD Waivers</u>.  If at any time during the term of this Agreement HUD shall, by regulation or other administrative rule applicable to the Development (which regulation or rule is not required by statute), modify the eligibility or suitability standards, including preferences, for occupancy of public housing units, the criteria or methods for calculation of applicant or resident income or contribution to rent, or any other factor bearing upon the charges for or occupancy or use of public housing units generally which, in the absence of waiver, would be applicable to the PHA-Assisted Units and which, in the reasonable judgment of Owner, would be adverse to the Development, the Authority shall, upon request by Owner supported by a statement of good cause, (a) promptly submit to HUD and diligently pursue a request for waiver excepting the

DCHAOGC/MVS/R&O Agree CapGate 5-1-05                21



PHA-Assisted Units from the application of such regulation or administrative rule, or (b) alternatively, during the term of the MTW Agreement, the Authority may elect to seek a waiver or adopt a local rule under the MTW Agreement superseding such HUD regulation or rule in whole or in part.

3.10    **Grievance Procedure.** Owner, with Authority approval, will establish a grievance procedure for residents of the PHA-Assisted Units in compliance with the requirements of Section 6(k) of the Act and 24 C.F.R. § 966 Subpart B. Such procedure will provide for informal discussion and settlement of grievances by the Management Agent and hearing before a hearing officer appointed in accordance with procedures to be detailed in the grievance procedure. The Authority will seek HUD approval of variations approved by the Authority from the requirements of 24 C.F.R. § 966, Subpart B, as amended or replaced from time to time or adopt regulations under its authority in the MTW Agreement. An initial form of grievance procedure has been reviewed and approved by the Authority.

3.11    **Tax Credit Requirements and Bonds Requirements.** The Authority acknowledges that the PHA-Assisted Units are also subject to the Tax Credit Requirements and Bonds Requirements and will be operated in accordance therewith. The Authority will not disapprove (with respect to the PHA-Assisted Units) any policy of Owner that is permitted under Public Housing Requirements and required for compliance with the Tax Credit Requirements or Bonds Requirements, nor shall the Authority impose upon Owner any policy or procedure with respect to the PHA-Assisted Units which would cause noncompliance with the Tax Credit Requirements or Bonds Requirements. Owner and the Authority will take such actions as are necessary to set ceiling rents or "flat rents" for the PHA-Assisted Units at a level not to exceed that permissible under the Tax Credit Requirements and Bonds Requirements, and Owner will not collect rents for such units in excess of such levels.

3.12    **Due Adoption; Public Housing Agency Plan.** The Authority will ensure that the material elements of this Agreement or of documents adopted by the parties pursuant hereto (including, but not restricted to, the Management Plan, the Waiting List, site-based resident selection preferences, and any transformation remedies) are reflected in duly adopted written policies of the Authority or duly adopted exceptions to such policies, effective no later than one hundred twenty (120) days before PHA-Assisted Units are first available for occupancy. The Authority will ensure that its PHA Plan continually includes such references to and provisions for the Development and its operations as may be necessary or appropriate to ensure that the provisions of this Agreement and the operating policies of the Development (including, but not restricted to, the Management Plan, the Waiting List, site-based resident selection preferences and transformation remedies) are authorized by the Act and recognized by HUD. The Authority will provide to Owner a true copy of its current PHA Plan and will provide to Owner: (1) a copy of any proposed amended or successor PHA Plan at the time public notice of consideration or proposed adoption is given, and (2) a copy of any amended of successor PHA Plan, as adopted, within 30 days of adoption, and shall make good faith efforts to provide earlier notice of any contemplated changes which would materially affect the Owner.



## ARTICLE 4   AUTHORITY FUNDING ASSISTANCE

4.1    **Program-Based ACC.** The Authority, in consultation with Owner, has entered into a Mixed-Finance Amendment to the ACC with HUD relating solely to the Development. The Authority shall not initiate any amendment to such Mixed Finance Amendment or any amendment to the ACC which materially adversely affects the operation of the Development without the written consent of Owner, the Investor, and, as long as the Construction Bond Loan is outstanding or as may be otherwise applicable, the Construction Bond Lender.

4.2    **Operating Subsidy.**

(a)    It is the general intent of this Agreement that the Development receive the benefit of an Operating Subsidy Payment calculated in accordance with the provisions herein. Under current HUD rules and procedures, but subject to Section 4.5, the methodology described below in sub-section (b) shall be used to calculate a subsidy ("**Operating Subsidy Requirement**") consistent with the foregoing intent:

(b)    In any PHA Fiscal Year, the Operating Subsidy Requirement shall be equal to (1) the Capital Gateway Family Rental AEL, as defined below in sub-section (b)(i), (2) plus Capital Gateway Family Rental UEL, as defined below in sub-section (b)(ii), (3) multiplied times the number PHA-Assisted Units, (4) multiplied by twelve, and (5) minus the PHA-Assisted Units Rental Income.

(i)    "**Capitol Gateway Family Rental AEL**" means the Development Operating Expenses divided by the total number of units multiplied by the number of PHA-Assisted Units and then divided by twelve, exclusive of Owner-paid utilities that is contained in an Operating Budget for the applicable PHA Fiscal Year. Unless otherwise agreed by the parties, the Capitol Gateway Family Rental AEL for any PHA Fiscal Year shall not be less than the Capitol Gateway Family Rental AEL for the prior PHA Fiscal Year multiplied by the CPI Index; provided, however, that notwithstanding the foregoing, the Capitol Gateway Family Rental AEL for any PHA Fiscal Year shall not exceed the Authority's AEL Cap, as defined in sub-section (b)(iv), for such fiscal year as shown (subject to Section 4.5 hereof) on line A-08 of Form 52723 as approved by HUD for such fiscal year or any successor system.

(ii)    "**Capitol Gateway Family Rental UEL**" means the per unit per month cost of utilities paid for the PHA-Assisted Units which are anticipated to be paid by the Owner. At the Authority's election, the Authority will pay all utilities associated with such PHA-Assisted Units. In the event the Authority elects to pay such utilities, any such payment shall not be included in the "Capitol Gateway Family Rental UEL."

(iii)    The Operating Subsidy Requirement for each PHA Fiscal Year shall be established prior to commencement of the PHA Fiscal Year, using (unless the



parties agree otherwise) the Owner's budgeted tenant and operating cost data, as approved by the Authority, as of the same date or period as was used by the Authority to establish its average dwelling rental income pursuant to 24 CFR § 990.109(b) or any successor regulation. In the event that any other element of the calculation is unknown at the commencement of the PHA Fiscal Year, the parties will provisionally use the same element from the prior PHA Fiscal Year or such alternative as they may agree upon, and shall recalculate and reconcile payments to date when the element is established.

(iv)     Subject to Section 4.5 hereof, the "**Authority's AEL Cap**" for any fiscal year shall be 95% of the "**Funded AEL**" defined as (1) the Authority's AEL (As currently shown on line A-08 of Form 52723) as approved by HUD for such fiscal year (or, in lieu of the Authority's AEL, any Project Expense Level established by HUD for the Development), minus (2) the per unit dollar amount of the Authority's operating subsidy entitlement which HUD actually does not fund in such year (as currently shown on Line F-7 of HUD Form 52723).

(v)     If during any PHA Fiscal Year, HUD adjusts or supplements the Authority's operating subsidy entitlement, retroactively altering the Authority's AEL Cap, a pro rata adjustment or supplement (on a per unit basis) shall be made to the Operating Subsidy Requirement for the same year which the Authority shall immediately pass through to Owner, provided, however, that if the Authority shall receive "catch up" amount from HUD for prior months, the Authority shall pay over to Owner its attributable share of funds within ten (10) days of the Authority's receipt of such funds.

(c)     Operating Subsidy Payment.

(i)     During each PHA Fiscal Year commencing in the PHA Fiscal Year in which the PHA-Assisted Units become eligible for operating fund subsidy pursuant to 24 CFR § 941.404(a) and no later than the 10th business day of each month or such other period as the Authority and Owner shall agree, the Authority shall pay one-twelfth (1/12th) of the Operating Subsidy Requirement for such PHA Fiscal Year (each as "**Operating Subsidy Payment**").

(ii)     In the event the Authority fails to make any Operating Subsidy Payment as and when due, whether or not Owner makes a withdrawal from the Affordability Reserve or Subsidy Carryover Account as provided herein, the Authority shall remain liable to make such payment promptly upon receipt from HUD  Owner shall return to the account from which it made a withdrawal, by way of replenishment, the amount of funds previously withdrawn (but not to exceed the amount of Operating Subsidy Payment subsequently made).

(iii)     The Owner shall deposit all Operating Subsidy Payments received from the Authority into a general operating account for the Development held in a federally-insured deposit financial institution. Owner shall also deposit all receipts derived from the PHA-Assisted Units, including tenants' rents, carrying charges and other revenues into the general

DCHAOGC/MVS/R&O Agree CapGate 5-1-05                24



operating account for the Development which account shall not hold any commingled funds from any other development.

(iv)    The Operating Subsidy Payment shall commence as of EIOP. Provided, however, that if it shall be ultimately determined that HUD did not commence providing Operating Subsidy Payments with respect to the Development until some date subsequent to EIOP, then (unless HUD's delayed commencement was due to the failure of the Authority to properly and diligently seek or fulfill its obligations with respect to the commencement of subsidy) the Owner shall proceed under (c)(ii) above. The Authority and Owner will work diligently to see that such payments of operating funds commence as early as possible. Subject to HUD consent, the Authority and Owner will establish sub-projects in accordance with **Exhibit B** which will have their own dates of full availability ("DOFA") as PHA-Assisted Units become available for occupancy. The Authority shall include the PHA-Assisted Units in its operating subsidy request to HUD within thirty (30) days following achievement of EIOP.

4.3       **Section 42 Compliance**.

(a)     In order to assure compliance with Section 42, notwithstanding anything to the contrary set forth in this Agreement, in any Development Fiscal Year all or part of which is included in the "compliance period" defined in Section 42 and in which Operating Subsidy Payments are made to the Owner, Operating Subsidy Payment will be paid to and retained by the Owner under this Agreement only to the extent that they constitute "qualifying rental assistance payments" as defined in Section 1.42-16 of the Treasury Regulations. In the event that the annual financial statements required to be provided by Owner to Authority pursuant to Section 7 below demonstrate that payments of Operating Subsidy Payments for any year covered by the preceding sentence exceed the amount constituting "qualifying rental assistance payments," the overage shall be promptly deposited by Owner into the Subsidy Carryover Account (as defined below). Owner shall not have any ownership interest in such excess funds at any time, but shall hold them in trust for the Authority until deposit into the Subsidy Carryover Account. No deposit shall be made into the Subsidy Carryover Account pursuant to this section of the balance in the Subsidy Carryover Account exceeds any ceiling established in Section 4.7(d). Any overage not deposited into the Subsidy Carryover Account shall be promptly refunded to the Authority or credited against Operating Subsidy Payments for the succeeding year as directed by the Authority after consultation with the Owner.

(b)     Separately and independently from the reconciliation provided for under subsection (a) above, but subject to adjustment if needed after such reconciliation, Owner shall return to the Authority not later than 60 days after the end of each Development Fiscal Year, the amount, if any, of Operating Subsidy Payments received by Owner during such Development Fiscal Year attributable to any PHA-Assisted Unit for a period in which such PHA-Assisted Unit was vacant for a period longer than 60 days. A PHA-Assisted Unit shall be deemed vacant (i) commencing on the first day for which rent is not charged for the unit following termination or expiration of its occupancy as a PHA-Assisted Unit, and (ii) ending on the day preceding the first day for which rent is charged for such unit based on re-occupancy as a PHA-Assisted Unit, or the first day for which rent is charged for occupancy as a PHA-Assisted Unit of a different unit

DCHAOGC/MVS/R&O Agree CapGate 5-1-05                25



which was not previously occupied as a PHA-Assisted Unit, whichever shall first occur. The amount of Operating Subsidy Payment attributable to a PHA-Assisted Unit for a period in which such unit was vacant for a period longer than 60 days shall be determined by multiplying the total of Operating Subsidy Payments received by Owner during such year by the product of (A) the number of bedrooms of such vacant PHA-Assisted Unit, divided by the number of bedrooms of all PHA-Assisted Units in the Development, multiplied by (B) the number of days beyond the 60th day after such PHA-Assisted Unit became vacant during which such unit remained vacant, and (C) divided by 365.

4.4   **Documentation for Operating Subsidy.** Within thirty (30) days of the Authority's request, Owner shall provide to the Authority the information necessary to allow the Authority to complete all documentation required by HUD with respect to requests for HUD Operating Subsidy. The Authority shall promptly submit such documentation to HUD and take any and all reasonable and necessary actions to obtain prompt HUD approval thereof and to ensure that there is no interruption in the HUD Operating Subsidy.

4.5   **Future Changes.** The parties recognize that HUD's implementation of the Operating Fund is evolving. Upon HUD's elaboration or revision of the Operating Fund regulations, the parties agree to amend this Article 4 if and as necessary so as to achieve as closely as possible the effect contemplated herein. In the event a "Project Expense Level" is established by HUD for purposes of calculating operating subsidy available to the Development, the Authority and Owner both shall use their most diligent efforts to secure the maximum Project Expense Level available. In the event a tenant-based subsidy or any other replacement subsidy system is established in lieu of the current Operating Fund, such that the mechanism described in this Article 4 is fundamentally incompatible with the federal subsidy system, the Authority and Owner both shall use diligent efforts to secure the maximum subsidy available to support the Development.

4.6   **Operating Account.** Operating Subsidy Payments received from the Authority, together with all other operating receipts in respect of the Development including tenant rents and charges and other revenues (but exclusive of tenant security deposits), shall be deposited by Owner in a Development-wide operating account maintained in a financial institution whose deposits are insured by an agency of the Federal Government. The operating account shall at all times be fully insured or held in Permitted Investments.

4.7   **Subsidy Carryover Account.**

(a)   Establishment. After any budgeted deposit to the Replacement Reserve (PHA-Assisted) as provided in Section 5.1, Owner shall deposit any remaining excess of PHA-Assisted Units Income over PHA-Assisted Units Expenses, up to the amount of Operating Subsidy Payments received by Owner in such year, for deposit into a "Subsidy Carryover Account". Such amount shall be deposited on an annual basis within 30 days of the date audited financial statements are provided by Owner to Authority in accordance with Section 7.4 hereof. Interest earned on this account shall be reinvested in the account and shall be available for use as described herein.

DCHAOGC/MVS/R&O Agree CapGate 5-1-05          26



(b)     Ownership. The Subsidy Carryover Account shall be maintained as an escrow account or a dual signature account in one or more financial institutions whose deposits are insured by an agency of the Federal government. Funds placed in the Subsidy Carryover Account (including interest thereon and including any additional amounts deposited therein from time to time pursuant to the terms hereof) shall be invested by the Authority in Permitted Investments, shall constitute restricted trust funds to be applied during the term of this Agreement solely for the benefit of the PHA-Assisted Units in accordance with the terms and conditions hereof, and shall be used solely for those uses authorized for Operating Funds under Section 9(e) of the Act. Unless and until paid over to Owner for use in operations, funds in the Subsidy Carryover Account shall remain the property of the Authority.   Upon any sale or transfer of Owner's interest in the Development during the term of this Agreement, amounts remaining in the Subsidy Carryover Account shall continue to be available to assist the PHA-Assisted Units, in accordance with this Agreement. Upon termination of this Agreement, any funds in the Subsidy Carryover Account shall be released to the Authority free of any trust.

(c)     Withdrawals. Owner may cause the Authority to withdraw sums from the Subsidy Carryover Account at any time in a year that a PHA-Assisted Units Shortfall exists or can reasonably be forecast in the next ninety (90) days, and pay such sum over to Owner. Any such withdrawal may be in the amount of the current or forecast PHA-Assisted Units Shortfall. Owner will provide to the Authority, together with any request for withdrawal, documentation establishing the need therefore. The Authority shall approve disbursement of the requested amount within ten (10) days of a properly justified and documented request therefor. Payment from the Subsidy Carryover Account to Owner shall be deemed an Operating Subsidy Payment for all purposes hereunder. All withdrawals from the Subsidy Carryover Account are subject to the annual reconciliation process set forth in Section 7.6 hereof.

(d)     Ceiling. If at any time the fund balance in the Subsidy Carryover Account shall exceed six (6) months of the current year's budgeted PHA-Assisted Units Expenses, upon the written agreement of Owner, which agreement shall not be unreasonably withheld, delayed or conditioned, the Authority may transfer such excess from the Subsidy Carryover Account and treat it as any other operating receipt of the Authority, free of any trust hereunder. Owner shall be obliged to agree to such withdrawal, unless Owner contests that an excess exists in accordance with this paragraph.

## ARTICLE 5    PHA-RELATED RESERVES.

### 5.1    Replacement Reserve (PHA-Assisted).

(a)     Establishment. Owner may deposit no less than Two Hundred Fifty Dollars ($250.00) and no greater than Five Hundred Dollars ($500.00) per PHA-Assisted Unit per year, increased on an annual basis by 3 percent(3%), into a replacement reserve account ("Replacement Reserve "); provided, however, that such deposit shall not include any amount that causes a PHA-Assisted Units Shortfall unless the Owner, in its sole discretion, determines to contribute such amount from its own funds including cash flow from Non-PHA-Assisted Units.



Such amount shall be deposited on an annual basis no later than the time audited financial statements are provided by Owner to Authority in accordance with Section 7.4 hereof.

(b)    Restricted Funds. Funds placed in the Replacement Reserve (PHA-Assisted) (including interest thereon and including any additional amounts deposited therein from time to time pursuant to the terms hereof) shall be invested by the Owner in Permitted Investments and shall constitute restricted trust funds to be applied during the term of this Agreement solely for the benefit of the PHA-Assisted Units in accordance with the terms and conditions hereof. Upon any sale or transfer of Owner's interest in the Development during the term of this Agreement, amounts remaining in the Replacement Reserve (PHA-Assisted) shall continue to be available to assist the PHA-Assisted Units, in accordance with this Agreement.

(c)    Use. Funds in the Replacement Reserve (PHA-Assisted) may be used by Owner solely for necessary repair, replacement or modernization of the PHA-Assisted Units (including their allocable share of all common areas and structures) all such expenditures to be reflected in an approved annual budget or otherwise approved in writing by the Authority. Owner may expend such funds for that portion of the Development's capital needs which is attributable to the PHA-Assisted Units based on the Authority Percentage or as the parties otherwise agree is appropriate under the circumstances, but in any event in accordance with Public Housing Requirements and subject to such approvals of the Construction Bond Lender or Investor as may be otherwise required.

5.2    Affordability Reserve. Owner shall establish a partnership reserve denominated the Affordability Reserve and deposit therein from equity, no later than the Investor's final equity contribution, $150,000 (the "Initial Deposit"). During the term of this Agreement, Owner will make withdrawals from the Initial Deposit only to cover any PHA-Assisted Units Shortfall that cannot be paid from the Subsidy Carryover Account, unless otherwise approved by the Authority. In the event Owner makes a withdrawal because the Authority has failed to make an Operating Subsidy Payment equal to the Operating Subsidy Requirement, or a payment from the Subsidy Carryover Account as required hereunder, and the Authority shall subsequently make such missed payment, then the amount previously withdrawn shall be repaid to the Affordability Reserve. Upon sale or transfer of Owner's interest in the Development during the term of this Agreement, amounts remaining in the Affordability Reserve shall continue to be available to assist the PHA-Assisted Units, in accordance with this Agreement; provided, however, that in connection with the sale or transfer of Owner's interest in the Development to the Authority, Owner shall pay any balance in the Affordability Reserve to the Authority, such payment to be applied by the Authority against the outstanding balance on the Authority Mortgage Loan.

## ARTICLE 6    PRESERVATION AND TRANSFORMATION OF PHA-ASSISTED UNITS.

6.1    General. The parties recognize that they are structuring a long-term relationship premised on, among other things, the continuation without substantial change of the Act and the maintenance of full federal appropriations to support the federal government's obligations under



the Act. The purpose of this Article is to ensure that in the event there should be any legislative changes, diminished appropriations, uncontrollable cost increases, or other circumstances not the fault of Owner which create an imbalance of income and expenses attributable to the PHA-Assisted Units, the viability of the Development can be maintained without unnecessary hardship to then-current residents or excessive claim on scarce resources of the Authority.

6.2    **No Contribution.** It is the intent of this Agreement that the Owner's obligation to maintain and operate the PHA-Assisted Units in accordance with Public Housing Requirements shall be funded with PHA-Assisted Units Income. Owner shall not be expected to contribute from its own funds toward PHA-Assisted Units Expenses in order to preserve the PHA-Assisted Units as required hereunder.

6.3    **Initial Remedies.** In the event that there is a PHA-Assisted Units Shortfall for any reason, the Authority shall remain obligated to pay the Operating Subsidy Requirement to Owner in accordance with Article 4 hereof. Owner shall continue to maintain and operate the PHA-Assisted Units as required hereunder and will draw upon the Subsidy Carryover Account or the Affordability Reserve as provided herein as a temporary measure to bridge such Shortfall; provided, however, that if the quarterly statements of income and expenses for the Development delivered pursuant to Section 7.2 shall indicate a PHA-Assisted Units Shortfall of more than fifteen percent (15%) of PHA Assisted Units Expenses, and Owner reasonably forecasts that such PHA-Assisted Units Shortfall will not be made up and eliminated over the next two succeeding quarterly periods, or if any event (including without limitation a legislative or regulatory event) should occur which makes it substantially certain that a PHA-Assisted Units Shortfall of the indicated magnitude will occur imminently, then Owner may give notice to the Authority and HUD, and obtain the Authority's written approval prior to availing itself of the provisions of Paragraphs (b)-(c) below, but only if Owner simultaneously undertakes Paragraph (a) below. Upon the occurrence of circumstances which would entitle Owner to exercise "initial remedies" pursuant to this Section 6.3, the Authority shall be deemed to be unable to fulfill its contractual obligations for purposes of Section 35(h) of the Act or any successor.

(a)    Cost Cutting Plan.    Owner shall undertake in good faith to develop a plan to reduce Development Operating Expenses (but not to the physical or financial detriment of the Development or so as to adversely affect the health or safety of residents). However, Owner shall not be required to seek to reduce maintenance, renewal and replacement and other Development Operating Expenses below a level which Owner determines to be prudent, nor below the level of such expenses incurred for other units (in the same geographic area that are managed by the Management Agent and subject to Section 42) as a condition to, or as a preferred corrective action to, seeking to increase income from tenant rents in accordance with the following paragraphs, nor shall Owner be required to reduce the management fee below District of Columbia residential apartment market levels, to reduce resident services expenditures below that required to support the resident population, to reduce services and amenities below that required to competitively market to, and retain, residents; or to act in a manner which would violate Tax Credit Requirements, Bonds Requirements or any other regulatory or financing agreement by which Owner is bound.



(b)    Adjust Income Mix on Turnover. Owner may take such steps as it deems necessary and in accordance with Public Housing Requirements, Tax Credit Requirements and Bonds Requirements to increase the income level of new tenants admitted to the PHA-Assisted Units, including giving admission preference to public housing eligible persons or families having higher income levels than would otherwise receive priority under the system of preferences used by the Authority and/or applicable to the Development, but subject always to Sections 6.7 and 3.5(e).

(c)    Cooperation of the Authority. In order to facilitate the rental of units in the Development to public housing eligible persons or families having higher income levels as provided in the preceding paragraph, the Authority will offer conventional public housing units or Housing Choice Vouchers, to the extent available to the Authority, to sufficient tenants in the Development so as to encourage lower-income tenants to vacate the Development. The Authority shall take all such administrative actions as may be necessary to confirm the authorization contained in this paragraph

6.4    **Transformation.** If:

(a)    at least six (6) months after the notice given pursuant to Section 6.3, all such actions by Owner and the Authority are insufficient to eliminate the PHA-Assisted Units Shortfall for a period of three (3) consecutive calendar months, or

(b)    at any time the Affordability Reserve shall have a balance of less than three (3) times the current monthly PHA Assisted Units Expenses; or

(c)    if Owner and the Authority agree at any time that more focused measures are necessary in order to preserve the PHA-Assisted Units for lower-income housing use,

then, Owner may take all further restructuring actions necessary to eliminate the PHA-Assisted Units Shortfall so that income from the PHA-Assisted Units in the aggregate, plus all such public assistance as aforesaid, shall be not be less than (but not substantially more than) PHA-Assisted Units Expenses; provided, however, that any such actions must be consistent with Public Housing Requirements (including Section 35(h) of the Act), and with Tax Credit Requirements and Bonds Requirements. The PHA-Assisted Units Lease shall provide for the possibility of Transformation remedies.

6.5    **Preservation and Transformation Plan.**

(a)    Before Owner may exercise its rights under Section 6.4 hereof, Owner shall develop and submit for Authority's approval a Preservation and Transformation Plan ("**Transformation Plan**") which satisfies Public Housing Requirements and sets forth in detail the nature and priority of different remedial actions to be taken, the rights of existing tenants affected thereby, and other relevant matters. Such Transformation Plan must be reasonably likely to eliminate any PHA-Assisted Units Shortfall while maximizing the availability of PHA-Assisted Units for low-income and very-low income families and minimizing the adverse effects

DCHAOGC/MVS/R&O Agree CapGate 5-1-05                30



on existing tenants. Owner may develop and submit such a Transformation Plan at any time after providing notice under section 6.3.

(b)    Owner and the Authority shall make diligent efforts in good faith to agree upon a Transformation Plan. If they shall fail to agree prior to Owner being entitled to exercise remedies in accordance with Section 6.4 or within sixty (60) days of Owner proposing such a Plan (whichever is later), Owner may proceed to implement its Plan. However, if the Authority shall advance to Owner (or place in escrow for Owner's access pursuant hereto) additional operating subsidy sufficient (based on current income/expense data) to fund the PHA-Assisted Units Shortfall for at least six (6) months without any further depletion of the Affordability Reserve, then Owner shall follow the Transformation Plan of the Authority until either the Transformation Plan accomplishes its goals and can be terminated, or the additional subsidy advanced by the Authority has been exhausted, in which case Owner may institute its own Transformation Plan. All such plans shall be specifically subject to HUD's approval to the extent required by Public Housing Requirements.

(c)    Any Transformation Plan will provide as follows, in addition to any provisions required by (and to the extent not otherwise required by) Public Housing Requirements including, without limitation, the Uniform Relocation Act:

(i)    Revisions in the rent structure may require some households to pay more than otherwise-applicable limits, as permitted by Section 35(h) of the Act, and/or may impose a higher minimum rent applicable to all households. If a new rent structure is not contained within the Transformation Plan, Owner shall give the Authority written notice of the new rent structure for its prior written approval if required hereunder. After the Authority approval, Owner shall give each affected household at the Development written notice of the new rent structure, which shall be effective no sooner than the first of the month that is more than thirty (30) days following such notice.

(ii)    To the extent that the Authority has available substitute housing (Housing Choice Voucher or public housing), the Authority shall offer such substitute housing to households which are unable, or which fail, to pay the rent which Owner has specified for such household and unless contrary to any MTW Agreement, or if applicable, Section 35(h) of the Act, Owner may direct the transfer of such households to such substitute housing pursuant to the Uniform Relocation Assistance and Real Property Acquisition Act of 1970 (42 U.S.C. §4601 et seq.), if applicable. If applicable law (including the MTW Agreement) permits the Authority to provide Housing Choice Voucher subsidies to the Owner on behalf of households residing in the PHA-Assisted Units, and the Authority has available such subsidies, then the Authority shall do so and Owner shall accept such subsidies in lieu of displacing households unable to pay the rent.

(iii)    All expenses to be incurred in relocating residents shall be provided for in the Transformation Plan.

6.6    **Restoration of Units.** If, subsequent to institution of remedial steps described in



Sections 6.3 and 6.4 above, the Operating Subsidy Payment, the resources provided hereunder, and any other resources made available shall support operation on a continuing basis of all or a portion of the number of PHA-Assisted Units in the manner they were operated prior to such action, and the Affordability Reserve shall have been restored to at least the amount of the Initial Deposit, the obligation of Owner to so operate such number of units as public housing in accordance with the terms hereof shall be reinstated, subject to continuing rights of existing tenants.

6.7    **First Right of Return**. Households that vacate PHA-Assisted Units in the Development because of Owner's exercise of any of the remedies provided herein shall have a right of first return if the obligations of Owner are reinstated pursuant to the foregoing Section 6.6, subject to such households' continuing eligibility for the PHA-Assisted Units.

6.8    **Subsequent Laws**. Nothing contained herein shall prevent or diminish the full application to PHA-Assisted Units of any legislation enacted after the date hereof which provides for the termination of operating subsidies under Section 9 of the Act, including, without limitation, any provision thereof releasing or otherwise modifying occupancy or tenant rent restrictions previously applicable to units in such developments.

6.9    **Good Faith**. The parties agree to act in good faith and cooperate with each other to find strategies to ensure the continued viability of the Development if changes occur with respect to the Operating Fund beyond the changes contemplated in this Agreement. In so agreeing, the parties are mindful of Authority's obligation to its entire portfolio of public housing stock, as well as the desire of both parties to preserve the Development as a feasible affordable housing development.


## ARTICLE 7    FINANCIAL STATEMENTS AND REPORTS; ANNUAL RECONCILIATION.

7.1    **Accounting System**. Owner will maintain a system of accounting established and administered in accordance with sound business practices and Public Housing Requirements.

7.2    **Quarterly Reports**.

(a)    As soon as available, but not later than thirty (30) days from the end of each fiscal quarter other than the final quarter of each fiscal year, Owner shall submit to the Authority a Quarterly Report, commencing on the first quarter in which any of the units are occupied. The Quarterly Report shall consist of all narratives, reports and statements provided to the general and limited partners of Owner including all compliance reports and statements otherwise provided to Investor and will include, at a minimum, a balance sheet, an income statement, and a narrative summary describing any significant financial activity which is not captured in the balance sheet and income statement. The Quarterly Report shall also include a current rent roll identifying all PHA-Assisted Units.

DCHAOGC/MVS/R&O Agree CapGate 5-1-05                    32



(b)      As soon as available, but not later than thirty (30) days from the end of each fiscal quarter, the Authority will provide to Owner a Quarterly Report stating the current balance in each account maintained by it pursuant to this Agreement, including without limitation the Subsidy Carryover Account, and any deposit to or withdrawal from such account.

7.3      **Annual Statement of Income and Expenses**. As soon as available, but not later than ninety (90) days after the end of each PHA Fiscal Year, commencing with the year in which occupancy of the Development first occurs, Owner shall deliver to the Authority, separately with respect to the PHA-Assisted Units and the Development as a whole, itemized statements of income and expenses, prepared on an accrual basis, in form substantially comparable to Form HUD-52599 (Statement of Operating Receipts and Expenditures) certified by an officer of the general partner of Owner, from the beginning of the PHA Fiscal Year to the end of such PHA Fiscal Year.

7.4      **Annual Audited Financial Statements**. Not later than one hundred twenty (120) days after the end of each Development Fiscal Year, Owner shall deliver to the Authority, a copy of the audited financial statements of Owner for such year prepared in accordance with accounting principles generally used for partnerships operating Section 42 housing developments and accompanied by the report of independent certified public accountants thereon, together with a copy of any additional financial statements or reports delivered by Owner to its general and limited partners.

7.5      **Supplemental Data**. The financial statements described in Section 7.4 shall be accompanied by supplemental data which shall show on an accrual basis for such period (i) PHA-Assisted Units Rental Income, (ii) the Operating Subsidy Payments received by Owner, including from the Subsidy Carryover Account; (iii) any other operating revenues or assistance attributable to the PHA-Assisted Units, (iv) PHA-Assisted Units Expenses, and (v) net deposits to the Replacement Reserve (PHA-Assisted). Such supplemental data shall also include (vi) the balance at the end of the period of the Subsidy Carryover Account, Replacement Reserve (PHA-Assisted), Affordability Reserve and any other reserve or special account relating specifically to the PHA-Assisted Units, and (vii) aggregate stated lease rents and the amounts thereof uncollected from PHA-Assisted Units for which no eviction actions have been commenced.

7.6      **Annual Reconciliation**.

(a)      If the supplemental data provided pursuant to Section 7.5 above shall show that the sum of the amounts described in clauses (i) PHA-Assisted Units Rental Income, (ii) (Operating Subsidy Payments, including from the Subsidy Carryover Account) and (iii) (any other operating revenues or assistance attributable to the PHA-Assisted Units) shall exceed the amount described in clauses (iv) (actual PHA-Assisted Units Expenses) and (v) (net deposits to Replacement Reserve (PHA-Assisted)), then not later than thirty (30) business days following delivery of such supplemental data to the Authority, Owner shall deposit any excess, up to the total amount of Operating Subsidy Payments received in the subject fiscal year, to the Subsidy Carryover Account. Owner shall pay over any remaining excess to the Authority to be retained by the Authority and used for eligible purposes.

DCHAOGC/MVS/R&O Agree CapGate 5-1-05                    33

(b)    If the supplemental data provided pursuant to Section 7.5 above shall show that the sum of the amounts described in clauses (i) PHA-Assisted Rental Income, (ii) (Operating Subsidy Payments, including from the Subsidy Carryover Account) and (iii) (any other operating revenues or assistance attributable to the PHA-Assisted Units) shall be less than the amount described in clause (iv) thereof (actual PHA-Assisted Units Expenses), the Owner may withdraw any deficit amount from the Subsidy Carryover Account until it is exhausted and then from the Affordability Reserve as long as income and expenses conform to the Operating Budget.

7.7    **Maintenance of Records**.  It shall remain the responsibility of the Authority to maintain sufficient records and to take necessary action to assure HUD that all the Authority obligations to HUD under Public Housing Requirements are fulfilled.  Owner is to maintain all records in accordance with HUD requirements, as it relates to PHAS and other requirements.  Where the ACC or other Public Housing Requirements, including PHAS, require the Authority to furnish reports, records, statements, certificates, documents or other information to HUD, or otherwise deal with HUD, Owner shall furnish to the Authority such reports, records, statements certificates, documents or other information as are within its control and shall provide all other information in its control reasonably requested by the Authority. Owner shall retain books and records of the Development for a period of three (3) years from the close of the PHA Fiscal Year to which they apply, unless prior to the expiration of such period the Authority notifies Owner that the Authority is required to see to the preservation of such records for a longer period under 24 CFR §85.42(b)(2).

# ARTICLE 8    NON-DISCRIMINATION AND OTHER FEDERAL REQUIREMENTS.

Owner will comply with all applicable requirements of the following, as the same may be amended from time to time:

A.    The Fair Housing Act, 42 U.S.C. 3601-19, and regulations issued thereunder, 24 C.F.R. Part 100; Executive Order 11063 (Equal Opportunity in Housing) and regulations issued thereunder, 24 C.F.R. Part 107; the fair housing poster regulations, 24 C.F.R. Part 110, and advertising guidelines, 24 C.F.R. Part 109.

B.    Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d, and regulations issued thereunder relating to nondiscrimination in housing, 24 C.F.R. Part 1.

C.    Age Discrimination Act of 1975, 42 U.S.C. 6101-07, and regulations issued thereunder, 24 C.F.R. Part 146.

D.    Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794, and regulations issued thereunder, and PIH Notices interpreting such provisions, 24 C.F.R. Part 8; the Americans with Disabilities Act, 42 U.S.C. 12181-89, and regulations issued thereunder, 28 C.F.R. Part 36, and any voluntary compliance agreement by and between the Authority and HUD.



E.    Section 3 of the Housing and Urban Development Act of 1968, 12 U.S.C. 1701u, and its implementing regulations of 24 C.F.R. Part 135 which requires thirty percent (30%) of the new hires of owner and its subcontractor including the Management Agent to be "Section 3 Residents" and ten percent (10%) of the funds for subcontractors to be with "Section 3 Concerns" as such terms are defined in 24 CFR § 135.5.

F.    Wage rates under the Davis-Bacon Act (40 USC § 276(a) et seq.).

G.    OMB Circular Number A-110 and A-122 as they relate to the acceptance and use of federal funds and to 24 CFR Part 85, to the extent applicable.

## ARTICLE 9    INSURANCE REQUIREMENTS; RESTORATION OF PROPERTY.

9.1    Owner shall comply with all requirements of Part B, Attachment VII of the ACC and shall procure and maintain in force adequate insurance to protect Owner and the Authority from financial loss resulting from hazards, including, without limitation, hazards insured against under such types of coverages as are required by Part B, Attachment VII, of the ACC, or if stricter, such coverages and in such amounts as may be required by any lender (including, without limitation, the Authority as lender under the Authority Mortgage Loan), and such other hazards to which Owner determines that exposure exists. Without limiting the generality of the foregoing, Owner shall maintain all risk-insurance with respect to all insurable property pertaining to the Development, including a deductible no greater than $25,000, against loss or damage by fire, lightning, windstorm, explosion, hail, tornado and such other hazards as are presently included in so-called "all-risk" coverage, in an amount not less than 100% of the full replacement cost (as established by an agreed value endorsement approved by the Authority), including the cost of debris removal, without deduction for depreciation and sufficient to prevent Owner from being a co-insurer, such insurance to be in builder's risk (non-reporting) form during and with respect to any construction on the Development Site.

9.2    If any act or occurrence of any kind or nature (including any taking by condemnation or any casualty) shall result in damage to or loss or destruction of the Development, in whole or in part, and without diminution of any obligation of Owner in respect thereof under the Approved Mortgage Loans, Owner, to the extent that insurance proceeds or condemnation proceeds and other funds, if any, made available by the Authority (including, without limitation, by further advance pursuant to the Approved Mortgage Loans) permit, shall promptly cause the restoration, reconstruction, and/or repair of the Development as nearly as possible to its value, condition and character immediately prior to such taking or casualty. The Approved Mortgage Loan documents shall contain provisions requiring restoration consistent with the foregoing if such restoration shall be determined feasible in accordance with the ACC, including the Mixed-Finance Amendment, provided however, that any determination of infeasibility shall be subject to HUD approval. If such condemnation or insurance proceeds and other available funds are not sufficient or restoration is otherwise determined in accordance with the Approved Mortgage Loan documents to be not feasible, such proceeds shall be applied as provided in the Approved Mortgage Loan documents and the number of units (and bedroom count) in the Development

DCHAOGC/MVS/R&O Agree CapGate 5-1-05                35



remaining following such taking or casualty (and following any construction, reconstruction or repair undertaken by reason thereof or necessitated thereby) which shall be PHA-Assisted Units shall be determined in accordance with Section 13(B) of the ACC, as amended by Section 11 of the Mixed-Finance Amendment.

## 10    DISPOSITION AND ENCUMBRANCE.

10.1    **No Demolition or Disposition.**  During the term of this Agreement and during such further period when such approval may be required by law as then in effect, and subject to the terms of Sections 10.3 and 10.4 hereof, Owner shall not demolish or dispose of its interest in the PHA-Assisted Units (including, without limitation, by conveyance or lease of the Development or any portion thereof, or by assignment of Owner's rights under this Agreement), without the prior written approval of the Authority and HUD.

10.2    **No Encumbrances.**  During the term of this Agreement, and subject to the terms of Sections 10.3 and 10.4 hereof, Owner shall not mortgage, pledge, or otherwise encumber its interest in the PHA-Assisted Units or in the Development, without the prior written approval of the Authority and HUD.

10.3    **Exclusions.**  The following actions are expressly excluded from the covenants set forth in Sections 10.1 and 10.2 hereof:

(a)    Mortgage of Owner's interest in the Development Site and the Development pursuant to any Approved Mortgage Loans, and transfer of the Development Site or the Development to the mortgagee under any of such mortgage loans, by foreclosure or deed-in-lieu of foreclosure (or the leasehold equivalent thereof), or to a third-party purchaser pursuant to a foreclosure sale (or the leasehold equivalent thereof), provided that any such transfer shall be subject to the terms of the Declaration of Restrictive Covenants and this Agreement.

(b)    Conveyance or dedication of land for use as streets, alleys, or other public rights-of-way, and grants and easements for the establishment, operation, and maintenance of utility services.

(c)    Normal uses and encumbrances associated with the operation of the Development or arising by operation of law.

(d)    Execution and recordation of the Tax Regulatory Agreement, Indenture of Restrictive Covenants, or other covenants, conditions or restrictions pursuant to Tax Credit Requirements or Bonds Requirements.

(e)    Execution and recordation of instruments subjecting the Development Site or the Development to a Planned Unit Development or otherwise recording zoning requirements

(f)    Execution and recordation of covenants, conditions and restrictions relating to a



common interest community including the Development.

(g)    Leases of dwelling units at the Development in accordance with this Agreement.

10.4    **Transfers of Interests.**

(a)    No transfer, conveyance, or assignment shall be made, without the approval of the Authority and HUD, of (i) any interest of a general partner, managing member or controlling stockholder (any such interest being referred to as a "Controlling Interest") in Owner, or (ii) a Controlling Interest in any entity which has a Controlling Interest in Owner, or (iii) prior to payment in full of all equity contributions described in the evidentiary documents approved by HUD under the Mixed-Finance Amendment, any other interest in Owner, or in any partner or member thereof. The Authority agrees that they will not unreasonably delay a request by Owner for consent to an internal reorganization of the corporate or partnership structure of Owner or any of the partners, members, or stockholders of Owner. A limited partnership interest in Owner shall not be deemed a Controlling Interest.

(b)    Notwithstanding the foregoing,

(i)    the Authority's consent is not required where a business organization that has a limited interest (non-controlling and non-managing member) in the Owner transfer a non-controlling and non-managing interest in the business organization, provided that the Owner , provides HUD and the Authority with written notice of such transfer, and certifies to the Authority that the new owner of the limited interest remains obligated to fund its equity contribution in accordance with the terms of the HUD approved organizational documents of the Owner.

(ii)    The consent of the Authority will not be required for the transfer of the investor (limited partnership or member) interest in Owner to an investor entity in which Enterprise Social Investment Corporation or an affiliate thereof remains the general partner or managing member, provided that the Owner provide the Authority with the written notice of such transfer and certifies to the Authority that the new investor entity remains obligated to fund its equity contribution in accordance with the terms of the HUD approved organizational documents of the Owner.

(iii)    The approval of the Authority will not be required for the removal of the general partner in Owner by the Investor that is an affiliate of the Investor but the Authority will be provided with thirty (30) days advance written notice of such substitution. However, in all other events of the substitution of a new general partner by the Investor, the approval of the Authority shall be required.

## ARTICLE 11  DEFAULT AND REMEDIES.

11.1    **Default.** An Event of Default by either party under this Agreement shall occur if that party violates, breaches, or fails to comply with any material provision of, or obligation under,

this Agreement (including, without limitation, by reason of its violation, breach, or failure to comply with Public Housing Requirements) and fails to cure such default within the time period provided in Section 11.2.

11.2    **Notice and Cure Period.**

(a)    Upon a determination by one party that a default by the other party has occurred, the non-defaulting party shall notify the defaulting party in writing of (i) the nature of the default, (ii) the actions required to be taken by the defaulting party to cure the default, and (iii) the period of time within which the defaulting party must respond with a showing that all required actions have been taken, provided that such period time shall be no less than thirty (30) days for other monetary defaults, and no less than sixty (60) days for non-monetary defaults, or such additional periods of time as may be reasonable, provided that the defaulting party promptly commences the cure of such default within the initial cure period and diligently prosecutes the same to completion.

(b)    In addition to all other rights of the Investor hereunder, if upon receipt of said written notices from the Authority, the Investor shall have exercised its removal right under the Partnership Agreement and the substitute general partner within thirty (30) days of being admitted to Owner either has cured such default or has commenced to cure and thereafter diligently and continuously pursues same, then Owner shall not be considered in default or breach of the Agreement.

11.3    **Remedies.** If the defaulting party (or, as applicable, the Investor and/or the Construction Bond Lender if either has exercised intervention rights available to it) fails to respond or take corrective action to the satisfaction of the non-defaulting party within the time periods set forth above, the non-defaulting party shall have the right to exercise any equitable remedy available to it by reason of the nature of such default, including without limitation to seek appropriate relief through a non-compulsory arbitration proceeding conducted under rules of the American Arbitration Association (need to define type of arbitration) or otherwise as the parties may agree, or to seek appropriate relief in any court having jurisdiction, including but not limited to specific performance, injunctive relief, or the appointment of a receiver to take over and operate the Development in accordance with the terms of this Agreement.

11.4    **Preserving Operations.** The Authority agrees that until it prevails in an arbitration proceeding conducted as provided above, or obtains a court order from a court of competent jurisdiction, and the Owner has failed to cure its default within the time provided by such arbitrator or court (but not less than 30 days), Owner shall not be deemed in default of this Agreement for purposes of any cross-default provision in any other document and the Authority will continue to pay the Operating Subsidy Payment provided, however, that Owner shall provide all reports specified in Section 7.1 on a monthly basis.

11.5    **Rights of Others.** The Authority shall transmit concurrently to the Investor, the Construction Bond Lender only during the time the Construction Bonds are outstanding, and to any Approved Mortgage Lender a copy of any notice of default by Owner under this Agreement,

DCHAOGC/MVS/R&O Agree CapGate 5-1-05                    38



and in the event that Owner shall fail to cure any such default within the applicable time period, the Investor and any Approved Mortgage Lender shall be given a reasonable period of time (not less than ninety (90) days) to effect a cure of Owner's default; provided, however, that in an emergency situation the Authority shall be permitted to act temporarily to protect the PHA-Assisted Units and the tenants thereof.

11.6    **Exclusive Remedy.** Notwithstanding anything to the contrary herein, in the event that diminished appropriations under Section 9 of the Act or other legislative changes significantly reduce the amount of operating subsidy that the Authority is able to provide to the Owner, the remedies contained in this Agreement, consistent with the Act (including, without limitation Section 35(h) thereof) as amended from time to time, and applicable HUD Regulations issued pursuant thereto, including, but not limited to, steps to be taken by the Owner to increase the rent derived from the PHA-Assisted Units, shall be the exclusive remedies available to the Owner with respect to the reduction of operating subsidies provided by the Authority to the Owner.   The Owner further agrees that in the event that diminished appropriations under Section 9 of the Act or other legislative changes significantly reduce the amount of operating subsidy that the Authority is able to provide, the Owner shall have no recourse under this Agreement against any other "project" or "operating receipt" of the Authority, as the term project is defined in the ACC or any public housing operating reserves of the Authority reflected in the Authority's annual budget and provided by HUD in accordance with the ACC or otherwise. Nothing in this paragraph shall restrict Owner from seeking payment of the Operating Subsidy Requirement, which by its terms is reduced in the event of a reduction in the HUD-provided subsidy.

## ARTICLE 12  DISCLAIMER OF HUD RELATIONSHIPS

12.1    The Authority and Owner acknowledge that any transfer of HUD grant funds by the Authority to Owner shall not be or be deemed to be an assignment of such grant funds, and Owner shall not succeed to any rights or benefits of the Authority under the ACC or Grant Agreement, or attain any privileges, authorities, interests, or rights in or under the ACC or the Grant Agreement.

12.2    Nothing contained in the ACC or in any agreement between the Authority and Owner, nor any act of HUD or the Authority, shall be deemed or construed to create any relationship of third-party beneficiary, principal and agent, limited or general partnership, joint venture, or any association or relationship involving HUD, except between HUD and the Authority as provided under the terms of the ACC; provided, however, that any Approved Mortgage Lender  shall be entitled to rely upon Section 11(D) of the Mixed-Finance Amendment and to foreclose upon its mortgage and/or exercise any rights or remedies thereunder, and in doing so, succeed to the status of Owner under said mortgage and hereunder.

## ARTICLE 13  MISCELLANEOUS.

13.1    **Term of Agreement.** This Agreement shall continue in full force and effect until the later to occur of (i) expiration of the period during which the PHA-Assisted Units are required by law

DCHAOGC/MVS/R&O Agree CapGate 5-1-05          39



to be operated as "public housing" in accordance with the Act, and (ii) the expiration of 40 years from the date of first occupancy of a PHA-Assisted Unit.

### 13.2 Decision Standards

(a)    In any approval, consent or other determination by any party required under any of this Agreement, the party shall act reasonably, in good faith and in a timely manner, unless a different standard is explicitly stated, but such standard shall not require the Authority to act more reasonably than a commercial party that is not quasi-government or publicly funded.

(b)    "Good faith" means honesty in fact in the conduct or transaction concerned based on the facts and circumstances actually known to the individual(s) acting for the party.

(c)    "Discretion", "sole discretion", "option", "election" or words of similar import in this Agreement denote the party's privilege to act in furtherance of the party's interest.

(d)    "Judgment" denotes a subjective standard obligating the party to use good faith in forming its professional opinion or estimate.

(e)    "Reasonable judgment" denotes an objective standard obligating the party in good faith to act in a manner which is consistent with usual and customary practices of entities similarly situated, and not arbitrary or capricious.

### 13.3 Authority Approvals.

(a)    Notwithstanding anything hereinabove provided, in all instances where the Authority is empowered or required to grant its approval or otherwise take action, the Authority's exercise or non-exercise of such power shall (subject to Public Housing Requirements) be consistent with Tax Credit Requirements, Bonds Requirements and Owner's obligations to the DCHFA and any Approved Mortgage Lender under their respective documents.

(b)    For all actions requiring Authority approval, Owner shall submit the request for approval and supporting information with a notice that bears a bold face legend substantially as follows: "Important: Your Response is Required in ___ Working Days."

(c)    The Authority shall have a specified number of days to respond in writing. The Authority's response, if not an approval, must include the basis for any objection and suggested modifications to obtain approval. For some issues, this Agreement identifies the number of days that the Authority shall have to respond. For other issues, the amount of response time shall be stated in the notice, and shall be proportionate to the type and magnitude of the decision and the Owner's need to operate the Development. For example, but not in limitation, the decision time for emergency situations shall be shorter than the time for review and approval of budgets. Such notice requesting Authority approval shall no less than ten (10) business days excluding emergencies which shall be twenty-four (24) hours. Emergencies shall be life-threatening

DCHAOGC/MVS/R&O Agree CapGate 5-1-05                    40



situations.

(d)     If Owner does not receive a response within the specified number of days, it may send the Authority a notice of non-response, which shall be delivered to the Executive Director of the Authority in accordance with the formal notice provisions hereof and which shall bear the bold-faced legend, "**Important: Notice of Non-response**". Following the giving of this notice, the Authority will have five (5) business days in which to respond.

(e)     If the Authority does not respond within such five (5) business days, the Authority shall be deemed to have approved the action.

13.4    **Notices.** All notices, requests, demands, approvals, or other communications given hereunder or in connection with this Agreement shall be in writing and shall be deemed given when received, if (i) delivered by hand, (ii) sent by registered or certified mail, return receipt requested, (iii) sent by recognized overnight delivery service such as Federal Express, or (iv) transmitted by facsimile or electronic mail, provided such notice is also sent simultaneously in the manner provided for in (i), (ii), or (iii) above, addressed as follows:

If to the Authority:          Michael Kelly, Executive Director
                              District of Columbia Housing Authority
                              1133 North Capitol Street, NE
                              Washington, DC  20002

Copy to:                      Margaret McFarland, General Counsel
                              District of Columbia Housing Authority
                              1133 North Capitol Street, NE
                              Washington, DC  20002

If to Owner:                  East Capitol Family Rental Limited Partnership c/o
                              A&R Development Corp.
                              1040 Park Avenue, Suite 300
                              Baltimore, MD  21201
                              Attention:  President

Copy to:                      Monica Hilton Sussman, Esq.
                              Nixon Peabody LLP
                              401 9th Street, N.W., Suite 900
                              Washington, D.C.  20004

If to Investor:               Enterprise Housing Partners XII Limited Partnership
                              Enterprise Housing Partners III Series II Limited
                              Partnership
                              c/o The Enterprise Social Investment Corporation
                              10227 Wincopin Circle, Suite 810



Columbia, MD 21044

If to DCHFA:

Milton Bailey, Executive Director
District of Columbia Housing Finance Agency
815 Florida Avenue, N.W.
Washington, DC 20001

Copy to:

General Counsel
District of Columbia Housing Finance Agency
815 Florida Avenue, N.W.
Washington, D.C. 20001

If to HUD:

U.S. Department of Housing and Urban Development
Office of Public Housing Investment
451 7th Street, S.W., Fourth Floor
Washington, D.C. 20410

All such notices and other communications shall be deemed given on the date of personal or local courier delivery, telecopy (fax) transmission, delivery to overnight courier or express delivery service, or deposit in the United States Mail, and shall be deemed to have been received (i) in the case of personal or local courier delivery, on the date of such delivery, (ii) in the case of telecopy (fax), upon receipt of electronic confirmation thereof, (iii) in the case of delivery by overnight courier or express delivery service, on the date following dispatch, and (iv) in the case of mailing, on the date specified in the return receipt therefor.

13.5    **Further Assurances.** Each party shall execute such other and further documents as may be reasonably necessary or proper for the consummation of the transaction contemplated by this Agreement.

13.6    **No Assignment.** This Agreement shall be binding upon and inure to the benefit of the successors and assigns of each of the parties; provided, however, that except as provided in Section 10.4, Owner may not assign its interest in the Agreement without the prior written consent of the Authority and HUD, which shall not unreasonably be withheld.

13.7    **Interpretation and Governing Law.** This Agreement shall not be construed against the party who prepared it but shall be construed as though prepared by both parties. This Agreement shall be construed, interpreted, and governed by the laws of the District of Columbia. It is the intention of the parties that each and every provision of law required to be inserted and set forth in this Agreement shall be so inserted and if any such provision has not been inserted, by mistake or otherwise, it shall be deemed incorporated herein.

13.8    **Severability.** If any portion of this Agreement is declared by a court of competent jurisdiction to be invalid or unenforceable, such portion shall be deemed severed from this Agreement and the remaining parts shall continue in full force as though such invalid or unenforceable provision had not been part of this Agreement.



13.9    **No Personal Liability.** No officer, director, shareholder, partner, employee, agent or other person authorized to act for or on behalf of either party shall be personally liable for any obligation, express or implied, hereunder. Owner shall look solely to Authority funds that are legally available for such purpose, and the Authority shall look solely to Owner, for the satisfaction of any remedy each party might have with respect to the other for the other's failure to perform any of its obligations hereunder.

13.10    **Modification of Agreement.** This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties and approved in writing by HUD, the Construction Bond Lender (during the Construction Bond Loan period) and the Investor.

13.11    **Owner's Employees and Liabilities.** It is understood that persons engaged or employed by Owner as employees, agents, or independent contractors shall be engaged or employed by Owner and not by the Authority; and Owner alone is responsible for their work, direction, compensation and personal conduct. Nothing included in any provision of this Agreement shall impose any liability or duty upon the Authority to persons, firms, or corporations employed or engaged by Owner in any capacity whatsoever, or make the Authority liable to any such persons, firms, or corporations, or to any government, for the acts, omissions, liabilities, obligations, and taxes, of whatsoever nature, of Owner or of its employees, agents, or independent contractors.

13.12    **Neither Party an Agent.** Nothing in this Agreement shall be deemed to appoint either Owner or the Authority as an agent for or representative of the other, and neither one shall be authorized to act on behalf of the other with respect to any matters except those specifically set forth in this Agreement. Neither Owner nor the Authority shall have any liability or duty to any person, firm, corporation, or governmental body for any act of omission or commission, liability, or obligation of the other, whether arising from Owner's or the Authority's actions under this Agreement or otherwise.

13.13    **Conflict of Interest.** Both parties warrant that to their actual knowledge, this Agreement (if deemed a contract) would not violate Article 19 of the ACC. Owner shall not knowingly grant an interest hereunder to a person identified in such Article 19 except with the approval of the Authority and HUD.

13.14    **Waivers.** The failure of either party to insist in any one or more cases upon the strict performance of any of the other party's obligations under this Agreement or to exercise any right or remedy herein contained shall not be construed as a waiver or a relinquishment for the future of such obligation, right or remedy. No waiver of any provision of this Agreement shall be deemed to have been made unless set forth in writing and signed by the waiving party.

13.15    **Total Agreement.** This instrument embodies the whole agreement of the parties with respect to the matters set forth herein. There are no promises, terms, conditions, or obligations other than those contained herein, and this Agreement shall supersede all previous communications, representation, or agreements, either verbal or written between the parties. Without limitation, the parties acknowledge and agree that this Agreement, together with the



Ground Lease and the Authority Mortgage Loan Agreement, supercedes and replaces the covenants and agreements contained in a certain Contract for Redevelopment of East Capitol and Capitol View Plaza, as contemplated in Section 4.01 of that Contract for Redevelopment, which Contract for Redevelopment shall have no continuing force or effect with respect to the Development (as that term is defined and used in this Agreement) to the extent of any differences or conflicts between the provisions of that Contract for Redevelopment and this Agreement.

13.16   **Future Changes in Applicable Laws.** The parties hereto agree that in the event any of the federal or other legal requirements currently applicable hereto are amended, modified or repealed subsequent to the date hereof, it is the intent of the parties that, to the greatest extent permitted by law, nothing herein shall be construed or interpreted to apply such amendments, modifications, or new requirement in a manner more restrictive of the operation of the Development than those requirements currently applicable to the Development.

13.17   **Calendar Days.** Unless otherwise stated, all references herein to a numbered period of days means calendar days.

13.18   **Temporary Interests.** Any rights granted hereunder to the DCHFA, DHCD, any Approved Mortgage Lender, or other party, shall exist and be effective only for so long as such party maintains an otherwise enforceable interest in the Development, as through a currently effective loan or regulatory agreement. Any approval rights of HUD referenced herein shall be required only if and to the extent required by then-current Public Housing Requirements.

13.19   **Acknowledgment of Third Party Rights.** The parties hereto expressly acknowledge the Investor and the First Mortgage Lender as a 3rd party beneficiary to enforce specific rights of notice and cure granted to it hereunder.

[Remainder of Page Left Blank]



IN WITNESS WHEREOF, the parties have duly executed this Agreement by their duly authorized signatories on or as of the date written on the initial page hereof.

AUTHORITY:        DISTRICT OF COLUMBIA HOUSING AUTHORITY

By:

Michael Kelly, Executive Director

DISTRICT OF COLUMBIA  )

The foregoing instrument was signed and acknowledged before me this **2nd** day of
___**MAY**___, 2005, by Michael Kelly as Executive Director of the District of Columbia Housing Authority, a public body corporate and politic.

_Madine M. Robinson_
Notary Public

Print, Type or Stamp Name

Personally Known____ or Produced Identification __✓__
Type of Identification Produced **DC DL**

Madina M. Robinson
Notary Public, District of Columbia
My Commission Expires 12-14-2008

DCHAOGC/MVS/R&O Agree CapGate 5-1-05              45

**OWNER:**  **EAST CAPITOL FAMILY RENTAL LIMITED PARTNERSHIP,**
A District of Columbia limited partnership

By: Capgate, LLC, its General Partner

By: A&R/THC, LLC, its Sole Member

By: A & R Development Corp., its Managing Member

By: _____
Cheryl P. Hamilton, Vice President

DISTRICT OF COLUMBIA )

The foregoing instrument was signed and acknowledged before me this 2nd day of May, 2005, by Cheryl P. Hamilton on behalf of East Capitol Family Rental Limited Partnership, a District of Columbia limited partnership.

_____
Notary Public

Print, Type or Stamp Name

Madina M. Robinson
Notary Public, District of Columbia
My Commission Expires 12-14-2008

Personally Known_____ or Produced Identification ✓
Type of Identification Produced  MD DL



**EXHIBIT A**
**Site Description**



LEGAL DESCRIPTION
AREA 1
FUTURE RENTAL UNITS
SQUARE 5246
WASHINGTON
DISTRICT OF COLUMBIA

Being part of Lot 78, Square 5246, as shown on a plat recorded in Book 129 at Page 21, among the records of the Office of the Surveyor of the District of Columbia, also being proposed A&T Lots 848 and 849, Square 5246, and being more particularly described as follows:

Beginning at a point on the western right-of-way line of 58th Street, N.E., variable width right-of-way, said point being common to the northeast corner of the aforesaid Lot 78, Square 5246 and the south side of a 15 foot public alley, thence with said right-of-way line of 58th Street, N.E.

1.  Due South, 64.00 feet to a point; thence leaving said right-of-way line and crossing the aforesaid Lot 78

2.  Due West, 140.00 feet to a point on the east side of a 20 foot public alley as shown on the aforesaid plat, thence with said public alley

3.  Due North, 64.00 feet to a point at the intersection of said 20 foot public alley and the aforesaid south side of a 15 foot public alley, and thence with said south side of said 15 foot public alley

4.  Due East, 140.00 feet to the place of beginning, containing 8,960 square feet or 0.2057 of an acre of land, more or less.



LEGAL DESCRIPTION
AREA 2
FUTURE RENTAL UNITS
SQUARE 5246
WASHINGTON
DISTRICT OF COLUMBIA

Being part of Lot 77, Square 5246, as shown on a plat recorded in Book 129 at Page 21, among the records of the Office of the Surveyor of the District of Columbia, also being proposed A&T Lots 840 thru 843, Square 5246, and being more particularly described as follows:

Beginning at a point distant South 85°48'28" West, 39.96 feet from the northeast corner of the aforesaid Lot 77, thence crossing the aforesaid Lot 77 the following four (4) courses

1.     Due South, 104.00 feet to a point;

2.     Due West, 85.00 feet to a point;

3.     Due North, 104.00 feet to a point; and

4.     Due East, 85.00 feet to the place of beginning, containing 8,840 square feet or 0.2029 of an acre of land, more or less.



LEGAL DESCRIPTION
AREA 3
FUTURE RENTAL UNITS
SQUARE 5246
WASHINGTON
DISTRICT OF COLUMBIA

Being part of Lots 76 and 77, Square 5246, as shown on a plat recorded in Book 129 at Page 21, among the records of the Office of the Surveyor of the District of Columbia, also being proposed A&T Lots 835 thru 838, Square 5246, and being more particularly described as follows:

Beginning at a point on the western right-of-way line of 58th Street, N.E., variable width right-of-way, being distant Due South, 114.35 feet from the northeast corner of the aforesaid Lot 77, thence with said western right-of-way line 58th Street, N.E.

1. Due South, 75.00 feet to a point; thence leaving said right-of-way line and crossing the aforesaid Lots 76 and 77 the following three (3) courses

2. Due West, 104.00 feet to a point;

3. Due North, 75.00 feet to a point; and

4. Due East, 104.00 feet to the place of beginning, containing 7,800 square feet or 0.1791 of an acre of land, more or less.



LEGAL DESCRIPTION
AREA 4
FUTURE RENTAL UNITS
SQUARE 5246
WASHINGTON
DISTRICT OF COLUMBIA

Being part of Lots 56, 75 and 76, and part of 16 foot public alleys (to be closed), Square 5246, as shown on a plat recorded in Book 129 at Page 21, among the records of the Office of the Surveyor of the District of Columbia, also being proposed A&T Lots 813 thru 815 and 817, Square 5246, and being more particularly described as follows:

Beginning at a point on the eastern right-of-way line of 57th Place, N.E., formerly Hollywood Place, 60 feet wide, being distant South 12°02'00" West, 60.96 feet from the northwest corner of the aforesaid Lot 56, thence leaving said right-of-way line of 57th Place, N.E. and crossing the aforesaid lots and public alley the following five (5) courses:

1.    South 84°37'12" East, 62.96 feet to a point;

2.    Due East, 82.00 feet to a point;

3.    Due South, 92.00 feet to a point;

4.    Due West, 153.20 feet to a point; and

5.    North 38°59'00" West, 15.55 feet to a point on the aforesaid eastern right-of-way line of 57th Place, N.E.; thence with said right-of-way line

6.    North 12°02'00" East, 87.75 feet to the place of beginning, containing 14,443 square feet or 0.3316 of an acre of land, more or less.



LEGAL DESCRIPTION
AREA 5
FUTURE RENTAL UNITS
SQUARE 5246
WASHINGTON
DISTRICT OF COLUMBIA


Being Lots 51, 52 and part of Lots 50, 53, and 66 thru 69, and part of a 16 foot public alley (to be closed), Square 5246, as shown on a plat recorded in Book 129 at Page 21, among the records of the Office of the Surveyor of the District of Columbia, also being proposed A&T Lots 811, 818 and 819, Square 5246, and being more particularly described as follows:

Beginning at a point on the eastern right-of-way line of 57th Place, N.E., formerly Hollywood Place, 60 feet wide, being distant North 12°02'00" East, 27.20 feet from the southwest corner of the aforesaid Lot 50, thence with said easterly right-of-way line of 57th Place, N.E.

North 12°02'00" East, 72.64 feet to a point; thence leaving said right-of-way line and crossing the aforesaid Lots 50, 53, 66 thru 69 and the public alley the following five (5) courses:

North 51°01'00" East, 12.58 feet to a point;

Due East, 124.25 feet to a point;

Due South, 82.50 feet to a point,

Due West, 76.36 feet to a point; and

North 87°12'47" West, 72.90 feet to the place of beginning, containing 11,481 square feet or 0.2636 of an acre of land, more or less.



LEGAL DESCRIPTION
AREA 6
FUTURE RENTAL UNITS
SQUARE 5246
WASHINGTON
DISTRICT OF COLUMBIA

Being part of Lots 72 thru 75, Square 5246, as shown on a plat recorded in Book 129 at Page 21, and part of a 16 foot public alley (to be closed), Square 5246, among the records of the Office of the Surveyor of the District of Columbia, also being proposed A&T Lot 825 and 826, Square 5246, and being more particularly described as follows:

Beginning at a point on the western right-of-way line of 58th Street, N.E., 60 feet wide, being distant Due North, 15.96 feet from the southeast corner of the aforesaid Lot 74, thence leaving said right-of-way line of 58th Street and crossing the aforesaid lots and public alley the following four (4) courses

1.    Due West, 67.00 feet to a point;

2.    Due North, 82.50 feet to a point;

3.    Due East, 57.00 feet to a point; and

4.    South 45°00'00" East, 14.14 feet to a point on the aforesaid western right-of-way line of 58th Street, N.E., 60 feet wide, thence with said right-of-line of 58th Street, N.W.

5.    Due South, 72.50 feet to the place of beginning, containing 5,478 square feet or 0.1257 of an acre of land, more or less.



LEGAL DESCRIPTION
AREA 7
FUTURE RENTAL UNITS
SQUARE 5280
WASHINGTON
DISTRICT OF COLUMBIA

Being parts of Lots 25 thru 28, Square 5280, as shown on a plat recorded in Book 78 at Page 5, Lots 172 thru 174 and part of Lots 168 thru 171 and 175, Square 5280 and part of a 16 foot public alley (to be closed), Square 5280, as shown on a plat recorded in Book 129 at Page 23, among the records of the Office of the Surveyor of the District of Columbia, also being proposed A&T Lots 828 and 886, Square 5280, and being more particularly described as follows:

Beginning at a point on the eastern right-of-way line of 56th Place, S.E., 60 feet wide, being distant North 11°15'43" West, 85.00 feet from the intersection of said eastern right-of-way line of 56th Street, S.E. and the northern right-of-way line of 'A' Street, S.E., 60 feet wide, thence with said right-of-way line of 56th Place, S.E.

1.    North 11°15'43" West, 89.92 feet to a point; thence leaving said right-of-way line and crossing the aforesaid Lots 25 thru 28, 168 thru 171, 175 and the 16 foot public alley the following four (4) courses;

2.    North 78°44'17" West, 101.44 feet to a point;

3.    Due East, 113.93 feet to a point;

4.    Due South, 69.00 feet to a point; and

5.    South 78°44'17" West, 199.70 feet to the place of beginning, containing 17,470 square feet or 0.4011 of an acre of land, more or less.



LEGAL DESCRIPTION
AREA 8
FUTURE RENTAL UNITS
SQUARE 5280
WASHINGTON
DISTRICT OF COLUMBIA


Being part of Lot 5, Square 5280, as shown on a plat recorded in Book 15 at Page 35, and part of Lot 105, Square 5280, as shown on a plat recorded in Book 135 at Page 38 among the records of the office of the Surveyor of the District of Columbia, also being proposed A&T Lots 838 thru 842, Square 5280, and being more particularly described as follows:

Beginning at a point distant South 04°06'56" West, 125.32 feet from the northeast corner of the aforesaid Lot 105, Square 5280, thence crossing said Lots 5 and 105 the following eight (8) courses:

1.     South 45°00'00" East, 7.07 feet to a point;

2.     Due South, 116.00 feet to a point;

3.     South 45°00'00" West, 7.07 feet to a point;

4.     Due West, 80.00 feet to a point;

5.     Due North, 84.78 feet to a point of curvature;

6.     36.23 feet along the arc of a curve, deflecting to the right, having a radius of 172.50 feet and a chord bearing North 06°01'00" East, 36.16 feet to a point of tangency;



7. North 12°02'00" East, 5.38 feet to a point; and

8. Due East, 75.09 feet to the place of beginning containing 10,617 square feet or 0.2437 of an acre of land, more or less.



## LEGAL DESCRIPTION
## AREA 9
## FUTURE RENTAL UNITS
## SQUARE 5280
## WASHINGTON
## DISTRICT OF COLUMBIA

Being part of Lots 157 thru 160, Square 5280, as shown on a plat recorded in Book 129 at Page 23 and part of a 16 foot public alley (to be closed), Square 5280, recorded among the records of the office of the Surveyor of the District of Columbia, also being proposed A&T Lot 878, Square 5280, and being more particularly described as follows:

Beginning at a point on the northern right-of-way line of 'A' Street, S.E. 60 wide, being distant 5.67 feet along the arc of a curve deflecting to the left, having a radius of 320.00 feet and a chord bearing South 84°40'57" West, 5.67 feet, from the southeast corner of the aforesaid Lot 159, Square 5280, thence with said northerly right-of-way line of 'A' Street the following two (2) courses:

1.  30.36 feet along an arc of a curve, deflecting to the left, having a radius of 320.00 feet and a chord bearing South 81°27'23" West, 30.35 feet to a point of tangency; thence

2.  South 78°44'17" West, 27.57 feet to a point; thence leaving said right-of-way line and crossing the aforesaid lots and public alley the following six (6) courses:

3.  North 56°15'43" West, 14.14 feet to a point;

4.  North 11°15'43" West, 16.03 feet to a point of curvature;

5.  33.91 feet along an arc of a curve deflecting to the right, having a radius of 172.50 feet and a chord bearing North 05°37'52" West, 33.85 feet to a point of tangency;

6.  Due North, 38.84 feet to a point;

7.  Due East, 75.27 feet to a point; and

8.  Due South, 86.21 feet to the place of beginning, containing 6,713 square feet or 0.1541 of an acre of land, more or less.



LEGAL DESCRIPTION
AREA 10
FUTURE RENTAL UNITS
SQUARE 5280
WASHINGTON
DISTRICT OF COLUMBIA

Being part of Lot 105, Square 5280, as shown on a plat recorded in Book 135 at Page 38, part of Lots 152 thru 156, Square 5280, as shown on a plat recorded in Book 129 at Page 23, and part of 57th Street, S.E. (to be closed), Square 5280 among the records of the office of the Surveyor of the District of Columbia, also being proposed A&T Lots 870 thru 874, Square 5280 and being more particularly described as follows:

Beginning at a point distant South 07°17'49" East, 126.02 feet from the northeast corner of the aforesaid Lot 105, Square 5280 thence crossing the aforesaid lots and 57th Street, S.E. the following six (6) courses:

1.   Due East, 80.00 feet to a point;

2.   Due South, 126.00 feet to a point;

3.   Due West, 80.00 feet to a point;

4.   North 45°00'00" West, 7.07 feet to a point;

5.   Due North, 116.00 feet to a point; and

6.   North 45°00'00" East, 7.07 feet to the place of beginning containing 10,685 square feet or 0.2453 of an acre of land, more or less.



LEGAL DESCRIPTION
AREA 11
FUTURE RENTAL UNITS
SQUARE 5280
WASHINGTON
DISTRICT OF COLUMBIA

Being Lots 113, 114 and part of Lot 105, 111 and 112, Square 5280, as shown on a plat recorded in Book 135 at Page 38, and part of Lots 151 thru 153, Square 5280 a shown on a plat recorded in Book 129 at Page 23, among the records of the office of the Surveyor of the District of Columbia, also being proposed A&T Lots 835 thru 837, Square 5280 and being more particularly described as follows:

Beginning at a point on the southern right-of-way line of East Capitol Street, 90 feet wide, said point being the northeast corner of the aforesaid Lot 114, Square 5280; thence leaving said right-of-way line of East Capitol Street with the easterly line of said Lot 114

1.   Due South, 125.00 feet to a point; thence crossing the aforesaid Lots 105, 111, and 151 thru 153 the following three (3) courses

2.   Due West, 77.50 feet to a point;

3.   Due North, 115.00 feet to a point; and

4.   North 45°00'00" East, 14.14 feet to a point on the aforesaid southern right-of-way line of East Capitol Street, thence with said southern right-of-way line of East Capitol Street

5.   Due East, 67.50 feet to the place of beginning, containing 9,638 square feet or 0.2212 of an acre of land, more or less.



LEGAL DESCRIPTION
AREA 12
FUTURE RENTAL UNITS
SQUARE 5280
WASHINGTON
DISTRICT OF COLUMBIA


Being Lots 142, 143, part of Lots 141, 144, 147 thru 150, and 181, Square 5280, as shown on a plat recorded in Book 129 at Page 23 and part of a 16 foot public alley (to be closed), Square 5280, as shown among the records of the office of the Surveyor of the District of Columbia, also being proposed A&T Lot 862, Square 5280, and being more particularly described as follows:

Beginning at a point distant Due South, 69.48 feet from the northeast corner of the aforesaid Lot 150, Square 5280, thence with part of the eastern line of said Lot 150, Square 5280

1.    Due South, 34.76 feet to a point; thence

2.    North 78°44'15" East, 44.01 feet to a point; thence crossing the aforesaid Lots 141, 181 and 16 foot public alley

3.    South 37°34'17" West, 133.20 feet to a point on the northern right-of-way line of 57th Street, S.E., 60 feet wide, thence with said right-of-way line of 57th Street, S.E.

4.    14.33 feet along an arc of a curve deflecting to the left, having a radius of 200.00 feet and a chord bearing North 58°02'33" West, 14.33 feet to a point of compound curvature; and



5.   41.59 feet along an arc of a curve deflecting to the left, having a radius of 320.00 feet and a chord bearing North 63°49'06" West, 41.56 feet to a point; thence leaving said right-of-way line and crossing the aforesaid Lots 144, 147 thru 150 and the 16 foot public alley, Square 5280, the following five (5) courses;

6.   North 25°48'15" West, 13.31 feet to a point;

7.   North 15°56'00" East, 25.73 feet to a point of curvature;

8.   63.26 feet along an arc of a curve deflecting to the left, having a radius of 227.50 feet and a chord bearing North 07°58'00" West, 63.06 feet to a point of tangency;

9.   Due North, 6.64 feet to a point; and

10.  Due East, 77.50 feet to the place of beginning, containing 10,502 square feet or 0.2411 of an acre of land, more or less.



LEGAL DESCRIPTION
AREA 13
FUTURE RENTAL UNITS
SQUARE 5280
WASHINGTON
DISTRICT OF COLUMBIA


Being Lots 185 thru 191, and part of Lots 183, 184 and 192, Square 5280, as shown on a plat recorded in Book 129 at Page 23 among the records of the office of the Surveyor of the District of Columbia, also being proposed A&T Lots 890 thru 898, Square 5280 and being more particularly described as follows:

Beginning at a point on the western right-of-way line of 58th Street, S.E., 60 feet wide, distant South 11°15'45" East, 6.38 feet from the northeast corner of the aforesaid Lot 183, Square 5280, thence with said western right-of-way line of 58th Street, S.E.

1. South 11°15'45" East, 232.00 feet to a point; thence leaving said right-of-way line and crossing the aforesaid Lot 192, Square 5280

2. South 78°44'15" West, 90.00 feet to a point on the easterly side of a 16 foot public alley; thence with said easterly side of the 16 foot public alley and crossing the aforesaid Lots 183 and 184, Square 5280

3. North 11°15'45" West, 232.00 feet to a point; and

4. North 78°44'15" East, 90.00 feet to the place of beginning, containing 20,925 square feet or 0.4804 of an acre of land, more or less.



LEGAL DESCRIPTION
AREA 14
FUTURE RENTAL UNITS
SQUARE 5280
WASHINGTON
DISTRICT OF COLUMBIA


Being Lots 196 thru 198 and part of lots 195 and 199, Square 5280, as shown on a plat recorded in Book 129 at Page 23 among the records of the office of the Surveyor of the District of Columbia, also being proposed A&T Lots 902 thru 906, Square 5280 and being more particularly described as follows:

Beginning at a point on the western right-of-way line of 58th Street, S.E., 60 feet wide, distant South 11°15'45" East, 8.84 feet from the northeast corner of the aforesaid Lot 195, Square 5280, thence with said western right-of-way line of 58th Street, S.E.

1.    South 11°15'45" East, 126.00 feet to a point; thence leaving said right-of-way line and crossing the aforesaid Lot 199, Square 5280

2.    South 78°44'15 " West, 90.00 feet to a point; thence continuing crossing said Lot 199 and in part with the easterly side of a 16 foot public alley

3.    North 11°15'45" West, 126.00 feet to a point; thence crossing the aforesaid Lot 195, Square 5280

4.    North 78°44'15" East, 90.00 feet to the place of beginning, containing 11,340 square feet or 0.2603 of an acre of land, more or less.



LEGAL DESCRIPTION
AREA 15
FUTURE RENTAL UNITS
SQUARE 5281
WASHINGTON
DISTRICT OF COLUMBIA


Being Lots 76, 77 and part of Lots 75 and 78, Square 5281, as shown on a plat recorded in Book 129 at Page 23 and part of a 16 foot public alley (to be closed), Square 5281 among the records of the office of the Surveyor of the District of Columbia, also being proposed A&T Lot 858, Square 5281 and being more particularly described as follows:

Beginning at a point on the southern right-of-way line of 'A' Street, S.E., 60 feet wide, distant North 78°44'17" East, 12.09 feet from the northwest corner of the aforesaid Lot 75, Square 5281, thence with said southerly right-of-way line of 'A' Street,

North 78°44'17" East, 25.07 feet to a point of curvature; and thence

50.75 feet along the arc of a curve deflecting to the right, having a radius of 260.00 feet and a chord bearing North 84°19'48" East, 50.67 feet to a point; thence leaving said right-of-way line and crossing the aforesaid Lots 75, 78 and the said 16 foot public alley the following five (5) courses:

1.     South 00°04'41" East, 80.67 feet to a point;

2.     North 88°27'06" West, 7.13 feet to a point;

3.     South 78°44'17" West, 62.90 feet to a point;

4.     North 11°15'43" West, 72.50 feet to a point; and

5.     North 33°44'17" East, 14.14 feet to the place of beginning, containing 6,332 square feet or 0.1454 of an acre of land, more or less.



LEGAL DESCRIPTION
AREA 16
FUTURE RENTAL UNITS
SQUARE 5281
WASHINGTON
DISTRICT OF COLUMBIA

Being Lots 52, 53, 120, 121 and part of lots 50, 51, 54, 55, 119, and 122, Square 5281, as shown on a plat recorded in Book 129 at Page 23, part of a 16 foot public alley (to be closed), Square 5281, and part of 57th Street, S.E. (to be closed), among the records of the office of the Surveyor of the District of Columbia, also being proposed A&T Lots 840 thru 843 and 881 thru 883, Square 5281 and being more particularly described as follows:

Beginning at a point on the eastern right-of-way line of 56th Place, S.E., 60 feet wide, distant North 11°15'43" West, 20.86 feet from the southwest corner of the aforesaid Lot 50, Square 5281, thence with said southerly right-of-way line of 56th Place, S.E.

1.    North 11°15'43" West, 121.00 feet to a point; thence leaving said right-of-way line and crossing the aforesaid Lots 54, 55, 119, Square 5281 and the said 16 foot public alley, the following three (3) courses:

2.    North 78°44'17" East, 97.50 feet to a point;

3.    South 11°15'43" East, 17.62 feet to a point; and

4.    North 65°09'27" East, 124.71 feet to a point in the right-of-way of 57th Place, S.E., 60 feet wide, thence crossing said right-of-way of 57th Place, S.E.



5. 41.18 feet along the arc of a curve deflecting to the left, having a radius of 1030.00 feet and a chord bearing South 25°59'16" East, 41.18 feet to a point of tangency, said point being on the southern right-of-way line of said 57th Place, S.E., thence with said right-of-way line

6. South 27°08'00" East, 40.56 feet to a point, thence leaving said right-of-way and crossing the aforesaid Lots 50, 51, 122 and the 16 foot public alley, the following three (3) courses;

7. South 62°52'00" West, 148.44 feet to a point;

8. South 11°15'43" East, 13.23 feet to a point; and

9. South 78°44'17" West, 97.50 feet to the place of beginning, containing 23,306 square feet or 0.5350 of an acre of land, more or less.



LEGAL DESCRIPTION
AREA 17
FUTURE RENTAL UNITS
SQUARE 5281
WASHINGTON
DISTRICT OF COLUMBIA

Being part of Lot 1, Square 5281, as shown on a plat recorded in Book 15 at Page 35, among the records of the office of the Surveyor of the District of Columbia, also being proposed A&T Lots 821 and 822, Square 5281 and being more particularly described as follows:

Beginning at a point on the western right-of-way line of Southern Avenue, 60 feet wide, said point being the northeast corner of Lot 140, Square 5281, as per plat recorded in Book 152 at Plat 186, among the aforesaid records of the Office of the Surveyor of the District of Columbia; thence leaving said right-of-way line of Southern Avenue and with the southern outline of said Lot 1 with northern outline of said Lot 140

1.  North 73°32'00" West, 118.80 feet to a point; thence crossing the aforesaid Lot 1, Square 5281

2.  North 45°02'00" East, 103.83 feet to a point; and

3.  South 44°58'00" East, 104.33 feet to a point on the aforesaid western right-of-way line of Southern Avenue, thence with said right-of-way line

4.  South 45°02'00" West, 47.02 feet to the place of beginning, containing 7,870 square feet or 0.1807 of an acre of land, more or less.



LEGAL DESCRIPTION
AREA 18
FUTURE RENTAL UNITS
SQUARE 5279
WASHINGTON
DISTRICT OF COLUMBIA

Being part of Lots 27 thru 29, Square 5279, as shown on a plat recorded in Book 71 at Page 63, part of Lot 49, Square 5279 as shown on a plat recorded in Book 145 at Page 193 and part of Lot 53, Square 5279 as shown on a plat recorded in Book 158 at Page 5 among the records of the office of the Surveyor of the District of Columbia, also being proposed A&T Lots 824 thru 828, Square 5279 and being more particularly described as follows:

Beginning at a point on the southern right-of-way line of East Capitol Street, 90 feet wide, distant due East, 153.49 feet form the intersection of the said southern right-of-way with the easterly right-of-way line of 58th Street, S.E., 60 feet wide, thence with said southern right-of-way line of East Capitol Street

1.  Due East, 126.00 feet to a point, thence leaving said right-of-way line and crossing the aforesaid Lots 27 thru 29, 49 and 53, Square 5279 the following three (3) courses

2.  Due South, 120.00 feet to a point;

3.  Due West, 126.00 feet to a point; and

4.  Due North, 120.00 feet to the place of beginning, containing 15,120 square feet or 0.3471 of an acre of land, more or less.



EXHIBIT B

# DOFA Phasing



KEY

A   Senior Building
B   Multi-Family Apartment Building
C   Community Center
D   Commercial Center
D-1 Multi-tenant Buildings, 5,600 s.f.
D-2 Multi-tenant Buildings, 7,000 s.f.
D-3 Single tenant Buildings, 1,000 s.f.
D-4 Pad Site Buildings, 7,000 s.f.
D-5 Multi-tenant Buildings, 3,200 s.f.
D-6 Multi-tenant Building 6,600 s.f.
D-7 Supermarket 55,000 s.f.
D-8 Multi-tenant Building 7,200 s.f.

